**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

THE STATE OF LOUISIANA,
By and through its Attorney General, Elizabeth
B. Murrill;

THE STATE OF TEXAS,
By and through its Attorney General,
Ken Paxton;

THE STATE OF MISSISSIPPI,
By and through its Attorney General,
Lynn Fitch;

THE STATE OF ALABAMA,
By and through its Attorney General,
Steve Marshall;

CIVIL ACTION NO. _____

THE STATE OF ALASKA,
By and through its Attorney General,
Treg Taylor;

THE STATE OF ARKANSAS,
By and through its Attorney General,
Tim Griffin;

THE STATE OF FLORIDA,
By and through its Attorney General,
Ashley Moody;

THE STATE OF GEORGIA,
By and through its Attorney General,
Christopher M. Carr;

THE STATE OF KANSAS,
By and through its Attorney General,
Kris W. Kobach;

THE STATE OF MONTANA,
By and through its Attorney General,
Austin Knudsen;

THE STATE OF NEBRASKA,
By and through its Attorney General,
Michael T. Hilgers;

THE STATE OF OKLAHOMA,
By and through its Attorney General,
Gentner Drummond;

THE STATE OF SOUTH CAROLINA,
By and through its Attorney General,
Alan Wilson;

THE STATE OF UTAH,
By and through its Attorney General,
Sean D. Reyes;

THE STATE OF WEST VIRGINIA,
By and through its Attorney General,
Patrick Morrisey

THE STATE OF WYOMING,
By and through its Attorney General,
Bridget Hill,

PLAINTIFFS,

v.

JOSEPH R. BIDEN, JR., in his official capacity
as President of the United States;

THE U.S. DEPARTMENT OF ENERGY;

JENNIFER GRANHOLM, in her official ca-
pacity as Secretary of Energy;

DAVID M. TURK, in his official capacity as
Deputy Secretary of Energy;

GERI RICHMOND, in her official capacity as
Under Secretary for Science and Innovation;

BRAD CRABTREE, in his official capacity as
Assistant Secretary, Office of Fossil Energy and
Carbon Management;

AMY SWEENEY, in her official capacity as Di-
rector, Office of Fossil Energy and Carbon
Management,

DEFENDANTS.

## COMPLAINT

The State of Louisiana, along with the States of Alabama, Alaska, Arkansas, Florida, Georgia, Kansas, Mississippi, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, West Virginia, and Wyoming bring this civil action against the above-listed Defendants for declaratory and injunctive relief and allege as follows:

## INTRODUCTION

1.      President Biden began his presidency by issuing an unlawful moratorium on offshore and onshore oil-and-gas leasing. *Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022). Almost three years to the day later, his administration followed the same playbook to unlawfully ban new liquified natural gas (LNG) exports. On January 26, 2024, President Biden and the Department of Energy decided to stop *all* new approvals of LNG exports to non-Free-Trade-Agreement countries effective immediately—what the media has termed the "LNG Export Ban." *See* R. Liao & S. Stapczynski, *Biden's LNG export ban stalls projects and risks U.S. market share*, World Oil (Mar. 15, 2024), https://perma.cc/ZA5F-CPWD. This ban disregards statutory mandates, flouts the normal regulatory process, upends the industry, disrupts Plaintiffs' economies, and subverts our constitutional structure. These unlawful actions leave Plaintiffs with no choice but to once more turn to the courts to enforce the law.

2.      The Department's own actions six months before Defendants announced the LNG Export Ban confirm the ban's unlawfulness. Just months ago, the Department acknowledged that "there is no factual or legal basis" for exactly what the LNG Export Ban does—"halt approval of pending applications to export LNG." DOE, *Order Denying Petition for Rulemaking on Exports of Liquefied Natural Gas* at 27 (July 18, 2023), https://perma.cc/TB8Y-56TV ("July 2023 Decision"). That is why the Department issued a 35-page order denying an environmental coalition's petition asking it to

1

"[g]rant no more licenses for LNG export . . . until it has completed a final revision of its policy guidelines … on LNG export." *Id.* at 9.

3.      Now—in the midst of an election year, and after a sustained pressure campaign from billionaire conglomerates, celebrities, "influencers," and banks—the Biden Administration acts as if its July 2023 Decision does not exist. The Administration likewise ignores the Natural Gas Act's presumption in favor of exports, decades of agency policy, and State and private reliance on exports.

4.      But ours is a nation of laws and administrative transparency. Accordingly, the whims of activists cannot override the Natural Gas Act's clear command that the Secretary "*shall* issue" an export license "*unless*, after opportunity for hearing, [the Secretary] finds that the proposed exportation or importation will not be consistent with the public interest." 15 U.S.C. § 717b(a) (emphasis added). Nor can such whims overcome the Administrative Procedure Act's transparency-forcing rulemaking procedures and command that agency action be reasonable and reasonably explained on an administrative record.

5.      The Court should therefore uphold the rule of law and grant the relief requested by Plaintiffs, who are currently being harmed by the unlawful LNG Export Ban.

## PARTIES

6.      Plaintiff State of Louisiana is a sovereign State of the United States of America. Elizabeth B. Murrill is the Attorney General of the State of Louisiana. She is authorized by Louisiana law to sue on the State's behalf. LA. CONST. art. IV, § 8. Her offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

7.      Plaintiff State of Alabama is a sovereign State of the United States of America. Alabama sues to vindicate its sovereign, proprietary, and quasi-sovereign interests. The LNG Export Ban will harm Alabama and its citizens.

8.      Plaintiff State of Alaska is a sovereign State of the United State of America. Treg Taylor is the Attorney General of the State of Alaska and authorized under Alaska law to sue on the State's behalf.

9.      Plaintiff State of Arkansas is a sovereign State of the United States of America. Arkansas sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. In particular, Arkansas produces natural gas and seeks to protect its economy, tax revenues, and other revenues harmed by the LNG Export Ban. Tim Griffin is the Attorney General of Arkansas. General Griffin is authorized to "maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts." ARK. CODE ANN. §25-16-703(a).

10.     Plaintiff State of Florida is a sovereign State of the United States of America. Ashley Moody is the Attorney General of the State of Florida and is authorized by law to sue on the State's behalf. FLA. STAT. § 16.01. The State of Florida "maintains a sovereign and proprietary interest in protecting" economic injury to its political subdivisions. *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1253 (M.D. Fla. 2021).

11.     Plaintiff State of Georgia is a sovereign State of the United States of America. Georgia sues to vindicate its sovereign, proprietary, and quasi-sovereign interests. The export ban will harm Georgia and its citizens, especially by reducing economic activity at Georgia's ports.

12.     Plaintiff State of Kansas is a sovereign State of the United States of America. Kris W. Kobach is the Attorney General of the State of Kansas. He is authorized by Kansas law to sue on the State's behalf. KAN. STAT. ANN. § 75-702(a). His offices are located at 120 SW 10th Avenue, 2nd Floor, Topeka, Kansas 66612.

13.     Plaintiff State of Mississippi is a sovereign State of the United States of America. Lynn Fitch is the Attorney General of the State of Mississippi. She is authorized by Mississippi law to sue on the State's behalf. Her offices are located at 550 High Street, Suite 1200, Jackson, Mississippi 39201.

14.     Plaintiff State Montana is a sovereign State of the United States of America. Montana sues to vindicate its sovereign, proprietary, and quasi-sovereign interests. The LNG Export Ban will harm Montana and its citizens.

15.     Plaintiff State of Nebraska is a sovereign State of the United States of America. Michael T. Hilgers is the Attorney General of the State of Nebraska. He is authorized by Nebraska law to sue on the State's behalf. His offices are located at 2115 State Capitol, Lincoln, Nebraska 68509.

16.     Plaintiff State of Oklahoma is a sovereign State of the United States of America. Plaintiff Gentner Drummond is the Attorney General of the State of Oklahoma. He is authorized by Oklahoma law to sue on the State's behalf. His offices are located at 313 Northeast Twenty-First Street, Oklahoma City, Oklahoma 73105.

17.     Plaintiff State of South Carolina is a sovereign State of the United States of America. Alan Wilson is the Attorney General of the State of South Carolina. He is authorized by South Carolina law to sue on the State's behalf. His offices are located at 1000 Assembly Street, Columbia, South Carolina 29201.

18.     Plaintiff State of Texas is a sovereign State of the United States of America. Plaintiff the State of Texas, by and through its Attorney General, brings this suit to assert the rights of the State and on behalf of its citizens. *See* Tex. Const. art. IV, § 22; Tex. Gov't Code Ch. 402; *see also* Tex. H.B. 1, art. IX, § 16.01, 82nd Tex. Leg., R.S. (2011). Uniquely, when Texas joined the Union, it retained its vacant and unappropriated lands "to be disposed of as said State may direct . . . ." *United States v. Texas*, 339 U.S. 707, 714 (1950); *see also* Tex. Nat. Res. Code § 11.011. Accordingly, the Texas Constitution established the Permanent School Fund and dedicated to it the State's unappropriated public lands as a perpetual endowment supporting Texas public schools Tex. Const. art. VII, §§ 2, 5, Tex. Nat. Res. Code § 11.041. The Texas General Land Office is tasked with the supervision and management of the more than thirteen million acres of state-owned lands dedicated to the Permanent

School Fund. TEX. CONST. art. VII, § 1; TEX. NAT. RES. CODE §§ 31.051, 51.011, 51.012. The Texas General Land Office has a fiduciary duty to maximize revenues from state-owned lands and minerals for the benefit of the Permanent School Fund and distributes hundreds of millions of dollars annually to Texas public schools. *See Rutherford Oil Corp. v. Gen. Land Off. of State of Tex.*, 776 S.W.2d 232, 235 (Tex. App.—Austin 1989, no writ).

19.     Plaintiff State of Utah is a sovereign State of the United States of America. Utah sues to vindicate its sovereign, proprietary, and quasi-sovereign interests. Sean D. Reyes is the Attorney General of Utah. He is authorized by Utah law to sue on Utah's behalf. His offices are located at 350 N. State Street, Suite 230, Salt Lake City, Utah 84114. The LNG Export Ban will harm Utah and its citizens.

20.     Plaintiff State of West Virginia is a sovereign State of the United States of America. Plaintiff Patrick Morrisey is the Attorney General of the State of West Virginia. The Attorney General "is the State's chief legal officer," *State ex rel. McGraw v. Burton,* 569 S.E.2d 99, 107 (W. Va. 2002), and his express statutory duties include "appear[ing] as counsel for the state in all causes pending . . . in any federal court[] in which the state is interested," W. VA. CODE § 5-3-2. His offices are located at the State Capitol Complex, Bldg. 1, Rm E-26, 1900 Kanawha Blvd. E., Charleston, West Virginia 25305.

21.     Plaintiff State of Wyoming is a sovereign State of the United States of America. Bridget Hill is the Attorney General of the State of Wyoming. She is authorized by Wyoming law to sue on the State's behalf. *See* WYO. STAT. ANN. § 9-1-603(a). Her offices are located at 109 State Capitol, Cheyenne, Wyoming.

22.     Defendants are responsible for promulgating or implementing the LNG Export Ban.

23.     Defendant Joseph R. Biden Jr. is the President of the United States. He is sued in his official capacity.

5

24.     Defendant United States Department of Energy is an executive department of the United States government headquartered in Washington, DC, and is statutorily responsible for administering the LNG Export program. *See* 15 U.S.C. §§ 717a(9), 717b(a); 42 U.S.C. § 7151; *see also Sierra Club v. FERC*, 827 F.3d 59, 62–63 (D.C. Cir. 2016).

25.     Defendant Jennifer Granholm is the Secretary of the Department of Energy. She administers the LNG export program. *See* 15 U.S.C. §§ 717a(9), 717b(a); 42 U.S.C. § 7151. She is sued in her official capacity.

26.     Defendant Donald M. Turk is the Deputy Secretary of the Department of Energy. He has a role in promulgating and implementing the LNG Export Ban. He is sued in his official capacity.

27.     Defendant Geri Richmond is the Under Secretary for Science and Innovation at the Department of Energy. Her office is responsible for overseeing the Office of Fossil Energy and Carbon Management. She is sued in her official capacity.

28.     Defendant Brad Crabtree is the Assistant Secretary of Energy, Office of Fossil Energy and Carbon Management at the Department of Energy. His office is responsible for administering the LNG export program. *See* DOE Redelegation Order No. S4-DEL-FE1-2023 (April 10, 2023), https://perma.cc/MP5R-JJBW; *see also Sierra Club v. FERC*, 827 F.3d at 63. He is sued in his official capacity.

29.     Defendant Amy Sweeney is the Director of the Office of Fossil Energy and Carbon Management, a component of the Department of Energy. 10 C.F.R. §§ 590.102, 590.201. Her office is responsible for processing LNG export applications. She is sued in her official capacity.

## JURISDICTION AND VENUE

30.     This Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 701–06. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant

declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 705–06, and its inherent equitable powers.

31.     The LNG Export Ban is a final agency action that is judicially reviewable under the Administrative Procedure Act. 5 U.S.C. §§ 704, 706.

32.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because (1) Defendants are United States agencies or officers sued in their official capacities, (2) the State of Louisiana is a resident of this judicial district, (3) no real property is involved, and (4) a substantial part of the events or omissions giving rise to the Complaint occurs within this judicial district. *See Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1982); *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020).

## BACKGROUND

### I.     With the Shale Gas Boom and LNG Exports, the Natural Gas Industry Has Bolstered the Economy and Energy Security.

33.     The United States is experiencing a shale gas boom, which has increased opportunities for natural gas production.

34.     The shale revolution and increased production opportunities have a profound effect on the United States. Nearly 187 million Americans use natural gas, and the natural gas industry currently supports over four million jobs. *Cleaner Energy by the Numbers*, Am. Gas Ass'n, https://perma.cc/7TZK-P6DN.

35.     As a result, the United States is the world leader in natural gas production and ranked first in the world in natural gas exports, at eight-six million metric tons, in 2023. B. Cahill, *U.S. LNG Export Boom: Defining National Interests*, CSIS (Jan. 11, 2024), https://perma.cc/5MEG-MRSL; *see also* M. Pistilli, *Top 10 Countries for Natural Gas Production*, Investing News Network (Oct. 25, 2023), https://perma.cc/USJ5-KR6E.

36. Natural gas can be converted from gas form into liquid form—known as LNG—for storage and transportation.

37. LNG "is produced by purifying natural gas and super-cooling it to -260°F to turn it into a liquid. During the process known as liquefaction, natural gas is cooled below its boiling point, removing most of the extraneous compounds found in the fuel. The remaining natural gas is primarily methane with small amounts of other hydrocarbons." *Natural Gas Fuel Basics*, DOE, https://perma.cc/NA6M-WMPP.

38. Because "more energy can be stored by volume" with LNG than when it remains in gas form, LNG can be easier to transport and store. *Id.* It can also be safer for transportation and storage, because it is less "prone to accidents like explosions." M. James, *What are the advantages of lng over natural gas in terms of transportation and safety?*, LNG Transfer (Aug. 7, 2020), https://perma.cc/E5Z4-JQHK.

39. In reliance on the longstanding LNG statutory and regulatory framework, companies have poured billions of dollars into LNG production and export. Since 2016, the United States has increased its LNG export capacity to 11.6 billion cubic feet per day. K. Fleury, *U.S. Exports of Natural Gas Set a Record High in the first Half of 2023*, U.S. Energy Info. Admin. (Oct. 4, 2023), https://perma.cc/R6QW-ARPY.

40. LNG exports are thus an "economic engine" with "positive economic impacts," such as "GDP growth, more jobs and higher wages." H. Vidas, *Impact of LNG Exports on the U.S. Economy: A Brief Update*, ICF (Sept. 11, 2017), at 5–6, 43, https://perma.cc/7CU5-KUGL. LNG exports have already created numerous jobs and increased GDP, and these benefits are expected to continue. *See id.* at 5 (projecting that LNG exports will create 73,100 to 452,300 jobs and increase GDP by $15.6 to $73.6 billion).

41.     Moreover, with continued investment in infrastructure and increasing production, the United States can continue to have "sufficient natural gas resources" for export and domestic needs at reasonably low prices. *See, e.g.*, NERA Economic Consulting, *Analysis of U.S. Natural Gast Market Price Impacts from Increasing Natural Gas Supply Accessibility for Different Natural Gas Demand Outlooks* (May 22, 2023), at 8, https://perma.cc/5NTY-BMYN. Indeed, U.S. LNG prices have been amongst the lowest in the world. *See* Int'l Energy Agency, *Gas Market Report, Q2-2023* (May 2023), at 31, https://perma.cc/9XBN-U8LP.

## II.  Congress Established a Legal Framework that Presumes Natural Gas Exports Are in the Public Interest.

42.     In 1938, Congress enacted the Natural Gas Act for the "principal purpose" of "encourag[ing] the orderly development of plentiful supplies of electricity and natural gas at reasonable prices." *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669-70 (1976). The Act's text and framework reflect this purpose and Congress's policy determination that allowing exports and imports of natural gas generally furthers this interest.

43.     Congress statutorily directs entities wanting to export natural gas to a foreign country to apply and "secure[] an order of the [Secretary of the Department of Energy] authorizing it to do so."[1] 15 U.S.C. § 717b(a). The statute then mandates that the Secretary "issue such order upon

---

[1] Initially, the Act tasked the now-defunct Federal Power Commission with approving LNG export applications. In 1977, however, Congress abolished that agency, "created the Federal Energy Regulatory Commission, and transferred the [§ 717b(a)] authority to the Secretary of the Department of Energy." *Sierra Club*, 827 F.3d at 62. In the Energy Policy Act of 2005, Congress vested the Department with the authority to "approve or deny an application for the siting, construction, expansion, or operation of [an LNG] terminal" in addition to its authority over LNG exports. Pub. L. No. 109-58, § 311(c) (codified at 15 U.S.C. § 717b(e)(1)). The Secretary, in turn, delegated the construction and operation approval authority to the Federal Energy Regulation Commission, but retained the authority to approve the import and export of natural gas under § 717b(a). *See* DOE, Delegation Order No. S1-DEL-FERC-2006, §1.21 (May 16, 2006), https://perma.cc/4M82-MPAG; *see also* Dep't of Energy Redelegation Order No. S4-DEL-FE1-2023 (April 10, 2023), https://perma.cc/D98Z-SJTG (delegating § 717b(a) approval authority to Assistant Secretary of Energy for Fossil Energy and Carbon Management).

9

application, unless, after opportunity for hearing, [the Secretary] finds that the proposed exportation or importation will not be consistent with the public interest." *See id.* ("*shall* issue" (emphasis added)); *Kingdom Technologies, Inc. v. United States*, 579 U.S. 162, 172 (2016) ("When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty.").

44.     Section 717b(a) accordingly commands the Secretary to entertain and grant a natural gas export application *unless* she makes an affirmative finding that doing so would be against the public interest. *Sierra Club v. DOE*, 867 F.3d 189, 203 (D.C. Cir. 2017) (*Sierra Club I*) ("[T]here must be 'an affirmative showing of inconsistency with the public interest' to deny the application."). And such a finding must be supported by substantial evidence and cannot be arbitrary and capricious. *See* 15 U.S.C. § 717r(b); *W. Virginia Pub. Servs. Comm'n v. DOE*, 681 F.2d 847, 852-53 (D.C. Cir. 1982).

45.     Section 717b(a) thus "sets out a general presumption favoring … authorization" of natural gas exports and imports. *W.Va. Pub. Servs. Comm'n*, 681 F.2d at 856 (citing *Cia Mexicana De Gas, S.A., v. Fed. Power Comm'n*, 167 F.2d 804, 806 (5th Cir. 1948)); *see also Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 847 F.2d 1168, 1176 (5th Cir. 1988) ("[A]uthorization of an import is to be presumed appropriate under section 3 [of the Natural Gas Act, 15 U.S.C. § 717b(a)]."). And for countries with which the United States has a Free-Trade Agreement, the Act (as amended) goes even further: it "'deem[s]' export 'to be consistent with the public interest, and applications for such . . . exportation shall be granted without modification or delay." 15 U.S.C. § 717b(c). Accordingly, the statutory text reflects Congress's policy determination that allowing natural gas exports and imports is generally in the public interest and that allowing natural gas exports to Free-Trade-Agreement nations is always in the public interest.

46.     It is not just the text of § 717b(a) that demonstrates the Secretary must entertain natural gas export applications and grant them absent an affirmative finding that the application would

not be consistent with the public interest. Indeed, the larger statutory framework and other provisions confirm this.

47.    15 U.S.C. § 717f(e) provides that before a company can construct a natural gas pipeline, it must first obtain approval from the Federal Energy Regulatory Commission. But rather than requiring a certificate to be issued unless it is found to be contrary to the public interest, it requires a certificate to be issued "if it is found that . . . the proposed service . . . will be required by the present or future public convenience and necessity; otherwise such application shall be denied." 15 U.S.C. § 717f(e). Section 717f(e) is thus "the reverse of" § 717b(a). *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F.2d 1105, 1111 (D.C. Cir. 1987). "While [§ 717b] requires an affirmative showing of inconsistency with the public interest to *deny* an application, [§ 717f(e)] requires an affirmative showing of public convenience and necessity to *grant* one." *Id.*; *see Cia Mexicana*, 167 F.2d at 806 (drawing the same conclusion).

48.    What is more, Congress left this framework intact after adding other provisions regarding the approval of applications to construct LNG terminals in the Energy Policy Act of 2005. *See* Pub. L. 109-58, § 311, 119 Stat. 685-88 (Aug. 8, 2005) (codified at 15 U.S.C. § 717b(e)).

49.    The statutory text and framework therefore make clear that the Secretary must grant any application for LNG export to a Free-Trade-Agreement country and must grant any application for LNG export to a non-Free-Trade-Agreement country unless she makes an affirmative finding that granting the application "is not consistent with the public interest." [2] *Cia Mexicana*, 167 F.2d at 806.

50.    No federal law grants the President, any federal officer, or any agency the authority to halt, pause, or otherwise impede the LNG export approval process under § 717b(a).

---

[2] The United States currently has LNG free trade agreements with 18 countries. *See Stabilis GDS, Inc.*, DOE/FECM Order No. 4863, at 2 n.4 (Aug. 22, 2022).

III.    **The Department Adopted a Case-by-Case Approach to Implementing the Natural Gas Act's Rebuttable Presumption that Exports Are in the Public Interest.**

51.    For decades, the Department "has consistently interpreted" § 717b(a) "as creating a rebuttable presumption that a proposed export of natural gas is in the public interest." July 2023 Decision at 9-10. So too have appellate courts. *See, e.g.*, *Panhandle Producers & Royalty Owners Ass'n*, 847 F.2d at 1176; *Sierra Club I*, 867 F.3d at 203.

52.    Consistent with this correct statutory interpretation, the Department's "longstanding practice" until 2024 was "to conduct an informal adjudication of each non-[Free-Trade-Agreement] export application that includes notice and an opportunity for any person to submit a protest, comments, and/or a motion to intervene [] and to grant the application, *unless* [the Department] finds that the proposed exportation will not be consistent with the public interest." July 2023 Decision at 10 (emphasis added).

53.    For at least forty years, the Department has adhered to the principles enunciated in its 1984 Policy Guidelines in its adjudications. *See* DOE, *New Policy Guidelines and Delegations Order Relating to Regulation of Imported Natural Gas*, 49 Fed. Reg. 6684 (Feb. 22, 1984) ("1984 Policy Guidelines"). Those guidelines have the "stated goals" of "minimiz[ing] federal control and involvement in energy markets" and "promot[ing] a balanced and mixed energy resource system." July 2023 Decision 11.[3] In non-Free-Trade-Agreement export authorization decisions, the Department has "continue[d] to subscribe to the principle set forth in [the] 1984 Policy Guidelines that, under most circumstances, the

---

[3] *See* July 2023 Decision at 11 (the Department "has long considered the 1984 Policy Guidelines in reviewing applications for exports of natural gas, including LNG"); *see also Phillips Alaska Nat. Gas Corp., et al.*, DOE/FE Order No. 1473, Docket No. 96-99-LNG, Order Extending Authorization to Export Liquefied Natural Gas from Alaska (Apr. 2, 1999), at 14 (citing *Yukon Pac. Corp.*, DOE/FE Order No. 350, Order Granting Authorization to Export Liquefied Natural Gas From Alaska, 1 FE ¶70,259, at 71,128 (1989) ("While [the 1984 Policy Guidelines] deal with imports, the principles are applicable to exports as well.")).

market is the most efficient means of allocating natural gas supplies." *Id.* (quoting *Freeport LNG Expansion, L.P*, DOE/FECM Order No. 4961, at 71).

54.     Rather than supplementing the 1984 Policy Guidelines with a broad rulemaking, the Department has instead opted to pursue "a regulatory approach to developing LNG export policy based on case-by-case adjudication of export applications—supplemented with discrete rulemakings, policy statements, and technical analyses, where appropriate." *Id.* at 17.

55.     The Department has done so because it thought that was the best way to implement the Natural Gas Act. It specifically rejected a broad-based public-interest determination because a case-by-case approach allows it "to take into account new or different facts, the latest supply and demand data, technical analyses, developments in energy security in the United States and abroad, changes in [National Environmental Policy Act] guidance, and other considerations that bear on the public interest as the U.S. and global LNG export markets rapidly develop." *Id.*

56.     In its case-by-case approach, the Department's "review has included" for "at least the last decade," "an evaluation of: (i) the domestic need for the LNG proposed to be exported, (ii) whether the proposed exports pose a threat to the security of domestic natural gas supplies, (iii) whether the arrangement is consistent with [the Department's] policy of promoting market competition, and (iv) any other factors bearing on the public interest as determined by [the Department]— which, to date, has included a variety of economic, environmental, and international considerations." *Id.* at 12.

57.     To the extent exports incidentally raise environmental concerns, the Department has acknowledged that those considerations are best addressed directly by the proper actors—whether the Environmental Protection Agency or state regulators—and not through the Natural Gas Act. *See, e.g.*, *FLEX*, DOE, Order 3357–B, Dkt. 11–161–LNG, Final Opinion and Order 86-87 (Nov. 14, 2014) (deferring to "environmental regulators" with the "legal authority to impose requirements on natural

gas production that appropriately balance benefits and burdens" and recognizing the Natural Gas Act
"is too blunt an instrument to address these environmental concerns efficiently"); *aff'd Sierra Club I*,
867 F.3d at 203.

58.     The Department, however, has not ignored environmental issues. *See* July 2023 Deci-
sion at 12. It has instead evaluated environmental considerations and placed great weight on the ex-
haustive environmental review conducted by the Federal Energy Regulatory Commission, which the
D.C. Circuit has concluded sufficiently accounts for environmental matters under the National Envi-
ronmental Policy Act and the Natural Gas Act. *See Sierra Club I*, 867 F.3d at 198-99, 201-03. It has also
considered greenhouse gas emissions for LNG exported from the United States. *See Freeport LNG
Expansion*, DOE/FECM Order No. 4961, at 18-21.[4]

59.     The case-by-case approach has also allowed the Department to consider current geo-
political events as they develop. For example, the Department has cited the "Russian invasion of
Ukraine" as a justification for authorizing additional exports to diversify the supply chain and improve
energy security for U.S. allies and trade partners. *See Magnolia LNG LLC*, DOE/FE Order No. 3909-
C (issued Apr. 27, 2022), at 53 ("By authorizing additional exports to non-[Free-Trade-Agreement]
countries, including to U.S. allies in Europe and elsewhere, this Order will enable Magnolia LNG to
help mitigate energy security concerns once it begins exporting U.S. LNG. More generally, to the
extent U.S. exports diversify global LNG supplies and increase the volumes of LNG available globally,
these additional exports will improve energy security for many U.S. allies and trading partners."); *Free-
port LNG Expansion*, DOE/FECM Order No. 4961, at 64-65 (noting the "renewed concerns about

---

[4] To be clear, Plaintiff States are not conceding that it is appropriate for the Department and the
Federal Energy Regulatory Commission to consider greenhouse gas emissions under the Natural Gas
Act or the National Environmental Policy Act. But Plaintiffs note that the Department has considered
greenhouse gas emissions in recent years as a factual matter. Any purported need to consider such
emissions therefore cannot justify the LNG Export Ban.

energy security for Europe and Central Asia, particularly given the relative share of Russian natural gas supplies into those regions until recently" and concluding "authorizing additional exports to non-[Free-Trade-Agreement] countries . . . will enable FLEX to help mitigate any acute and immediate energy security concerns").

IV.     **Supported by Multiple Studies, the Department Repeatedly Concludes LNG Exports Are Not Inconsistent with the Public Interest.**

60.     In its case-by-case proceedings, the Department has repeatedly—and unsurprisingly—made specific factual findings that LNG exports are in the public interest. *See, e.g.*, *Phillips Alaska Natural Gas Corp., et al.*, DOE/FE Order No. 1473, Docket No. 96-99-LNG, Order Extending Authorization to Export Liquefied Natural Gas from Alaska (Apr. 2, 1999), at 57; *Yukon Pacific Corporation*, DOE Order No. 350, 1 FE ¶ 70,259 (1989), *denied on reh'g*, 1 FE ¶ 70,303 (1990), at 17-22.

61.     For example, in one 2013 order, the Department concluded that the proposed exports under review "are likely to yield net economic benefits to the United States," will counteract concentration within global LNG markets, will diversify international supply options, and will improve energy security for the United States and its allies. *Lake Charles Exports, LLC*, DOE/FE Order No. 3324 (Aug. 7, 2013), at 6.

62.     In another order, the Department found that LNG exports produce "substantial economic and public benefits, including reductions to the U.S. trade deficit and the generation of significant tax revenues for federal, state, and local governmental entities," and that the proposed exports would produce no "deleterious economic and societal impacts." *Lake Charles Exports, LLC*, DOE/FE Order No. 3324-A (Jul. 29, 2016), at 121-22. It also found that exports served the public interest because domestic supply exceeds demand. *Id.*

63.     In yet another order, the Department granted an export application, finding that exports would have no practical impact on U.S. domestic LNG supply, would produce net economic benefits, and would benefit the international LNG markets and the U.S. trade balance. *Lake Charles*

*Exports, LLC*, DOE/FE Order No. 4011 (Jun. 29, 2017), at 25; *Lake Charles LNG Export Co., LLC*, DOE/FE Order No. 4010, (Jun. 29, 2017), at 26.

64.    In an order just last year, the Department again authorized LNG exports because the exports would not be inconsistent with the public interest. In granting the authorization, the Department made several specific findings.

65.    For example, the Department found that that "[t]he assumptions underlying" an earlier study's findings—including that "the United States will experience net economic benefits from the export of domestically produced LNG"—"remain consistent with more recent assessments of current and future natural gas supply, demand, and prices." *See Freeport LNG Expansion*, DOE/FECM Order No. 4961, at 56, 70. It also found that the Energy Information Administration's projections continue to show market conditions that can accommodate increased exports of natural gas and that "proposed exports will improve the United States' ties with its allies and trade partners and make a positive contribution to the United States' trade balance." *Id.* at 61.

66.    The Department also considered environmental factors in its 2023 order, including greenhouse gas emissions for LNG exports. *See Freeport LNG Expansion*, DOE/FECM Order No. 4961, at 19-21. It concluded that using "U.S. LNG exports for power production in European and Asian markets will not increase global [greenhouse gas] emissions from a life cycle perspective, when compared to regional coal extraction and consumption for power production." *Id.* at 20. As such, environmental considerations did not undercut the presumption that LNG exports are in the public interest. *See id.* at 21.

67.    Although the Department has taken a case-by-case approach, it has never denied an LNG export application on public-interest grounds. This is unsurprising. After all, Congress created the Natural Gas Act's rebuttable-presumption framework for a reason: Natural gas exports are usually in the public interest. Multiple studies—including by the Department itself—have confirmed this. The

studies have confirmed that LNG exports are not detrimental to domestic gas needs, are beneficial to the nation's economy, and could reduce overall greenhouse gas emissions.

68.     Beginning with President Obama's administration, the Department "has studied the domestic benefits of LNG exports under multiple presidential administrations . . . and has determined that as U.S. LNG exports increase, domestic production increases to meet global demand." Letter from Majority Staff to Members of the Subcommittee on Energy, Climate, and Grid Security, U.S. H. of Reps. (Feb. 4, 2024), https://perma.cc/3U2Y-PGW8, at 2. Indeed, based on the Department's own studies, "LNG exports could add between $50-73 billion to the U.S. economy by 2040, and between 220,000 and 453,000 American jobs by 2040." *Id.*

69.     In 2015, the Department released an export study that concluded that increasing LNG exports increases U.S. gross domestic product by billions of dollars. The report also specifically found that "[r]ising [LNG] exports are associated with a net increase in domestic natural gas production." DOE, *The Macroeconomic Impact of Increasing U.S. LNG Exports, conducted jointly by the Center for Energy Studies at Rice University's Baker Institute for Public Policy and Oxford Economics on behalf of DOE* 8 (Oct. 29, 2015), at 8, https://perma.cc/ZRH2-X3CX.

70.     In 2018, the Department released an extensive export study finding that "[i]ncreasing U.S. LNG exports under any given set of assumptions about U.S. natural gas resources and their production leads to only small increases in U.S. natural gas prices," "a large share of the increase in LNG exports is supported by an increase in domestic natural gas production," and "increased exports" "improve the U.S.  balance of trade and gross domestic product." 83 Fed. Reg. 67251, 67260, 67269, 67272 (Dec. 28, 2018).

71.     What is more, the Department's studies have not been limited to economic impacts. The Department "has also studied the environmental effects of natural gas production and LNG exports, finding that U.S. LNG production and exports are the cleanest in the world." Subcommittee

Letter, *supra* at 2 (citing Addendum to Environmental Review Documents Concerning Exports of Natural Gas From the United States, 79 Fed. Reg. 48132 (Aug. 15, 2014); Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States, 79 Fed. Reg. 32260 (June 4, 2014); 2019 Update to Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States, 84 Fed. Reg. 49278 (Sep. 19, 2019)). The Department has found that "the use of U.S. LNG exports for power production in European and Asian markets will not increase [greenhouse gas] emissions from a life cycle perspective, when compared to regional coal extraction and consumption for power production," and that exports may actually "decrease global [greenhouse gas] emissions." DOE, *Life Cycle Greenhouse Gas Perspective on Exporting Liquified Natural Gas from the United States: 2019 Update—Response to Comments*, 85 Fed. Reg. 72-02, 85-86 (Jan. 2, 2020); *see also Freeport LNG Expansion, L.P., et al.*, DOE/FECM Order No. 4961, at 21 (relying on 2019 Update).

72.     Notably, the Energy Information Administration's annual energy outlooks support the Department's findings. The Energy Information Administration has found that exports strengthen the natural gas industry and are a benefit, not a hindrance, to the domestic market.

73.     For example, last spring the Energy Information Administration found that "[a]cross all cases, domestic production outpaces domestic consumption" and that "exports to satisfy growing international demand for natural gas" can "encourage growth in domestic natural gas production." *Annual Energy Outlook 2023*, U.S. Energy Info. Admin., at 27 (Mar. 16, 2023), https://perma.cc/MPF4-W2CZ. It also found that "[a] significant portion of production growth is due to [LNG] export demand, which drives the overall increase in natural gas exports." *Id.*

## V.     The D.C. Circuit Rebuffs Challenges to LNG Export Approvals.

74.     Unhappy with Congress's presumption that exporting natural gas is in the public interest and with the Department's case-by-case approach, environmental groups have filed numerous legal challenges.

75.     In 2015 and 2016, the Sierra Club filed five petitions for review of long-term LNG export authorizations. *See* July 2023 Decision at 22. The D.C. Circuit rejected four of them in two separate opinions, and the Sierra Club withdrew its fifth petition. *See id.* at 22-23.

76.     Although the Sierra Club was challenging specific orders, its arguments largely boil down to a belief that the Department should weigh environmental considerations more heavily in its determination of the public interest. *See id.* at 22-24; *Sierra Club I*, 867 F.3d at 192 (arguing the Department failed to "sufficiently examine the indirect effects of LNG exports" and the "cumulative effects of other anticipated, pending, or approved export proposals"); *id.* at 203 ("[T]he only factor [Sierra Club] suggests is inconsistent with the public interest is environmental."); *Sierra Club v. DOE* (*Sierra Club II*), 703 F. App'x 1, 2-3 (D.C. Cir. 2017) (addressing arguments that the department should have conducted its own Environmental Impact Statement and engage in more localized impact analysis).

77.     The D.C. Circuit rejected such arguments and decided that the Department's process was appropriate. Specifically, the D.C. Circuit concluded that the Department appropriately considered the environmental impacts "through the [National Environmental Policy Act] process" and that further examination of environmental factors was unnecessary. *See Sierra Club I*, 867 F.3d at 203. It also confirmed, once again, the presumption in favor of exports and explained that, "[t]o the extent Sierra Club suggests the Department should have weighed environmental concerns more heavily before granting the [LNG export] application, it fails to overcome the presumption in favor of exports." *Id.* It also affirmed the Department's consideration of "job creation and energy security as factors counteracting" some of the potentially negative impacts identified by Sierra Club. *Sierra Club II*, 703 F. App'x at 3.

## VI.     In July 2023, the Department Reaffirms the LNG Export Approval Process and Denies a Rulemaking Petition.

78.     Despite these D.C. Circuit opinions affirming the appropriateness of the Department's export authorizations and the Department "directly address[ing] the substance" of environmental

groups' arguments over the years, environmental groups insisted that the Department issue a decision on an earlier rulemaking petition. *See* July 2023 Decision at 2. That rulemaking petition had asked the Department "to promulgate new regulations or guidance defining the process by which it will consider applications to export" LNG to non-Free-Trade-Agreement countries under Section 3. *Id.* at 1.

79.     Petitioners generally argued that the 1984 Policy Guidelines are out of date and that the Department should "develop 'modern policy guidelines' through public notice and comment that 'articulate [the Department's] policy orientation' on exports of domestically produced LNG and 'the factors which [the Department] will primarily consider in individual export dockets.'" *Id.* at 2. Petitioners argued that the Department "should implement a new rulemaking or adopt new policy guidelines rather than addressing LNG export issues in 'case-by-case adjudications.'" *Id.* at 8. Petitioners also contended that, in the public-interest analysis, the Department should account for "[t]he 'net climate and environmental impact' of using LNG given its life-cycle emissions of greenhouse gases (GHGs), which may put the public at risk." *Id.* at 7.

80.     Petitioners then made three specific requests.

81.     *First*, they asked the Department to "[g]rant no more licenses for LNG export to non-Free Trade Agreement nations until it has completed a final revision of its policy guidelines, focusing on LNG export." *Id.* at 9.

82.     *Second*, they asked the Department to "[c]onduct a notice-and-comment process to develop new natural gas export policy guidelines that would 'specifically and carefully articulate [the Department's] policy orientation on export, and the factors which [the Department would] primarily consider in individual [LNG] export dockets.'" *Id.*

83.     *Third*, they asked the Department to "[s]upport the development of these guidelines with a thorough, careful, economic study and . . . a full programmatic Environmental Impact Statement." *Id.*

84.     On July 18, 2023, the Department rejected those requests in a decision denying the rulemaking petition.

85.     The Department began by recounting its longstanding approach to examining LNG export applications to non-Free-Trade-Agreement nations. Along the way, it reiterated that the Department, "as affirmed by the D.C. Circuit[,] . . . has consistently interpreted [§ 717b(a)] as creating a rebuttable presumption that a proposed export of natural gas is in the public interest." July 2023 Decision 10. The Department also reiterated its "longstanding practice [of] conduct[ing] an informal adjudication of each non-[Free-Trade-Agreement] export application." *Id.* And it specifically reaffirmed its belief that case-by-case adjudication was superior in this context. *Id.* at 17.

86.     The Department also noted that it had rejected "the same arguments presented in the Rulemaking Petition" over ten years ago in its *Freeport* order and had continued to reject those arguments, which were being made by parties in numerous non-Free-Trade-Agreement export proceedings, in the intervening years. *Id.* at 19-20 (discussing *Freeport LNG Expansion L.P., et al.*, DOE/FE Order No. 3282, Docket No. 10-161-LNG, Order Conditionally Granting Long-Term, Multi-Contract Authorization to Export Liquefied Natural Gas by Vessel from the Freeport LNG Terminal on Quintana Island, Texas to Non-Free Trade Agreement Nations (May 17, 2013), at 108-09; *Freeport LNG Expansion, L.P., et al.*, DOE/FECM Order No. 4961, at 55; and *Sabine Pass Liquefaction*, LLC, DOE/FECM Order No. 4800, Docket No. 19-125-LNG, Order Granting Long-Term Authorization to Export Liquefied Natural Gas to Non-Free Trade Agreement Nations (Mar. 16, 2022), at 45–46).

87.     Ultimately, the Department was emphatic in again rejecting the Petitioners' arguments and request that it halt its review of LNG export applications. It articulated five reasons for denying the petition.

88.     *First*, the Department said that it "has reasonably (and repeatedly) determined that it is not necessary either to initiate a rulemaking or to develop new policy guidelines that 'articulate [the

21

Department's] policy orientation on export, and the factors which it will primarily consider in individual export dockets.'" July 2023 Decision 24. The Department explained that "[t]he best way for [it] to consider and apply the public interest standard to export authorization decisions is through the informal adjudications with which [the Department] has significant experience and that the D.C. Circuit has upheld." *Id.*

89.     *Second*, the Department reiterated that it was proper for it to "continue[] to incorporate the core principles set forth in the 1984 Policy Guidelines into its public interest analysis—to minimize federal control and involvement in energy markets and to promote a balanced and mixed energy resource system." *Id.* at 25. The Department specifically "explained that it 'continues to subscribe to the principle set forth in [the] 1984 Policy Guidelines that, under most circumstances, the market is the most efficient means of allocating natural gas supplies.'" *Id.* at 25 (quoting *Freeport LNG Expansion, L.P., et al.,* DOE/FECM Order No. 4961, at 71). The Department also noted that its longstanding policy allowed it to intervene when "necessary to protect the public in the event there is insufficient domestic natural gas for domestic use, or as a result of other facts or circumstances beyond those presented." *Id.*

90.     *Third*, the Department stated that it already "consider[s] a variety of economic and environmental impacts associated with the export of U.S. LNG," through its case-by-case adjudications, which rely on "studies (and study updates) issued through extensive public proceedings in which some Petitioners submitted comments for [the Department's] review." *Id.* Thus, the Department did not need to halt export applications because it can conduct such analysis without an export halt.

91.     *Fourth*, the Department defended its use of a case-by-case decisionmaking process. It explained that "[i]ndividual adjudications—particularly those involving the opportunity for public comment, as is the case here—are not an inferior form of agency action." *Id.* It then pointed out that its "cautious analytical approach since 2013 demonstrates how [the Department] may adjudicate

22

individual export applications on the basis of substantial administrative records (including public comment), while also developing and applying export-related policies." *Id.* at 26. After noting how it had adapted to circumstances over the years, the Department concluded that "[t]he adaptability of this regulatory approach is an advantage for [the Department] as well as for associated stakeholders, and thus outweighs any associated costs." *Id.*

92.     *Fifth*, the Department explained that case-by-case adjudication does not impede it from considering long-term effects of LNG exports. *Id.* at 26-27.

93.     The Department then concluded that "there is no factual or legal basis" for it "to halt approval of pending applications to export LNG to non-[Free-Trade-Agreement] countries." *Id.* at 27.

94.     The Department then offered the following summary of its decision:

[The Department] has discretion under [Natural Gas Act] section 3(a) [15 U.S.C. § 717b(a)] and the APA to proceed by rulemaking or adjudication in implementing the LNG export regulatory program. Further, [the Department's] Office of Fossil Energy and Carbon Management has demonstrated that it has a well-functioning adjudicatory process for evaluating applications to export LNG to non-[Free-Trade-Agreement] countries under [§ 717b(a)], which it has implemented together with a variety of regulatory actions and technical analyses in the 10 years since the Rulemaking Petition was filed. This approach is consistent with applicable legal principles, gives the public and interested stakeholders many opportunities to provide input and participate, and allows [the Department] the flexibility to adapt to changing economic and environmental circumstances. Precisely because the U.S. LNG market and related issues—including climate change considerations and global energy security—are dynamic, the LNG export program is best served by continuing to update the economic and environmental studies, analytical approaches, and public interest factors that [the Department] considers in an iterative fashion, based on developing facts and circumstances.

*Id.* at 27-28.

## VI.   Reversing Course, the Department Adopts the LNG Export Ban Without Explanation in January 2024.

95.     The Department's decades-long approach, expressly reaffirmed as recently as July 2023, was undone in a single day—with no process, reasoning, or legal authority.

96.     On January 26, 2024, President Biden released a statement declaring that his "Administration is announcing today a temporary pause on pending decisions of Liquefied Natural Gas exports." White House, *Statement from President Joe Biden on Decision to Pause Pending Approvals of Liquefied Natural Gas Exports* (Jan. 26, 2024), https://perma.cc/CF99-5V9P.

97.     The decision to which President Biden referred is a statement released the same day by the Department of Energy as a webpage. *See* DOE, *DOE to Update Public Interest Analysis to Enhance National Security, Achieve Clean Energy Goals and Continue Support for Global Allies* (Jan. 26, 2024), https://perma.cc/LF5T-T9R6. This two-page web posting contains no reasoning supporting the LNG Export Ban—other than stating that the Department wishes to conduct a review of its public-interest analysis.

98.     The Department's decision does not mention its longstanding case-by-case adjudication policy. It does not mention the 1984 Policy Guidelines. It does not mention the statutory presumption of granting export applications. It does not mention the Department's July 2023 decision. Nor does it mention reliance interests, the Natural Gas Act, or anything else. It is pure ipse dixit.

99.     That same day, the White House posted a "fact sheet" arguing that the "current economic and environmental analyses [the Department] uses to underpin its LNG export authorizations are roughly five years old and no longer adequately account for considerations like potential energy cost increases for American consumers and manufacturers beyond current authorizations or the latest assessment of the impact of greenhouse gas emissions." White House, *Fact Sheet: Biden-Harris Administration Announces Temporary Pause on Pending Approvals of Liquefied Natural Gas Exports* (Jan. 26, 2024), https://perma.cc/6YNN-GJB9. Like the Department's decision, the White House's factsheet does not mention the Department's longstanding case-by-case adjudication policy, the 1984 Policy Guidelines, the presumption of granting applications, or the Department's July 2023 decision. It also does not discuss reliance interests, the Natural Gas Act, or anything else. Once again: pure ipse dixit.

24

100.     The next day, the White House posted a webpage featuring congratulatory messages from environmentalist groups around the country, including many of the same groups who were parties to the July 2023 rulemaking denial. White House, *What They are Saying: Leaders Praise Biden-Harris Administration Pause on Pending Decisions of Liquefied Natural Gas Exports* (Jan. 27, 2024), https://perma.cc/KMP9-P8FC.

101.     That praise from environmentalists is predictable given that an associate director at the Rockefeller Family Fund has celebrated the LNG Export Ban as "the result of a sustained four-year push" by such groups. B. Morenne & A. Restuccia, *How the Rockefellers and Billionaire Donors Pressured Biden on LNG Exports*, Wall St. J. (Feb. 8, 2024), https://www.wsj.com/us-news/climate-environment/how-the-rockefellers-and-billionaire-donors-pressured-biden-on-lng-exports-c1bf0ff8. After the environmental groups' rulemaking petition was denied, a sustained pressure campaign from banks, celebrities, and internet "influencers" achieved the same result through the Department's unlawful January 26, 2024 decision.

102.     Weeks later, on February 8, 2024, the Department posted another webpage responding to withering bipartisan criticism of the LNG Export Ban. Like the other webpages through which the Ban was announced, this webpage does not mention the Department's longstanding case-by-case adjudication policy, the 1984 Policy Guidelines, the presumption of granting applications, or the Department's July 2023 decision. DOE, *Unpacking the misconceptions surrounding the DOE's LNG update* (Feb. 8, 2024), https://perma.cc/5649-T5TT.

103.     The Administration has published nothing in the Federal Register that explains, justifies, or even relates to its LNG Export Ban. It has not opened a rulemaking docket. It has not called for public comment. And it gave no warning of this action. This is policymaking by webpage.

104.     This LNG Export Ban has no end date, but could easily last fifteen months or longer. *See* Ben Lefebvre, *Biden reins in gas exports that have raised both US prestige and climate fears*, POLITICO (Jan.

26, 2024), https://perma.cc/G5CU-V3AY (noting "a person familiar with the plan" said the Department's review of environmental impacts "could take up to 15 months to finish").

105.    This is not the normal regulatory process. When an agency seeks to break from a longstanding position, it cannot simply announce that it's immediately taking a fundamentally new route and say that notice, comment, and a reasoned justification will follow. And it certainly cannot override serious well-reasoned decisions on precisely the same issue with ipse dixit.

106.    As noted above, just seven months before the Department announced the LNG Export Ban, it denied a rulemaking petition seeking precisely the same action. It based that denial on the Natural Gas Act's text and structure, court opinions confirming the Department's interpretation of that Act, longstanding policy, and the Department's determination that its case-by-case approach was the best way to account for precisely the same concerns the Administration purports to have with the longstanding process. The Department could not have been clearer in its finding that there is no factual or legal basis for a "halt [of] approval of pending applications." July 2023 Decision at 27. And far from pointing to any changed circumstances since July, the Department now simply acts as if that decision does not exist.

107.    The reason for this action is obvious to the man on the street. The President buckled to a sustained political pressure campaign in an election year.[5]

108.    Biden Administration officials have also publicly stated that the LNG Export Ban stems in part from international pressure. In explaining why the LNG Export Ban was happening now, an official stated: "Just a few weeks ago, we were all at a U.N. conference where the globe decided that we needed to transition away from fossil fuels." NPR, *Federal Approval is delayed for some pending*

---

[5] *See, e.g.*, B. Morenne & A. Restuccia, *How the Rockefellers and Billionaire Donors Pressured Biden on LNG Exports*, Wall St. J. (Feb. 8, 2024); Coral Davenport, *White House Said to Delay Decision on Enormous Natural Gas Export Terminal*, N.Y. Times (Jan. 24, 2024); Mark Ruffalo, X (Jan. 26, 2024), https://perma.cc/3BUH-BZ4K.

*liquefied natural gas projects* (Jan. 26, 2024), https://perma.cc/G34Q-CSV5 (interview with White House National Climate Advisor Ali Zaidi). And belying any claim that the Ban is merely temporary, this same official was unable to deny that the next step is to "eventually end[] LNG exports." *Id.*

109.    Reporting has also unveiled other possible motivations behind the unexplained LNG Export Ban. For example, White House officials have acknowledged that "one significant reason for the" LNG Export Ban "was to address concerns of young and climate-focused voters," whom "the administration needs . . . in the fall." R. Rapier, *How An American LNG Export Pause Could Increase Global Carbon Emissions*, Forbes (Jan. 29, 2024), https://perma.cc/3WQR-84HK. The "hope is that announcing this pause will energize them to vote for Biden in the November election." *Id.*

110.    Other reporting describes President Biden's climate envoy, John Podesta, as an architect of the LNG Export Ban, and notes that Podesta's brother is a lobbyist for foreign interests—including Russian LNG oligarchs—who stand to benefit significantly from the Ban. *See* A. Goodman, *John Podesta Was Behind Biden's Decision To Pause Natural Gas Exports. His Lobbyist Brother Stands To Benefit*, Wash. Free Beacon (Feb. 15, 2024), https://perma.cc/P3JW-AZSA.

111.    This hidden influence, lack of an administrative record, failure to consider statutory factors, failure to consider past practices, and other irregularities listed above demonstrate that the LNG Export Ban is unlawful.

## VII.    The LNG Export Ban Inflicts Significant Harms on Plaintiff States.

112.    This unlawful LNG Export Ban harms each Plaintiff State's sovereign, proprietary, and quasi-sovereign interests. *See Massachusetts v. EPA*, 549 U.S. 497, 518–20 (2007) (States afforded "special solicitude" in standing inquiry); *see also Texas v. United States*, 809 F.3d 134, 151-155 (5th Cir. 2015) (same).

113.    Not only will the LNG Export Ban cause Plaintiff States direct harm, such as loss of jobs and revenue streams tied to LNG, but it will also have detrimental ripple effects on their

economies and communities. *Cf. Louisiana*, 622 F. Supp. 3d at 285 ("Plaintiff States have also alleged loss of jobs and economic damage as a direct result of the Stop [of oil-and-gas leases]. These alleged damages are concrete, particularized, and imminent.").

114.    The LNG Export Ban has and will continue to decrease investment in the natural gas industry and infrastructure, leading to decreased production and loss of specific tax revenues for Plaintiff States. *See, e.g.*, M. Chicaiza, *Oil & Gas Executives Emphasize Long-Term Consequences of Biden's LNG Export Pause*, Energy In Depth (Feb. 7, 2024), https://perma.cc/TAZ4-XMQQ ("Disruptions to the U.S.'s LNG export capacity *now* can damage both investment and confidence in U.S. LNG for *decades to come . . . .*"); *id.* (noting "[t]he momentum is already shifting" as competitors to U.S. LNG signed major deals following the LNG Export Ban); Amanda Stephenson, *Canadian energy producers dismayed by Biden's move to pause U.S. LNG approvals*, The Canadian Press (Jan. 26, 2024), https://perma.cc/G34G-F69X (reporting that a Canadian producer that "currently supplies natural gas to five operating LNG export facilities on the U.S. Gulf Coast and has previously said it is interested in expanding its export strategy through further acquisitions in the region" has described the LNG Export Ban as "a loss for the U.S., our Allies, for U.S. jobs and for efforts to cut emissions"). Companies had been relying on the LNG-export approval process and the presumption that exports are in the public interest as they poured hundreds of millions of dollars into developing LNG facilities and infrastructure. *See, e.g.*, *LNG Export Application of LCE, LLC*, at 15, 17-20, DOE Docket No. 23-87-LNG (Aug. 18, 2023), https://perma.cc/EQ2Y-ECSM. And LNG export capacity was expected to double though 2027. *See LNG export capacity from North America is likely to more than double through 2027*, U.S. Energy Info. Admin. (Nov. 13, 2023), https://perma.cc/4JUB-CATS. The LNG Export Ban disrupts that and deters investment with predictable, detrimental consequences for Plaintiff States, such as loss of jobs and tax revenues.

115.    The LNG Export Ban could also reduce royalty payments to which Plaintiff States are statutorily entitled. Under the Outer Continental Shelf Lands Act, most coastal States receive twenty-seven percent of bonus bids, ground rent, and production royalties from oil-and-gas lease sales and production in adjacent waters. *See* 43 U.S.C. § 1337(g)(2). Plaintiff States Louisiana, Alabama, Mississippi, and Texas, however, are entitled to 37.5 percent of such revenues from areas of the Gulf of Mexico under the Gulf of Mexico Energy Security Act of 2006. *See* P.L. 109-432, 120 Stat. 3000 (codified at 43 U.S.C. §1331 note); *Gulf of Mexico Energy Security Act*, U.S. Dep't of the Interior, https://perma.cc/ETB7-REJA. Notably, as of 2022, "[t]he majority—87.6%—of total U.S. offshore natural gas production was in federal waters in the Gulf of Mexico." *Natural Gas Explained*, U.S. Energy Info. Admin., https://perma.cc/3HH6-URFG. Plaintiffs States are also entitled to royalties from onshore oil-and-gas leases on federal lands under the Mineral Leasing Act. *See Mineral Royalties on Federal Lands: Issues for Congress*, Congressional Research Service (Jan. 19, 2015), at 3, 5, https://perma.cc/CF45-XB59 (explaining that "royalty payments, based on the value of production, are made upon production" and that states generally receive "a 50% share of revenues collected (rents, bonuses, and royalties), less 2% for administrative costs," and Alaska "receives 90% of all revenues"). "These onshore revenue payments are important to the states with federal mineral leases as substitutes for private taxes because of the tax-exempt status of federal property." *Id.* at 6. As of 2019, natural gas production on onshore federal lands was nine percent of total production. *See Revenues and Disbursements from Oil and Natural Gas Production on Federal Lands*, Congressional Research Service (Sept. 22, 2022), at 3, https://perma.cc/K92B-QHE2.

116.    The LNG Export Ban has particularly significant impacts on Plaintiff Louisiana. Louisiana ranks third in the nation in natural gas production and fifth in natural gas reserves. *State Profile and Energy Estimates: Louisiana*, U.S. Energy Info. Admin., https://perma.cc/K7FR-ME9T (updated June 15, 2023). Louisiana accounts for approximately ten percent of national LNG production and

holds seven percent of the nation's LNG reserves. *Id.* In 2022, Louisiana shipped sixty-three percent of the nation's LNG exports. *Id.*

117.    LNG production and export is responsible for 18,000 Louisiana jobs, contributed $178 million to State tax revenue, and had over $4.4 billion in statewide economic impact. *Playing an Increasingly Critical Role in the Global LNG Supply Chain*, La. Office of Econ. Dev., https://perma.cc/45MS-7AP7. Indeed, since 2020, a single LNG export company "has paid the State of Louisiana $16,732,656 in Ad Valorem property taxes alone." *LNG Export Application*, DOE Docket No. 23-87-LNG, at 28. Add to that the loss of Louisiana's specific revenues tied to LNG—severance taxes and royalties—that the LNG Export Ban will cause. *See DOE v. Louisiana*, 690 F.2d 180, 187 (Temp. Emer. Ct. App. 1982) ("As a sovereign, [Louisiana] receives a severance tax based on the price at which oil and gas produced within the state are first sold or transferred; as a landowner, Louisiana leases its lands to producers and receives a royalty based on the price at which oil and gas are first sold or transferred."); *see also Louisiana Energy Facts and Figures*, La. Dep't of Energy and Nat. Res., https://perma.cc/P4DE-NMSF.

118.    The LNG Export Ban will thus cost thousands of Louisiana jobs and will deprive the State of significant revenues. And the LNG Export Ban is preventing the approval of LNG export applications for at least three LNG facilities in Louisiana and will likely affect two other LNG projects in Louisiana. *See Companies most affected by US pause on LNG export permits*, Reuters (Jan. 26, 2024), https://perma.cc/EU8R-VN99. One company has "deferred its investment on its planned Cameron facility in Louisiana," and another "has delayed construction of an export terminal" in Louisiana. R. Liao & S. Stapczynski, *Biden's LNG export ban stalls projects and risks U.S. market share*, World Oil (Mar. 15, 2024), https://perma.cc/ZA5F-CPWD. The LNG Export Ban is thus chilling investment, stopping development and hiring, and harming Louisiana's economy and its specific tax revenues.

119. The LNG Export Ban will also reduce the funding that Louisiana's public institutions receive, not only from tax revenues and royalties, but also directly from LNG exporters. *See, e.g.*, J. Letlow, *Biden's LNG pause is catastrophic decision for Louisiana and America*, Shreveport Times (Feb. 9, 2024), https://perma.cc/AR6B-PBPY; *Tellurian $1 Million Donation Presented to LNG Center at LNG Day*, McNeese State University (Oct. 23, 2023), https://perma.cc/H8MQ-BVZX; *LNG Export Application of LCE, LLC*, DOE Docket No. 23-87-LNG, at 26-27.

120. Plaintiff Alabama, its political subdivisions, and its people are also being harmed by the Export Ban. As the Energy Information Administration has documented, "Alabama is an energy-rich state with a wide variety of resources, including deposits of coal, crude oil and natural gas." *State Profile and Energy Estimates: Alabama*, U.S. Energy Info. Admin., https://perma.cc/7GXM-NTJ8 (last updated Oct. 19, 2023). In 2022, Alabama was the sixteenth highest producer of natural gas in the United States. *Natural Gas Gross Withdrawals and Production*, U.S. Energy Info. Admin., https://perma.cc/6Y23-9A97 (release date Feb. 29, 2024). "Alabama produces natural gas both on-shore and offshore in state waters, including in Mobile Bay." *State Profile and Energy Estimates: Alabama*, U.S. Energy Info. Admin., https://perma.cc/7GXM-NTJ8.

121. Thus, "natural gas extraction" is a "major contributor[] to Alabama's economy." *Id.* The Bureau of Economic Analysis reports that, in 2022, employees in Alabama working in oil and gas extraction received over $54 million in compensation and employees in pipeline transportation received over $86 million. *SAGDP4N Compensation of Employees*, U.S. Bureau of Economic Analysis, https://tinyurl.com/567cjxbk.

122. Alabama also receives funds directly from companies who have purchased the right to develop natural gas resources in Mobile Bay. *See Alabama Trust Fund*, Ala. Treasury Dep't, https://perma.cc/PAH7-SAYA. The amount of payment each year turns on natural gas volumes produced and the price of natural gas per thousand cubit feet. *See* Ala. State Treasurer's Office, *Alabama*

*Trust Fund Annual Report 2022* at 3, https://perma.cc/4F5N-YA5A. In Fiscal Year 2022, the Alabama Trust Fund, which receives these payments, received $67.9 million in royalties. *Id.*

123.     The Department has previously authorized the export of LNG from Alabama, as recently as 2017. *See* Okra Energy, LLC, DOE/FE Order No. 4019, Docket No. 16-188-LNG (Apr. 18, 2017), https://perma.cc/NK7M-KW75.

124.     The Export Ban will harm Alabama and its citizens by decreasing (if not eliminating) access to potential markets for natural gas, which will diminish demand for natural gas produced in Alabama, leading to lost wages, jobs, and tax revenue related to the natural gas production and transportation industries.

125.     The LNG Export Ban, similar to other illegal "pauses," harms Alaska by exacerbating federal regulatory uncertainty that depresses interest in exploration and development of natural gas resources and LNG projects in Alaska.

126.     Plaintiff State of Alaska has significant interests in royalty payments and other revenues derived from gas production and potential LNG projects in Alaska and the vast Outer Continental Shelf surrounding Alaska. Alaska's Cook Inlet basin is estimated to hold approximately 1.2 trillion cubic feet of undiscovered, technically recoverable gas. AK Dep't of Nat'l Resources, *Alaska Oil & Gas Update* (Jan. 19, 2023), at 12, https://perma.cc/C7KG-E5SS. Alaska's North Slope is estimated to hold approximately fifty trillion cubic feet of discovered gas, 194 trillion cubic feet of undiscovered conventional gas, and 125 trillion cubic feet of unconventional gas. *Id.* at 2. Royalties and taxes associated with oil and gas provide billions of dollars in revenues to the state and local governments. ALASKA STAT. §§ 43.20, 43.55, 43.56, 29.45, 38.05.180, ALASKA CONST. art. 8, § 1. Alaska has interests in the economic opportunities and well-being of Alaska's citizens, including in energy security, that responsible natural gas development provides. The LNG Export Ban harms Alaska's interests

in development of its abundant resources, revenues, energy security, and economic and socioeconomic well-being of Alaska's citizens.

127.     The LNG Export Ban also will cause significant harm to Florida. Florida derives significant revenue from LNG exports through its ports. *See, e.g., JAXPORT Partners Support Continued Growth of LNG as a Clean Marine Fuel*, JAXPORT (May 16, 2023), https://perma.cc/WY58-XTEE. For example, in 2023, the Jacksonville Port Authority signed a Memorandum of Understanding to promote the export of LNG to Aruba, which included a multiyear agreement between Aruba's utility and a Florida-based LNG company to export LNG from a Jacksonville facility. *See JAXPORT and Aruba Sign Agreement to Grow Business Connections*, JAXPORT (Mar. 27, 2023), https://perma.cc/TJT6-BEYB.  Additionally, Port Manatee facilitates the shipping of LNG technology and equipment manufactured in Florida that is used to support LNG export facilities across the country. *See Air Products to Increase Production Capacity at its LNG Equipment Manufacturing Facility in Port Manatee, Florida*, PR Newswire (July 31, 2023), https://perma.cc/YVA4-EG6C.

128.     The State of Florida has fifteen seaports that are ripe for similar opportunities and have expended resources in developing economic opportunities for their regions. *See Florida*, 544 F. Supp. 3d at 1253 (recognizing Florida's interests in protecting ports from economic injury because they are political subdivisions of the State). The LNG Export Ban grinds those efforts to a halt, costing the State untold potential benefits in revenue and job creation with no end in sight.

129.     Plaintiff Kansas will be harmed by the LNG Export Ban too. Kansas is the fourteenth-largest gas producing state, producing over 185 billon feet of natural gas in 2018. *Kansas Oil and Gas*, Kans. Dep't of Com. (Sept. 27, 2019), https://perma.cc/K3M3-BZ5F. The oil and gas industries employ more than 118,000 Kansans, and the LNG Export Ban will cost jobs. *Id.* The industries also account for $1.4 billion in state and local tax revenue, which will be at risk if the export ban moves forward. *Id.*

130.     The LNG Export Ban will result in significant harm to Mississippi. The State's citizens rely on electricity supplied by electric power companies that are the largest consumer of natural gas in the State, and their natural gas consumption has significantly increased in the past decade. *See State Profile and Energy Estimates: Mississippi*, U.S. Energy Info. Admin., https://perma.cc/2YYC-ZUUE (last updated Oct. 19, 2023). Mississippi is also home to one of the largest natural gas processing plants in the United States that can process over 1 billion cubic feet of natural gas per day. *Id.* The plant has received federal approval to add export capacity of up to 1.5 billion cubic feet of natural gas per day but that export capacity has not yet been built. *Id.* The LNG Export ban will disrupt the natural gas market and create uncertainty as to supply and cost of LNG, which will harm Mississippi.

131.     The LNG Export Ban also hurts Plaintiff Montana. It jeopardizes Montana's existing production, storage, and transportation of natural gas.  Montana produced 3,650 mmcf of natural gas in December 2023. *Montana*, U.S. Energy Info. Admin., https://perma.cc/FM4L-9VS7. In 2021, there were 8,936 gas producing wells. And Montana possesses 715 Bcf of proven dry natural gas reserves. *Id.* Montana leads the Rocky Mountain region in underground natural gas storage capacity—including the single largest underground storage site in the nation which can store 287 Bcf. *Montana State Energy Profile*, U.S. Energy Info. Admin. (last updated Apr. 20, 2023), https://perma.cc/8H9W-CXFR. Montana is also home to multiple natural gas storage facilities including a dedicated LNG storage facility. *Montana Energy Sector Risk Profile*, DOE, https://perma.cc/SY9B-AVQF. Finally, Montana contains three natural gas export pipelines. *Montana Natural Gas Resources*, Mon. Dep't of Envt. Quality, https://perma.cc/92K5-PV2J.

132.     Montana relies on the energy sector for private job growth, personal income, and state tax revenue.  The natural gas and oil sectors provided 13,740 direct jobs and contributed more than $7.4 billion to the state's economy. Montana's Workforce and Economy: Powered by Natural Gas

and Oil, Am. Petroleum Inst., https://perma.cc/CW6A-PM5F.  In 2023, the three export pipelines paid $11,673,918.55 in state, county, and school district property taxes.

133.    The LNG Export Ban will harm Nebraska. In 2022, Nebraska produced more than 295 million cubic feet of natural gas. *See State Profile and Energy Estimates: Nebraska*, U.S. Energy Info. Admin., https://perma.cc/8E3T-2PY5. Nebraska also has at least 7,000 miles of interstate natural gas pipelines. *See State of Nebraska Energy Sector Risk Profile*, DOE, https://perma.cc/E8PZ-JUUW. Nebraska is integral to the interstate pipeline system for natural gas because over ninety percent of the natural gas that enters Nebraska leaves and continues to downstream markets. *See State Profile and Energy Estimates: Nebraska*, U.S. Energy Info. Admin., https://perma.cc/R6YG-DZQN.

134.    The LNG Export Ban will create risks to Nebraska's economy. Production and transportation of oil and natural gas contributes billions of dollars annually in total economic impact in Nebraska. *See, e.g., Impacts of the Oil and Natural Gas Industry on the US Economy in 2021*, Am. Petroleum Inst., (Apr. 2023), at ES-1-3, https://perma.cc/32HJ-L8EN. Accordingly, it represents an important segment of Nebraska's economy. *See, e.g., id.* (estimating that nearly seven percent of Nebraska's economic activity relates to oil and natural gas). Natural gas also supports tens of thousands of jobs in Nebraska. *See Benefits and Opportunities of Natural Gas Use, Transportation, and Production: Nebraska*, Am. Petroleum Inst. (June 2017), at 193, https://perma.cc/YG4B-QD2K (estimating 21,100 jobs in Nebraska are related to natural gas). And Nebraska is the home of Northern Natural Gas Company, which owns the largest interstate natural gas pipeline system in the United States. *See Northern Natural Gas*, Berkshire Hathaway Energy, https://perma.cc/BY9F-TJBP.

135.    The LNG Export Ban will deprive the State of Nebraska of tax revenue to support schools, roads, bridges, and other public priorities. Natural gas pipelines pay income taxes based on apportioned sales and revenue miles (*i.e.,* transportation of one thousand cubic feet of gas the distance of one mile for a consideration). *See* 316 NEB. ADMIN. CODE § 24-342. Pipelines also pay property

taxes for the length of the pipelines within the State. Not to mention, Nebraska benefits from tax revenue based on employment related to the production and transportation of natural gas.

136.    The LNG Export Ban will cause significant harm to Oklahoma. In 2022, Oklahoma was the nation's fifth-largest producer of marketed natural gas. *State Profile and Energy Estimates: Oklahoma*, U.S. Energy Info. Admin., https://perma.cc/8GQC-PGGA. In 2022 alone, Oklahoma's natural gas marketed production was more than 2.7 trillion cubic feet. *Oklahoma State Energy Profile*, U.S. Energy Info. Admin, https://perma.cc/2TRM-LPVX.

137.    The LNG Export Ban will create risks to Oklahoma's economy. In 2023, Oklahoma's oil and natural gas production contributed over $55 billion annually in total economic impact in Oklahoma. *2023 Economic Impact in Oklahoma*, Oklahoma Energy Resources Board, https://perma.cc/H2SS-MPES. Oklahoma's oil and natural gas industry impacts twenty-two percent of total statewide economic activity and supports over 212,000 jobs. *Id.*

138.    The LNG Export Ban will deprive the State of Oklahoma of millions of dollars in revenue to support schools, roads, bridges, and other public priorities. The oil and natural gas industry recently contributed $2.9 billion in total taxes, including $230 million to the revenue stabilization fund in Oklahoma in 2023. *Id.*

139.    The LNG Export Ban will result in significant harm to South Carolina. Natural gas is the second-highest source of energy consumed in South Carolina. *State Profile and Energy Estimates: South Carolina*, U.S. Energy Info. Admin. (last updated Feb. 15, 2024), https://perma.cc/DQ3L-MY3L. In 2021, approximately 350 trillion BTUs of natural gas were consumed in South Carolina. *Id.* As of November 2023, the price of natural gas in South Carolina residential areas was already approximately 6.14 percent above the national average. *Id.* The LNG Export ban will create uncertainty as to supply and cost of LNG to South Carolina consumers, which will harm South Carolina.

140.     The LNG Export Ban also has a pronounced impact on Plaintiff Texas. For example, the Texas General Land Office has deposited over $30 billion into the Permanent School Fund since its inception, including over $800 million in oil and natural gas revenues last fiscal year (September 1, 2022 to August 31, 2023), of which approximately $339 million came from natural gas royalties. The LNG Export ban will harm Texas by disincentivizing billions of dollars in capital investment for natural gas exportation projects and will (1) hamstring Texas's ability to maximize revenue for the Permanent School Fund; (2) force Texas producers to flare excess natural gas instead of taking it to market, resulting in an increase in methane emissions; and (3) reduce or eliminate critical economic benefits including short- and long-term jobs, infrastructure updates, and long-term related development.

141.     Texas is the nation's leading producer of both crude oil and natural gas, much of which is produced from state-owned lands in the Texas Permian Basin. *See State Profile and Energy Estimates: Texas*, U.S. Energy Info. Admin., https://perma.cc/JAU5-AK6Z. Current infrastructure constraints limit the marketplace for Texas's abundant natural gas supply and deflate its market price. Natural gas is currently sold for less than $2.00/MMBtu domestically at Texas sales hub locations, but in export markets, LNG can fetch in excess of $10.00/MMBtu. Access to export markets is the necessary economic incentive for producers to pursue cost-intensive investments for the expansion and modernization of natural gas transportation infrastructure that should result in higher prices and royalties for the Permanent School Fund's natural gas.

142.     Wells drilled for the production of hydrocarbons will typically produce some combination of both oil and natural gas. Given current market conditions—relatively high oil prices and relatively low natural gas prices—most wells in Texas are drilled in the hopes of producing as much oil as possible. With adequate infrastructure, natural gas produced alongside crude oil production is captured and profitably taken to market. But without needed infrastructure, the same natural gas is

rendered a useless byproduct and must be burned or "flared," which is considered a waste of the otherwise useful natural resources and increases emissions of heat-trapping methane. Flaring requires a permit from the Railroad Commission of Texas, Texas's oil and gas regulatory agency, and Texas's total methane emissions are capped by the federal Environmental Protection Agency.

143.    When flaring is limited by regulators[6] and export market access is delayed, the Texas General Land Office's lessees will not only have to shut-in or delay drilling wells classified as natural gas wells, but also wells classified as oil wells because there will be no way to handle gas produced alongside oil. Not only will there be losses related to shutting in existing wells, in undeveloped areas with proven reserves of oil and gas, the inability to market or flare the gas in order to extract the oil will prevent a prospective lessee from leasing Permanent School Fund land because of the inability to economically produce. This deprives the Permanent School Fund of potential bonuses, rents, and royalties that would otherwise benefit Texas public schools and effectively condemns the Permanent School Fund minerals in place—*i.e.*, left in the ground with no commercially reasonable option or opportunity for the minerals' production.

144.    The Permanent School Fund also generates significant revenue from easements, surface structure leases, and fees associated with use of and access to state-owned submerged land in the Gulf of Mexico. Rents from such easements and leases can generate millions of dollars per year for the Permanent School Fund; a recent pipeline easement across Sabine Lake for use in connection with a Texas-located LNG export facility generated over $1,000,000 to the Permanent School Fund just by itself. The LNG Export Ban jeopardizes current and future revenue resulting from pipelines, dredge

---

[6] In fact, the Biden Administration is doubling down on its efforts to undercut energy resources by recently adopting sweeping methane emissions control requirements for oil and gas infrastructure that are aimed at eliminating flaring, including for existing wells. *See* EPA, *Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 89 Fed. Reg. 16,820 (Mar. 8, 2024).

sites, platforms, and other LNG production related infrastructure because it (1) postpones investment in these uses of state-owned land when applications for export will not be processed, (2) prevents existing LNG operators from expanding their lease footprint or taking new pipeline easements to accommodate expansion when applications will not be processed, and (3) encourages investment in other countries' LNG industries where regulatory agencies have not arbitrarily paused LNG export applications.

145.    Beyond the harms to the Permanent School Fund, the LNG Export Ban will deprive Texas of significant tax revenue that provides critical funding for the State Highway Fund, the state's "Rainy Day Fund" to be used in case of emergency such as relief following natural disasters, and Foundation School Program, a Texas Education Agency-administered fund used for expenses such as teacher salaries, bilingual education and special education. *See Taxes of Texas, A Field Guide*, Texas Comptroller of Public Accounts (Jan. 2024), https://perma.cc/7VNA-6X2Y. Because natural gas production in Texas is taxed at 7.5 percent of the market rate, the LNG Export Ban will effectively cap potential tax revenue at the domestic sales hub rate rather than export market rate that—as set forth above—is currently more than 5 times higher. *Id.* at 3. In the 2023 fiscal year, natural gas taxes generated $3.35 billion dollars for the state, comprising 4.1 percent of state revenue. *Id.* at 2, 16-17; *see also id.* at 14-15 (oil production taxes generated $5.93 billion dollars or 7.2 percent of state revenue).

146.    The LNG Export Ban will also result in significant harm to West Virginia.

147.    West Virginia is the nation's fourth-largest producer of natural gas. *State Profile and Energy Estimates: West Virginia*, U.S. Energy Info. Admin., https://perma.cc/KYU3-A5W7. It accounts for about seven percent of the nation's total natural gas production. *Profile Data: West Virginia*, U.S. Energy Info. Admin., https://perma.cc/42TQ-GJXD. The State sits atop the most prolific natural gas formation in the world.

148.    Most of West Virginia's natural-gas production is sent to places outside West Virginia. In 2022, for example, "West Virginians consumed less than one-tenth of the natural gas produced in the state." *See State Profile and Energy Estimates: West Virginia*, *supra.*  Indeed, "the first LNG facility [in the country] was constructed in 1912 in West Virginia to liquefy gas produced in that state for trans-portation elsewhere." R. Clingman & A. Cumming, *The 2005 Energy Policy Act: Analysis of the Jurisdictional Basis for Federal Siting of LNG Facilities*, 2 Tex. J. Oil Gas & Energy L. 57, 60 (2007). Even years ago, it was recognized that West Virginia's "lower domestic reliance on gas [would] allow West Virginia to remain critical in supplying gas to other states and even LNG export facilities to nations abroad." J. Clemente, *West Virginia Emerging as a Natural Gas Powerhouse*, Rigzone (Sept. 23, 2019), https://perma.cc/TK3Q-2JKV.

149.    Natural gas plays a central role in West Virginia's economy—indeed, the energy value of natural gas now surpasses that of the State's coal production. *Id.* The natural-gas and oil sector employs more than 17,000 people directly in the State, with more than 73,000 indirectly employed. *See W. Va. Neutral Gas Production Rises, Revenues Grow in 2022*, Gas & Oil Assoc. of W. Va. (Aug. 17, 2023), https://perma.cc/2PDF-3F3W. These jobs produced nearly $5 billion in labor income. *New Analysis: West Virginia's Abundant Natural Gas and Oil Reserves Provide Nearly $13 Billion in Economic, Trade & Jobs Benefits*, Am. Petro. Inst. (May 16, 2023), https://perma.cc/VGZ2-GBUW. All told, the oil-and-gas industry contributes nearly $13 billion to the State's economy. *Id.* Given the sector's size, it's no sur-prise that "West Virginia's natural gas producers [are] helping to meet the growing demand for U.S. LNG." C. Burd, *How W.Va. Oil and Gas Aids U.S. Foreign Policy*, The Intelligencer (Feb. 12, 2022), https://perma.cc/6DV3-KRPZ.

150.    Indeed, West Virginia's natural gas already contributes directly to LNG exports. For example, Antero Resources Corporation (operating in West Virginia and other parts of the Appala-chian Basin) has supplied 2.1 Bcf/d natural gas production to LNG facilities; among other things,

Antero provides feed gas for the Cove Point LNG Terminal near Lusky, Maryland. West Virginia is also one of the homes of Southwestern Energy; and "[a]t 1.5 Bcf per day, Southwestern Energy already sells the largest volume of natural gas directly to LNG exporters." *Letter from the Chairman of the Board*, Southwestern Energy, https://perma.cc/ZY9Z-H2XM. Industry experts see a need for more than 30 Bcf/d LNG export capacity just along the Eastern seaboard—an area served by West Virginia producers. *See* EQT, *Unleashing the U.S. LNG: The Largest Green Initiative on the Planet* (Mar. 2022), at 40, https://perma.cc/B5L4-NHA5. And West Virginia capacity can backfill markets that might otherwise be served by Gulf Coast States that are instead exporting LNG abroad.

151. So at least before the LNG Export Ban, West Virginia LNG exports promised significant returns for the State. *See, e.g.*, J. Beresky, *From Fracking to the FERC to Finland: An Overview of the Regulatory and Market Factors Impacting the Export of Liquefied Natural Gas*, 10 Ky. J. Equine, Agric. & Nat. Res. L. 133, 133 (2018) ("With the increasing capacity of pipeline infrastructure, there is immense potential for growth in the natural gas production industry in the Appalachian Basin, directly related to increased LNG exports."). But without an LNG export market, the market for natural gas more generally—and the economic development that comes with it—will be undermined.

152. The LNG Export Ban could prevent the potential future development of LNG export markets for West Virginia, thwarting the natural-gas industry in the State as a whole. For instance, Penn America Energy had explored constructing an LNG export terminal in the nearby city of Chester, Pennsylvania—a terminal that would have been the largest such facility on the Eastern Seaboard. *See* K. Cooper & S. Phillips, *Could Delco Get a Major LNG Export Terminal?*, WHYY (June 16, 2022), https://perma.cc/2WT4-69WK. West Virginia could have provided feed gas to that facility, as it does with Cove Point. But with the LNG Export Ban in place, development seems far less likely. *See* A. Wood, *Biden's Pause on LNG Approvals May Have 'Saved Chester,' The City's New Mayor Says*, The Philadelphia Inquirer (Jan. 31, 2024), https://perma.cc/92C5-NPFJ. The LNG Export Ban also makes it

41

far less likely that a once-promised $84 billion LNG-related investment agreement with China will ever come to fruition.

153.    This damage to the natural gas industry will directly injure the State in the form of lost tax revenues. For instance, West Virginia imposes a five percent severance tax on the extraction of natural resources like natural gas (relative to gross value at the well head). *See* N. Barkus, *The Future of West Virginia's Severance Tax*, Panhandle Progressive (Apr. 16, 2018), https://perma.cc/L8P4-XJ4V. Severance tax revenues are substantial—in fiscal year 2022, for instance, the State collected nearly $409 million in severance tax from the natural-gas industry. *See* W. Va. Tax Division, *Severance Taxes* (2022), https://perma.cc/4MGH-XQPZ. Indeed, severance tax collections from natural gas have been credited for the State's recent improved fiscal condition. *See* Office of the Governor, *Gov. Justice: West Virginia shatters all-time financial records with close of fiscal year* (June 30, 2023), https://perma.cc/77ZW-Z3R4. But stymied natural gas production will in turn stymie the severance tax collections that West Virginia could otherwise expect.

154.    The State derives substantial revenues from the natural gas industry in other ways. For example, the State also imposes a separate property tax on the value of natural-gas-producing wells. *See* W. Va. Code St. R. § 110-1J-1. *et seq.* This property tax likewise produces tens of millions of dollars in revenue, much of it returning to local governments. But here again, the value of the wells could be expected to decline if the market for the production deriving from them shrinks.

155.    Natural-gas producers also donate to public entities. Antero, for instance, recently donated $4 million to an energy education program at West Virginia University. *Training the next generation: Antero's $4M gift to WVU aids energy education*, WVUToday (Aug. 31, 2023), https://perma.cc/ZF2T-NUWX. Donations like these, too, could be threatened.

156.     The harms caused by the LNG Export Ban are irreparable. *See Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 340 (E.D. La. 2011); *see also Rest. Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023).

## CLAIMS FOR RELIEF

### COUNT I
### The LNG Export Ban Is Contrary to Law
### (5 U.S.C. § 706; 15 U.S.C. § 717b(a))

157.     Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

158.     The LNG Export Ban is final agency action. It marks the consummation of the agency's decisionmaking process because it finally decides that export applications should not be considered until the undisclosed date at which the not-public review of the public-interest determination will be completed. *See Louisiana*, 622 F. Supp. 3d at 291 ("As long as an agency has completed its decision-making on a challenged rule—even one interim in nature—the rule satisfies the first prong of the finality test." (citing *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 79–80 (D.C. Cir. 2020))). And legal consequences flow from this action—before the LNG Export Ban, entities were entitled to have their application considered by the Secretary and presumably granted unless the Secretary made an adverse finding. *Cf. id.*

159.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority[] or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

160.     By preventing consideration of LNG export applications, the LNG Export Ban violates the statutory requirement that the Secretary "shall issue such order upon application, unless, after opportunity for hearing, [the Secretary] finds that the proposed exportation or importation will not be consistent with the public interest." 15 U.S.C. § 717b(a). This provision provides no discretion for the

43

Secretary to decline to consider applications. Rather, the Secretary must consider an application and grant it unless she makes an affirmative finding that granting the application is not in the public interest. *See Sierra Club I*, 867 F.3d at 203 ("[T]here must be 'an affirmative showing of inconsistency with the public interest' to deny the application."). The Export Ban's across-the-board prohibition even on considering applications violates the statute's unambiguous command.

**COUNT II**
**The LNG Export Ban Is Not Authorized by Statute**
**(5 U.S.C. § 706)**

161.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

162.    Under the APA, a court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

163.    "An agency … 'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301 (2022) (quoting *Louisiana Publ. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

164.    Courts "presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). When an agency asserts power to take an action with "deep 'economic and political significance,'" courts are skeptical of its claimed statutory authority. *King v. Burwell*, 576 U.S. 473, 486 (2015).

165.    "To overcome that skepticism, the Government must—under the major questions doctrine—point to 'clear congressional authorization' to regulate in that manner." *West Virginia*, 597 U.S. at 732.

166.    It is not enough for an agency action to have "a colorable textual basis." *Id.* at 722. Instead, Congress's authorization for that action must be "clear." *Id.* at 723.

167.     The LNG Export Ban implicates an issue of profound national importance. LNG exports account for billions of dollars to the economy and thousands of jobs. They also raise serious questions of national security. And this is an issue that has been the subject of proposed legislation and public attention in and outside of Congress.

168.     Bills have been submitted to achieve this same result, but to no avail. Rulemaking petitions seeking this same result have been rejected.

169.     Because Defendants have identified no statutory authority whatsoever, much less clear statutory authority, the LNG Export Ban is beyond the Department's authority.

## COUNT III
### The LNG Export Ban Violates the APA's Notice-and-Comment Requirement
### (5 U.S.C. § 706)

170.     Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

171.     A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

172.     Notice-and-comment rulemaking "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." 5 U.S.C. § 553(c).

173.     The notice-and-comment process also benefits the agency by affording the agency the "chance to avoid errors and make a more informed decision." *Azar v. Alina Health Servs.*, 139 S. Ct. 1804, 1816 (2019).

174.     These requirements "are not mere formalities" but rather "are basic to our system of administrative law." *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018). That is why agencies must "subject their substantive rules to notice and comment" otherwise the rules "may not be enforced." *W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019) (citing

45

5 U.S.C. § 553). This helps "assure fairness and mature consideration of rules of general application," and it allows the agency "to educate itself." *Phillips Petro. Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir. 1994) (quotations omitted), *modified on other grounds,* No. 93–1377, 1994 WL 484506 (June 10, 1994).

175.    The LNG Export Ban is a substantive, binding agency action requiring notice and comment. It is not an interpretative rule, policy statement, or internal practice or procedure. *See Texas*, 809 F.3d at 170-71; *Batterton v. Marshall*, 648 F.2d 694, 701-02 (D.C. Cir. 1980). That is because the LNG Export Ban alters "rights and obligations" and does not leave agency decisionmakers free to grant export applications unless, exercising their discretion, they find that granting the application would contravene the public interest. *See Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (explaining the focus is "primarily on whether the rule has binding effect on agency discretion or severely restricts it"); *see also Louisiana*, 622 F. Supp. 3d at 295 ("When distinguishing policy statements from substantive rules, the Fifth Circuit instructs district courts to determine whether the rule imposes any rights and obligations, and whether it genuinely leaves the agency and its decisionmakers free to exercise discretion.").

176.    On its face, the LNG Export Ban imposes a moratorium on even considering export applications. That both alters the rights of private parties and deprives agency decisionmakers of their discretion to grant applications. Because this decision alters potential lessees' right to have their applications examined, it is a substantive rule that cannot be imposed by fiat. Instead, it must be promulgated through the APA's notice-and-comment procedures. *See Louisiana*, 622 F. Supp. 3d at 295–96 ("The Executive Order effectively commands that the [the Department of the Interior] stop performing its obligations under [statutes] to sell oil and natural gas leases. That impact is legal in nature.").

177.    No exceptions to the notice-and-comment requirement apply to the LNG Export Ban.

178.    No good cause exists for failure to undertake notice-and-comment on the LNG Export Ban. Indeed, the Department does not attempt to rely on the good-cause exception, which is sufficient to foreclose any good-cause-exception argument. *See N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 751 (10th Cir. 1987) (noting the agency "bears the burden of demonstrating good cause"); *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) ("In making our decision, we must rely only on the 'basis articulated by the agency itself' at the time of the rulemaking.").

179.    In any event, any good-cause argument would fail because no emergency situation exists, and a delay would not result in serious harm.

180.    "[I]t is well established that the 'good cause' exception to notice-and-comment should be read narrowly in order to avoid providing agencies with an escape clause from the requirements Congress prescribed." *Johnson*, 632 F.3d at 928 (internal quotation marks omitted); *see Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (explaining the good-cause exception is not an "escape clause[]" to be "arbitrarily utilized at the agency's whim"). Accordingly, the good-cause exception "is to be narrowly construed and only reluctantly countenanced." *United States v. Ross*, 848 F.3d 1129, 1132 (D.C. Cir. 2017) (quotation marks and citation omitted); *Council of the S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 (D.C. Cir. 1981). Courts therefore generally restrict agencies' use of the "good cause" exception "to emergency situations," *Mack Trucks*, 682 F.3d at 93 (citation omitted), such as where a "delay would imminently threaten life or physical property" or risk "fiscal calamity," *Sorenson Comm'ns Inc. v. FCC*, 755 F.3d 702, 706–07 (D.C. Cir. 2014).

181.    There is no evidence in the (nonexistent) administrative record that the Department had good cause to decline to invoke the APA's notice-and-comment provisions.

182.    The Department's failure to comply with the APA's notice-and-comment provisions is fatal to the LNG Export Ban.

183.     Finally, the final rule is not a logical outgrowth of any proposed rule because "[s]ome-thing is not a logical outgrowth of nothing." *Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994). And here, the agency provided nothing in advance of its final rulemaking. This, by definition, fails the logical-outgrowth test, which violates the notice-and-comment rulemaking process.

184.     Because "[i]t is uncontested that no notice and comment was conducted by Govern-ment Defendant agencies pursuant to 5 U.S.C. § 553[,] [t]he actions taken were substantive in nature, and the agency did not have good cause to forego the notice and comment requirement. . . . [T]he actions of the Government Defendants violate the APA's notice and comment procedure." *Louisi-ana*, 622 F. Supp. 3d at 296.

## COUNT IV
### The LNG Export Ban Is Arbitrary and Capricious
### (Ignores July 2023 Decision)
### (5 U.S.C. § 706)

185.     Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

186.     Under the APA, a court must "hold unlawful and set aside agency action" that is arbi-trary or capricious or otherwise not in accordance with law or is contrary to the Constitution. 5 U.S.C. § 706(2)(A).

187.     "An agency may not 'depart from a prior policy *sub silentio* or simply disregard rules still on the books.'" *Louisiana v. DOE*, 90 F.4th 461, 469 (5th Cir. 2024) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). "Rather, the agency must 'display awareness that it is changing position.'" *Id.* That means "changes require careful comparison of the agency's statements at T0 and T1 to ensure that the agency has recognized the change, reasoned through it without factual or legal error, and balanced all relevant interests affected by the change." *Id.* "An agency cannot shift its un-derstanding of the law between those two times, deny or downplay the shift, and escape vacatur under

the APA." *Wages & White Lion Invs., L.L.C. v. Food & Drug Admin.*, 90 F.4th 357, 381 (5th Cir. 2024) (en banc).

188.    That means the Department was required to "provide a 'detailed justification' for its change" here. *Id.* It did not, so its decision is "arbitrary or capricious." *Id.*

189.    The July 2023 Decision and LNG Export Ban are irreconcilable. Yet, the Department does not so much as acknowledge the existence of the July 2023 Decision or attempt to demonstrate why it now rejects its earlier, well-supported conclusions. This is black-letter arbitrary-and-capricious administrative action.

**COUNT V**
**The LNG Export Ban Is Arbitrary and Capricious**
**(Unreasoned)**
**(5 U.S.C. § 706)**

190.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

191.    Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or is contrary to the Constitution. 5 U.S.C. § 706(2)(A).

192.    "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspect[s] of the problem." *Michigan v. EPA*, 576 U.S. 743, 750–52 (2015) (internal quotation marks omitted) (requiring "reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

193.    For starters, an agency cannot "entirely fail[] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

194.    Further, agencies must actually analyze the relevant factors. "'Stating that a factor was considered . . . is not a substitute for considering it.'" *Louisiana*, 90 F.4th at 473. The agency must

instead provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Id.* ("We have previously held that 'conclusory statements'—like [the Department's]—do not constitute adequate agency consideration of an important aspect of a problem."); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

195.    Moreover, an agency may not advance arguments before a court without first presenting them in the administrative record. Rather, "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses its action was based." *Louisiana*, 90 F.4th at 469 (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). "The Supreme Court has repeatedly reaffirmed this prohibition on 'convenient litigating position[s]' and 'post hoc rationalization[s].'" *Id.* (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962)).

196.    "[D]ue deference to agencies does not make arbitrary and capricious review 'toothless'; rather, it has 'serious bite.'" *Id.* at 470.

197.    Defendants have provided no reasoning whatsoever for the LNG Export Ban. Indeed, Defendants do not even mention the Natural Gas Act or the considerations the Department has long found relevant under that statute. And the Department does not explain why a halt is necessary to conduct a review of the public interest decisionmaking process. Ipse dixit is not reasoned decisionmaking. This is particularly egregious given the decades of specific factual findings that LNG exports are in the public interest.

198.    The Department has thus failed in its obligation to reasonably explain the LNG Export Ban.

## COUNT VI
### The LNG Export Ban Is Arbitrary and Capricious
### (Unexplained Departure from Longstanding Policy)
### (5 U.S.C. § 706)

199.   Plaintiff States repeat and incorporate by reference all the Complaint's allegations stated above.

200.   Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or is contrary to the Constitution. 5 U.S.C. § 706(2)(A).

201.   As explained, "[a]n agency may not 'depart from a prior policy *sub silentio* or simply disregard rules still on the books,'" but rather it "must 'display awareness that it is changing position.'" *Louisiana*, 90 F.4th at 469 (quoting *Fox Television Stations*, 556 U.S. at 515).

202.   With the LNG Export Ban, the Department *sub silentio* departs from at least five longstanding agency policies.

203.   *First*, the Department departs from its longstanding policy of determining the public interest through a case-by-case process. *See* July 2023 Decision at 17.

204.   *Second*, the Department departs from its longstanding policy of generally relying on market forces rather than agency intervention. *See, e.g.*, *Phillips Alaska Natural Gas Corp., et al.*, DOE/FE Order No. 1473, Docket No. 96-99-LNG, Order Extending Authorization to Export Liquefied Natural Gas from Alaska (Apr. 2, 1999), at 14, 17.

205.   *Third*, the Department departs from its longstanding policy of presuming that an application will be granted. *See* July 2023 Decision at 10 ("DOE, as affirmed by the D.C. Circuit [] has consistently interpreted this provision as creating a rebuttable presumption that a proposed export of natural gas is in the public interest.").

206.   *Fourth*, the Department departs from its longstanding approach to accounting for environmental concerns. The Department has long deemed the Federal Energy Regulatory

Commission's exhaustive environmental review, conducted with the Department as an assisting agency, to be sufficient. *See, e.g.*, *Sierra Club I*, 867 F.3d at 198-99. Now the Department, without explanation, departs from this longstanding process, and declares that more environmental review is needed—even though the Department and Federal Energy Regulatory Commission already account for greenhouse emissions in their case-by-case environmental analysis.

207.    *Fifth*, the Department gave short shrift to foreign affairs and allied security considerations in contrast to its longstanding policy. In its ordinary review, the Department places great weight on the effect of the exports on the allies and trading partners, which the LNG Export Ban failed to do. *See* Gen. James L. Jones, *America can't ignore the national security concerns tied to the LNG freeze*, The Hill (Feb. 17, 2024), https://perma.cc/Q8JQ-WW3Z ("As former national security advisor to President Obama and former supreme allied commander of NATO, I am compelled to call attention to the significant national security ramifications involved in the administration's decision to pause new U.S. [LNG] export licenses.").

208.    Because the Department does not acknowledge, much less explain, its change in position, the LNG Export Ban is arbitrary and capricious.

### COUNT VII
### The LNG Export Ban Is Arbitrary and Capricious
### (Failure to Consider Important Aspects of the Problem)
### (5 U.S.C. § 706)

209.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

210.    An agency cannot "entirely fail[] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

211.    In addition to the issues discussed throughout this Complaint, the Department failed to consider numerous other important aspects of the problem. The Department failed to consider the impact on national security, even though U.S. allies rely on U.S. LNG exports, particularly in a time

of war. *See generally* ICF, *Study of Infrastructure Needed to Expand US LNG Exports to European and Asian Allies* (July 18, 2023), https://perma.cc/7FBY-5W2K. The Department failed to consider the impact on Plaintiff States' revenue. The Department failed to consider the impact on employment opportunities and economic growth. The Department failed to consider the downstream impact on other industries, such as the construction industry and investment companies. The Department failed to consider the impact on particular communities and on schools and charities that rely on funding from LNG exports. And the Department even failed to consider whether the LNG Export Ban will increase pollution or otherwise harm the environment by increasing foreign reliance on energy sources that are worse for the environment. *See, e.g.*, C. Barnard, *Biden's LNG 'Pause' Will Hurt the Environment*, Wall Street Journal (Jan. 26, 2024), https://www.wsj.com/articles/bidens-lng-export-permit-pause-will-hurt-the-environment-and-carry-geopolitical-risk-76dbcc99; R. Rapier, *How An American LNG Export Pause Could Increase Global Carbon Emissions*, Forbes (Jan. 29, 2024), https://perma.cc/3WQR-84HK.

212.    Each of those failures is yet another reason the LNG Export Ban is arbitrary and capricious under the APA.

## COUNT VIII
### The LNG Export Ban Is Arbitrary and Capricious
### (Failure to Consider Alternatives Within Previous Policy)
### (5 U.S.C. § 706)

213.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

214.    "[W]hen an agency rescinds [or alters] a prior policy[,] its reasoned analysis must consider the alternatives that are *within the ambit of the existing policy*." *Wages & White Lion Invs.*, 16 F.4th at 1139 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020)).

215.    As explained extensively above, the Department has several longstanding policies that it failed even to acknowledge in issuing the Ban. The Department did not examine any policies within

the ambit of its current approach, such as conducting the review it envisions without imposing a ban on LNG export authorizations.

216.    Because the Department did not "consider[] less disruptive alternatives," *id.*, or any alternatives whatsoever, the LNG Export Ban is arbitrary and capricious, *Louisiana*, 90 F.4th at 476 ("A policy's failure to fulfill this requirement renders that policy arbitrary and capricious, even if this defect is sole and 'alone.'").

**COUNT IX**
**The LNG Export Ban Is Arbitrary and Capricious**
**(Failure to Consider Reliance Interests)**
**(5 U.S.C. § 706)**

217.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

218.    An action is arbitrary and capricious if it does not consider the reliance interests of those affected by it. *Regents of the Univ. of California*, 140 S. Ct. at 1913.

219.    Plaintiff States and their economies have reasonably relied on the Department's longstanding approach to LNG export applications. Not only have entities invested and filed export applications in reliance on the previous system, but at least one entity has even incurred expenses to re-file applications in direct reliance on the Department's request to cure defects and re-file. The APA "prohibits administrative agencies from saying one thing, pulling a surprise switcheroo, and ignoring the reasonable reliance interests engendered by its previous statements." *Wages & White Lion Invs.*, 90 F.4th at 386; *see also Allina Health Servs.*, 139 S. Ct. at 1810 (citing the "surprise switcheroo" doctrine).

220.    The Department's failure even to consider these reliance interests renders the LNG Export Ban arbitrary and capricious.

## COUNT X
### The LNG Export Ban Is Arbitrary and Capricious
### (Failure to Conduct Cost/Benefit Analysis)
### (5 U.S.C. § 706)

221.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

222.    "[A] regulation is arbitrary and capricious if the agency failed to consider an important aspect of the problem." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) (cleaned up). "This includes, of course, considering the costs and benefits associated with the regulation." *Id.*

223.    The Department entirely failed to consider the costs and benefits of the LNG Export Ban. This is particularly egregious given the extensive LNG export analyses that the Department has conducted and relied upon in the past.

## COUNT XI
### The LNG Export Ban Is Arbitrary and Capricious
### (Pretext/Conflicting Explanations)
### (5 U.S.C. § 706)

224.    Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

225.    The opaque and rushed nature of the LNG Export Ban, along with its irreconcilable conflict with the July 2023 Decision's administrative record, fatally undermine the integrity of this decisionmaking process. The LNG Export Ban appears to have been a rushed decision. "That did not leave much time for reflection and analysis." *Texas v. United States*, 524 F. Supp. 3d 598, 654 (S.D. Tex. 2021). Given the extensive prior administrative records and decades-long practice, there is a "significant mismatch" between the justification given by Defendants and the administrative record. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019). Although a finding that the agency's stated reasoning for a decision is pretextual should not be made lightly, this is the rare case.

226. After making a robustly supported decision just months ago (that itself reaffirmed decades of policy), the Administration reversed course in an election year after an intense pressure campaign. Although "review is deferential," that does not mean courts are "required to exhibit a naiveté from which ordinary citizens are free." *Id.* (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).

227. Here, Defendants suggest that the reason for the LNG Export Ban is that the export-application process needs to be halted to conduct an environmental review. But the real reason for the LNG Export Ban is obvious: politics. Defendants caved to a sustained political pressure campaign in an election year and, as a result, disregarded the law.

## COUNT XII
### The LNG Export Ban Violates the Congressional Review Act
### (5 U.S.C. §§ 801–808)

228. Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

229. The Congressional Review Act requires all rules to be submitted to Congress to allow it an opportunity to pass a resolution disapproving the rule. If a rule is a major rule, the Government Accountability Office must provide a report and the effective date of the rule must be delayed. 5 U.S.C. § 801.

230. The LNG Export Ban is a major rule. These requirements, however, were not followed.

231. For the reasons already discussed about the APA's good-cause exception, the Department cannot meet the good-cause standards to avoid the Congressional Review Act's procedures. *Sorenson Commc'ns*, 755 F.3d at 706 ("Deference to an agency's invocation of good cause—particularly when its reasoning is potentially capacious, as is the case here—would conflict with this court's deliberate and careful treatment of the exception in the past.").

232.     Accordingly, the LNG Export Ban violates the Congressional Review Act, providing further reason to conclude the LNG Export Ban exceeds the Department's statutory authority and is not in accordance with law.

## COUNT XIII
### The LNG Export Ban Unreasonably Delays Agency Action
### (5 U.S.C. § 706)

233.     Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

234.     A "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

235.     An agency unreasonably delays action when (1) it "'failed to take a discrete agency action that it is required to take'" and (2) that "delay was unreasonable." *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 340 (D.C. Cir. 2023).

236.     Because Defendants offer no reason for their delay in processing applications, they have unlawfully delayed statutorily required LNG Export application decisions. *Ensco Offshore Co.*, 781 F. Supp. 2d at 339.

## COUNT XIV
### The LNG Export Ban Is Unconstitutional
### (Separation of Powers and Foreign Commerce Clause)
### (U.S. Const. art. I, §§ 1, 8, cl. 3; 5 U.S.C. § 706)

237.     Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

238.     The Constitution vests Congress with "[*a*]*ll* legislative Powers," including specifically the power "[t]o regulate Commerce *with foreign Nations,* and among the several States, and with the Indian Tribes." U.S. Const. art. I, §§ 1, 8, cl. 3 (emphases added).

239.     A ban on LNG exports is a regulation of foreign commerce. *Cf. United States v. Baston*, 818 F.3d 651, 667 (11th Cir. 2016).

240.     Congress enjoys this power exclusively. *Id.* Defendants' attempt to regulate foreign commerce without congressional authorization through the LNG Pause violates Article I of the Constitution.

241.     Plaintiffs assert this claim under the APA and under the *Larson* doctrine. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-90 (1949).

## COUNT XV
### The Actions of the Department and Its Officials Are Ultra Vires

242.     Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

243.     The actions of the Department and its officials (Defendants Granholm, Turk, Richmond, Crabtree, and Sweeney) in issuing and enforcing the LNG Export Ban are ultra vires and outside their statutory authority. As explained, there is no statutory authority for the LNG Export Ban, and it flouts 15 U.S.C. § 717b(a)'s mandate that export applications shall be issued unless there is an affirmative finding the specific proposed export would be inconsistent with the public interest.

244.     Ultra vires review is appropriate under the APA, *see Apter v. HHS*, 80 F.4th 579, 587 (5th Cir. 2023), and, in the alternative, it is appropriate under the common law, *see Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763-64 (D.C. Cir. 2022).

## COUNT XVI
### President Biden's Proclamation Is Ultra Vires

245.     Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

246.     Ultra vires review is appropriate to determine "whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011) (citing *Mountain States Legal Found. v. Bush*, 306 F.3d

1132, 1136 (D.C. Cir. 2002)); *see also Associated Builders & Contractors of Se. Texas v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016) ("The [Department of Labor], a federal agency also operating within the Executive Branch, has implemented the President's Executive Order by issuing the Guidance incorporated by reference in the new Rule. Therefore, the Executive Order may be challenged by Plaintiffs on both statutory and non-statutory grounds." (citing *Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996))).

247.     The LNG Export Ban is not justified by any statutory authority and thus is beyond the President's powers.

## PRAYER FOR RELIEF

248.     Plaintiff States therefore request that the Court enter an order and judgment that grants the following relief, which it is authorized to do under 5 U.S.C. §§ 702, 705, 28 U.S.C. § 2201, and Federal Rules of Civil Procedure 57 and 65:

   a.   Declare that the LNG Export Ban is contrary to law and in excess of statutory authority under the APA, or that it is an *ultra vires* action;

   b.   Declare that the LNG Export Ban is arbitrary and capricious and unlawful under the APA;

   c.   Declare that the LNG Export Ban violates the APA because it was promulgated without notice and comment;

   d.   Declare that the LNG Export Ban violates 15 U.S.C. § 717b(a);

   e.   Declare that the LNG Export Ban violates the Congressional Review Act;

   f.   Declare the LNG Export Ban violates Article I of the Constitution;

   g.   Declare that President Biden's Proclamation is *ultra vires*;

   h.   Vacate the LNG Export Ban as unlawful;

   i.   Stay the LNG Export Ban under 5 U.S.C. § 705;

j.   Preliminarily and permanently enjoin, without bond, Defendants from halting or attempting to halt the consideration of LNG Export applications;

k.   Grant all other relief to which Plaintiff States are entitled, including but not limited to attorneys' fees and costs.

Dated: March 21, 2024

Tyler R. Green*
Daniel Shapiro*
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

Respectfully submitted,

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

 _/s/_ Morgan Brungard
J. Benjamin Aguiñaga*
  *Solicitor General*
Morgan Brungard (La #40298)
  *Deputy Solicitor General*
Autumn Hamit Patterson*
  *Special Assistant Solicitor General*
OFFICE OF THE LOUISIANA ATTORNEY
GENERAL
1885 North Third Street
Baton Rouge, LA 70804
(225) 326-6766
brungardm@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

60

**KEN PAXTON**
**Attorney General of Texas**
**BRENT WEBSTER**
**First Assistant Attorney General**
**JAMES LLOYD**
**Deputy Attorney General for Civil Litigation**
**KELLIE E. BILLINGS-RAY**
**Chief, Environmental Protection Division**

*/s/ J. Amber Ahmed*
J. Amber Ahmed*
  *Assistant Attorney General*
Ian M. Lancaster*
  *Assistant Attorney General*
H. Carl Myers*
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
ENVIRONMENTAL PROTECTION DIVISION
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Telephone (512) 463-2012
Facsimile (512) 320-0911
Amber.Ahmed@oag.texas.gov
Ian.Lancaster@oag.texas.gov
Carl.Myers@oag.texas.gov

*Counsel for Plaintiff State of Texas*

**LYNN FITCH**
**Attorney General of Mississippi**

*/s/* Justin L. Matheny
Justin L. Matheny*
  *Deputy Solicitor General*
MISSISSIPPI ATTORNEY GENERAL'S
OFFICE
P.O. Box 220
Jackson, MS 39205
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of*
*Mississippi*

**STEVE MARSHALL**
**Attorney General of Alabama**

*/s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.*
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

**TREG TAYLOR**
**Attorney General of Alaska**

*/s/ Mary Hunter Gramling*
Mary Hunter Gramling*
STATE OF ALASKA
DEPARTMENT OF LAW
P.O. Box 110300
Juneau, AK 99811-0300
Telephone: (907) 465-3600
Facsimile: (907) 465-2520
Email: mary.gramling@alaska.gov

*Counsel for Plaintiff State of Alaska*

**TIM GRIFFIN**
**Attorney General of Arkansas**

*/s/ Nicholas J. Bronni*
Nicholas J. Bronni*
  *Solicitor General*
Dylan L. Jacobs*
  *Deputy Solicitor General*
OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov
dylan.jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

**ASHLEY MOODY**
**Attorney General of Florida**

*/s/ Natalie P. Christmas*
Natalie P. Christmas*
  *Counselor to the Attorney General*
OFFICE OF THE FLORIDA ATTORNEY
GENERAL
PL-01 the Capitol
Tallahassee, Florida 32399
(850) 414-3300
natalie.christmas@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**

*/s/ Stephen J. Petrany*
Stephen J. Petrany*
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

**KRIS W. KOBACH**
**Attorney General of Kansas**

*/s/ Erin B. Gaide*
Erin B. Gaide*
  *Assistant Attorney General*
Memorial Building, 2nd Floor
120 S.W. 10th Avenue
Topeka, Kansas 66612-1597
Tel: (785) 296-2215
Fax: (785) 296-2218
Email: erin.gaide@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

**AUSTIN KNUDSEN**
**Attorney General of Montana**

*/s/ Christian B. Corrigan*
Christian B. Corrigan*
  *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for Plaintiff State of Montana*

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**

*/s/ Grant D. Strobl*
Grant D. Strobl*
  *Assistant Solicitor General*
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.Strobl@nebraska.gov

*Counsel for Plaintiff State of Nebraska*


**ALAN WILSON**
**Attorney General of South
Carolina**

*/s/ Joseph D. Spate*
Joseph D. Spate*
  *Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Plaintiff State of South Carolina*


**GENTNER DRUMMOND**
**Attorney General of Oklahoma**

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II*
  *Solicitor General*
OFFICE OF OKLAHOMA ATTORNEY
GENERAL
313 NE 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov

*Counsel for Plaintiff State of
Oklahoma*


**SEAN D. REYES**
**Attorney General of Utah**

*/s/ Stanford E. Purser*
Stanford E. Purser*
  *Utah Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Telephone: (801) 538-9600
spurser@agutah.gov

*Counsel for Plaintiff State of Utah*

**PATRICK MORRISEY**
**Attorney General of West Virginia**

*/s/ Michael R. Williams*
Michael R. Williams*
  *Principal Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd. East
Building 1, Room E-26
Charleston, WV 25305
Tel: (304) 558-2021
Michael.R.Williams@wvago.gov

*Counsel for Plaintiff State of*
*West Virginia*

*Pro Hac Vice admission application forthcoming

**BRIDGET HILL**
**Attorney General of Wyoming**

*/s/D. David DeWald*
D. David DeWald*
  *Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
OF WYOMING
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for Plaintiff State of Wyoming*