## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

The State of LOUISIANA,
By and through its Attorney General,
Elizabeth B. Murrill; et al.,

PLAINTIFFS,

v.

Joseph R. BIDEN, Jr. in his official capacity as
President of the United States; et al.,

DEFENDANTS.

Civil Action No. 2:24-cv-00406-JDC-TPL

Judge James D. Cain, Jr.
Magistrate Judge Thomas P. LeBlanc

## MEMORANDUM IN SUPPORT OF MOTION FOR A STAY UNDER 5 U.S.C. § 705 OR FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 1

I.    THE SHALE GAS BOOM AND LNG EXPORTS BOLSTER THE ECONOMY AND ENERGY SECURITY. ..................................................................................................... 1

II.   CONGRESS ESTABLISHES A LEGAL FRAMEWORK PRESUMING THAT NATURAL GAS EXPORTS AND IMPORTS ARE IN THE PUBLIC INTEREST. .................................................. 2

III.  THE DEPARTMENT IMPLEMENTS THE STATUTORY LNG EXPORT APPLICATION PROCESS AND REPEATEDLY CONCLUDES LNG EXPORTS ARE IN THE PUBLIC INTEREST. ....................... 3

      A.    The Department Applies the Statutory Presumption in Favor of Exports. ................. 3

      B.    The Department Consistently Looks to the 1984 Policy Guidelines. ........................... 4

      C.    The Department Employs a Case-By-Case Approach. ................................................ 4

      D.    The Department Conducts Studies and Issues Orders Concluding that LNG Exports Are in the Public Interest. ........................................................................ 5

      E.    The Department Considers Environmental Factors and Repeatedly Concludes LNG Exports Are in the Public Interest. ....................................................................... 5

IV.  THE DEPARTMENT DENIES A RULEMAKING PETITION TO CHANGE ITS LNG EXPORT APPROVAL PROCESS IN JULY 2023. ........................................................................ 6

V.   THE DEPARTMENT REVERSES COURSE SIX MONTHS LATER AND ADOPTS THE LNG EXPORT BAN WITHOUT EXPLANATION OR A RULEMAKING PROCESS. ..................................... 8

ARGUMENT ......................................................................................................................... 8

I.    PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. .................... 9

      A.    The LNG Export Ban Is Contrary to Law and Exceeds Statutory Authority. ............. 9

            1. The LNG Export Ban violates Section 3 of the Natural Gas Act, 15 U.S.C. § 717b(a). ...... 9

            2. The LNG Export Ban is not authorized by law. ................................................... 11

      B.    The LNG Export Ban Requires Notice-and-Comment Procedures. ........................... 12

      C.    The LNG Export Ban Is Arbitrary and Capricious Under the APA. .......................... 14

            1. The LNG Export Ban ignores the Department's July 2023 Decision. ................................. 14

*2. The LNG Export Ban silently departs from longstanding agency policies.* .............................15

*3. The LNG Export Ban is not the product of reasoned decisonmaking.* ...................................16

    D.    No Procedural or Jurisdictional Issues Hinder Plaintiffs' Likelihood of Success. .......17

*1. The LNG Export Ban is reviewable.* .........................................................................17

*2. Plaintiff States have standing.* .................................................................................19

II.    Plaintiff States Will Suffer Irreparable Harm Without Relief. ...........................................23

III.    Preliminary Relief Would Not Harm Defendants or Disserve the Public Interest. .................24

CONCLUSION ..................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Alabama Ass'n of Realtors v. HHS*
141 S.Ct. 2485 (2021) ............................................................................................................. 14

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*
458 U.S. 592 (1982) ................................................................................................................ 28

*ANR Pipeline Co. v. FERC*
771 F.2d 507 (D.C. Cir. 1985) ............................................................................................... 22

*Apter v. HHS*
80 F.4th 579 (5th Cir. 2023) ............................................................................................ 11, 22

*Bd. of Nat. Res. of State of Wash. v. Brown*
992 F.2d 937 (9th Cir. 1993) .................................................................................................. 26

*Biden v. Nebraska*
143 S.Ct. 2355 (2023) ............................................................................................................. 13

*BST Holdings, L.L.C. v. OSHA*
17 F.4th 604 (5th Cir. 2021) ................................................................................................... 30

*Am. Inst. of Certified Pub. Accountants v. IRS*
804 F.3d 1193 (D.C. Cir. 2015) .............................................................................................. 26

*Cook Inletkeeper v. DOI*
No. 3:22-cv-00279, 2023 WL 3892486 (D. Alaska June 8, 2023) ......................................... 28

*Ensco Offshore Co. v. Salazar*
781 F. Supp. 2d 333 (E.D. La. 2011) ............................................................................... 13, 21

*Louisiana v. Biden*
622 F. Supp. 3d 267 (W.D. La. 2022) .............................................................................*passim*

*VanDerStok v. Garland*
633 F. Supp. 3d 847 (N.D. Tex. 2022) ................................................................................... 29

*Cia Mexicana De Gas, S.A. v. Fed. Power Comm'n*
167 F.2d 804 (5th Cir. 1948) ............................................................................................ 12, 16

*City of Oakland v. Lynch*
798 F.3d 1159 (9th Cir. 2015) ................................................................................................ 24

*Czyzewski v. Jevic Holding Corp.*
580 U.S. 451 (2017) ................................................................................................................ 25

*Dep't of Commerce v. New York*
  139 S.Ct. 2551 (2019) ........................................................................................26

*El Paso County v. Trump*
  982 F.3d 332 (5th Cir. 2020) ..............................................................................24

*Encino Motorcars, LLC v. Navarro*
  579 U.S. 211 (2016) ............................................................................................18

*FEC v. Cruz*
  596 U.S. 289 (2022) ............................................................................................13

*Florida v. Becerra*
  544 F.Supp.3d 1241 (M.D. Fla. 2021) ................................................................24

*General Land Office v. Biden*
  71 F.4th 264 (5th Cir. 2023) .........................................................................26, 27

*Hornbeck Offshore Servs., L.L.C. v. Salazar*
  696 F. Supp. 2d 627 (E.D. La. 2010) ..................................................................21

*Indep. Petroleum Ass'n of Am. v. Econ. Regul. Admin.*
  870 F.2d 168 (5th Cir. 1989) ................................................................................5

*Ingalls Shipbuilding, Inc. v. Asbestos Health Claimants*
  17 F.3d 130 (5th Cir. 1994) ...........................................................................11, 12

*Kingdomware Techs. Inc. v. United States*
  579 U.S. 162 (2016) ............................................................................................11

*Larson v. Domestic & Foreign Commerce Corp.*
  337 U.S. 682 (1949) ............................................................................................22

*Louisiana v. DOE*
  90 F.4th 461 (5th Cir. 2024) ...................................................................17, 18, 20

*Louisiana v. Horseracing Integrity & Safety Auth. Inc.*
  617 F. Supp. 3d 478 (W.D. La. 2022) .................................................................29

*Mack Trucks, Inc. v. EPA*
  682 F.3d 87 (D.C. Cir. 2012) ..............................................................................17

*Massachusetts v. EPA*
  549 U.S. 497 (2007) ............................................................................................27

*Michigan v. EPA*
  576 U.S. 743 (2015) ............................................................................................19

*Motor Vehicle Mfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
  463 U.S. 29 (1983) ...................................................................................20

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*
  783 F.3d 1301 (D.C. Cir. 2015) .............................................................22

*NAACP v. Fed. Power Comm'n*
  425 U.S. 662 (1976) ...................................................................................2

*Nat'l Wildlife Fed'n v. Burford*
  871 F.2d 849 (9th Cir. 1989) ..................................................................22

*Natural Res. Defense Council v. Wheeler,*
  955 F.3d 68 (D.C. Cir. 2020) ..................................................................21

*New York v. Yellen*
  15 F.4th 569 (2d Cir. 2021) ....................................................................24

*Nken v. Holder*
  556 U.S. 418 (2009) .................................................................................10

*Opulent Life Church v. City of Holly Springs, Miss.*
  697 F.3d 279 (5th Cir. 2012) ..................................................................10

*Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*
  822 F.2d 1105 (D.C. Cir. 1987) ....................................................4, 11, 22

*Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*
  847 F.2d 1168 (5th Cir. 1988) ..............................................................3, 5

*Phillips Petro. Co. v. Johnson*
  22 F.3d 616 (5th Cir. 1994) ...............................................................15, 16

*Rest. Law Ctr. v. United States Dep't of Labor*
  66 F.4th 593 (5th Cir. 2023) ...................................................................28

*Shell Offshore Inc. v. Babbitt*
  238 F.3d 622 (5th Cir. 2001) ..................................................................16

*Sierra Club v. DOE, (Sierra Club I)*
  867 F.3d 189 (D.C. Cir. 2017) .........................................................3, 7, 19

*Speech First, Inc. v. Fenves*
  979 F.3d 319 (5th Cir. 2020) ..................................................................22

*Texas v. Becerra*
  577 F. Supp. 3d 527 (N.D. Tex. 2021) ...................................................29

*Texas v. EEOC*
   933 F.3d 433 (5th Cir. 2019) ..................................................................................16, 25, 27

*Texas v. EPA*
   829 F.3d 405 (5th Cir. 2016) ...................................................................................... 10, 30

*Texas v. United States*
   328 F. Supp. 3d 662 (S.D. Tex. 2018) ...............................................................................27

*Texas v. United States*
   50 F.4th 498 (5th Cir. 2022)........................................................................................ 26, 27

*Texas v. United States*
   809 F.3d 134 (5th Cir. 2015)........................................................................................*passim*

*Trans World Airlines, Inc. v. Mattox*
   897 F.2d 773 (5th Cir. 1990) ............................................................................................30

*U.S. Army Corps of Engineers v. Hawkes Co.*
   578 U.S. 590 (2016) ...........................................................................................................21

*United States v. Cain*
   583 F.3d 408 (6th Cir. 2009) ............................................................................................16

*United States v. Texas*
   559 U.S. 670 (2023) ...........................................................................................................27

*Voting for Am., Inc. v. Andrade*
   488 F. App'x 890 (5th Cir. 2012) .....................................................................................10

*W. Virginia Pub. Servs. Comm'n v. DOE*
   681 F.2d 847 (D.C. Cir. 1982) ...................................................................................... 3, 11

*W&T Offshore, Inc. v. Bernhardt*
   946 F.3d 227 (5th Cir. 2019) ............................................................................................15

*Wages & White Lion Invs. L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021)........................................................................................ 9, 28

*Wages & White Lion Invs., L.L.C. v. FDA*
   90 F.4th 357 (5th Cir. 2024)........................................................................................ 17, 18

*Watt v. Energy Action Educ. Found.*
   454 U.S. 151 (1981) ...........................................................................................................25

*West Virginia v. EPA*
   597 U.S. 697 (2022) ...........................................................................................................14

*Wyoming v. Oklahoma*
   502 U.S. 437 ................................................................................................................24

**Statutes**

5 U.S.C. § 705 ..................................................................................................... 1, 9, 27

5 U.S.C. § 706 .....................................................................................................10, 14, 16

15 U.S.C. § 717b ..................................................................................................*passim*

15 U.S.C. § 717r .........................................................................................................3

**Regulations**

*New Policy Guidelines and Delegations Order Relating to Regulation of Imported Natural Gas*
   49 Fed. Reg. 6684 (Feb. 22, 1984) ........................................................................4

# INTRODUCTION

Nearly three years to the day after its unlawful moratorium on offshore and onshore oil-and-gas leasing, the Biden Administration announced—with no warning—that it will stop considering and approving *all* new applications to export liquified natural gas (LNG), effective immediately. This LNG Export Ban, as it has come to be known, Ex. 1, ignores clear statutory text and silently departs from decades of agency policy. Indeed, just last July, the Department of Energy issued a decision denying a rulemaking petition and concluded there was zero factual or legal basis to do exactly what the LNG Export Ban does: halt approval of LNG exports to non-Free-Trade-Agreement countries. This abrupt, unexplained about-face disregards statutory text, flouts the normal regulatory process, subverts our constitutional structure, and causes Plaintiffs immediate irreparable harm. Defendants leave Plaintiffs no option but to ask this Courts to stay the LNG Export Ban and uphold the rule of law.

# BACKGROUND

## I.    THE SHALE GAS BOOM AND LNG EXPORTS BOLSTER THE ECONOMY AND ENERGY SECURITY.

The United States is in the midst of a shale gas boom, which has led to increased opportunities for natural gas production. Natural gas can be converted from gas form into liquid form—known as liquified natural gas ("LNG")—by removing impurities and "cooling it to -162°C (-260°F)." Ex. 2. LNG allows more energy to be stored by volume, providing advantages for transport and storage. *Id.*

Relying on a longstanding statutory and regulatory framework, companies have invested billions to produce, transport, and export LNG, and are looking to invest over $100 billion more. *See, e.g.*, Ex. 3, Ex. 4, Ex. 5 at 10–11 ($62.8 billion past investment in LNG projects in Louisiana and Texas, $50.3 billion current investment in LNG projects, and $72.6 billion anticipated future investment in LNG projects (absent the LNG Export Ban)). The United States is the world leader in natural gas production and LNG exports. *See* Exs. 6–8. LNG exports have been an "economic engine" with "positive economic impacts," such as "GDP growth, more jobs and higher wages." Ex. 9 at 5–6, 44.

1

Indeed, "a single LNG export project will produce about $600 billion in revenue over its lifespan and create thousands of jobs, including in steel manufacturing and fracking." Ex. 10. And these economic benefits are expected to continue as additional exports are authorized and LNG export capacity is increased. *See* Ex. 9 at 5, 43–44.

Plaintiffs have benefited from increased LNG exports that have driven investment, production, and job growth. *See* Ex. 5 at 5–7; Ex. 11 at 6, 28. Indeed, LNG exports have contributed 18,000 jobs and $4.4 billion to Louisiana's economy alone, which has been a blessing following destructive hurricanes. Ex. 12. Moreover, Plaintiffs have benefited from revenue streams tied to natural gas production and LNG, such as severance taxes, taxes on LNG facilities and pipelines, and bonus, rental, and royalty payments—not to mention increased income, property, and sales taxes and donations from LNG companies to support educational programs at public schools. *See, e.g.*, Exs. 11–14. Plaintiffs are anticipating additional LNG-related economic benefits, such as employment growth and increased state incomes. *See* Ex. 15 at 1–4, 38–40, 46–49, 55–56 (2013 study showing job growth and increased income in Plaintiff States), Ex. 9 at 5, 44 (2017 study noting that job-growth gains are expected to be more modest than earlier estimates but still "very positive"); *see also* Ex. 5 at 5–7.

## II.   CONGRESS ESTABLISHES A LEGAL FRAMEWORK PRESUMING THAT NATURAL GAS EXPORTS AND IMPORTS ARE IN THE PUBLIC INTEREST.

LNG exports are governed by the Natural Gas Act, which Congress enacted in 1938 for the "principal purpose" of "encourag[ing] the orderly development of plentiful supplies of electricity and natural gas at reasonable prices." *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669–70 (1976). The Act's text and framework reflects this purpose and Congress's policy determination that allowing exports and imports of natural gas is presumptively in the public interest.

Section 3 of the Act, 15 U.S.C. § 717b(a), governs the LNG exports at issue in this case. Section 717b(a) directs entities wanting to export natural gas to a foreign country to apply and

"secure[] an order of the [Department of Energy] authorizing it to do so." 15 U.S.C. § 717b(a).  It then mandates that the Department "issue such order upon application, unless, after opportunity for hearing, [the Department] finds that the proposed exportation or importation will not be consistent with the public interest." *Id.*  Accordingly, § 717b(a) commands the Department to entertain and grant an LNG export application unless it makes "'an affirmative showing of inconsistency with the public interest' to deny the application." *Sierra Club v. DOE*, 867 F.3d 189, 203 (D.C. Cir. 2017) (*Sierra Club I*). Such a finding must be supported by substantial evidence and cannot be arbitrary and capricious. *See* 15 U.S.C. § 717r(b); *W. Virginia Pub. Servs. Comm'n v. DOE*, 681 F.2d 847, 852–53 (D.C. Cir. 1982).

Section 717b(a) thus "sets out a general presumption favoring … authorization" of natural gas exports and imports. *W.V. Pub. Servs. Comm'n*, 681 F.2d at 856; *see, e.g., Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 847 F.2d 1168, 1176 (5th Cir. 1988). And Congress left § 717b(a)'s presumption intact when it amended the Act to address applications to construct LNG terminals. *See* Energy Policy Act of 2005, Pub. L. 109-58, § 311(c) (codified at 15 U.S.C. § 717b(e)).

## III. THE DEPARTMENT IMPLEMENTS THE STATUTORY LNG EXPORT APPLICATION PROCESS AND REPEATEDLY CONCLUDES LNG EXPORTS ARE IN THE PUBLIC INTEREST.

### A. The Department Applies the Statutory Presumption in Favor of Exports.

For decades, the Department properly interpreted § 717b(a) as "creating a rebuttable presumption that a proposed export of natural gas is in the public interest." *See* DOE, Order Denying Petition for Rulemaking on Exports of Liquified Natural Gas, at 10–11 (July 18, 2023) ("July 2023 Decision") (attached as Ex. 16). And courts affirmed this interpretation. *See, e.g., Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F.2d 1105, 1111 (D.C. Cir. 1987) (concluding a presumption favoring exports and imports "is completely consistent with, if not mandated by, the statutory directive"). The Department's "longstanding practice" until 2024 was therefore "to conduct an informal adjudication of each non-[Free-Trade-Agreement] export application that includes notice

and an opportunity for any person to submit a protest, comments, and/or a motion to intervene . . . and to grant the application, *unless* [the Department] finds that the proposed exportation will not be consistent with the public interest." Ex. 16 at 10 (emphasis added).

### B.    The Department Consistently Looks to the 1984 Policy Guidelines.

For at least 40 years, the Department has adhered to principles enunciated in its 1984 Policy Guidelines. *See New Policy Guidelines and Delegations Order Relating to Regulation of Imported Natural Gas*, 49 Fed. Reg. 6684 (Feb. 22, 1984). Those guidelines have the "stated goals" of "minimiz[ing] federal control and involvement in energy markets" and "promot[ing] a balanced and mixed energy resource system." Ex. 16 at 11. The Department "has long considered the 1984 Policy Guidelines in reviewing applications for exports of natural gas, including LNG" and has "continue[d] to subscribe to the principle" that the market is usually "the most efficient means of allocating natural gas supplies." *Id.* The Guidelines have been upheld by courts as consistent with the Act and with the Department's obligations under the Administrative Procedure Act ("APA"). *See Panhandle Producers*, 847 F.2d at 1172–76; *Indep. Petroleum Ass'n of Am. v. Econ. Regul. Admin.*, 870 F.2d 168, 172 (5th Cir. 1989).

### C.    The Department Employs a Case-By-Case Approach.

Not only does the Department's longstanding approach to export applications include a rebuttal presumption and adherence to principles in the 1984 Policy Guidelines, but it also includes a case-by-case adjudication policy. Rather than engaging in a broad rulemaking for export applications, the Department has pursued "a regulatory approach to developing LNG export policy based on case-by-case adjudication of export applications—supplemented with discrete rulemakings, policy statements, and technical analyses, where appropriate." Ex. 16 at 17. It has done so because a case-by-case approach allows the Department "to take into account new or different facts, the latest supply and demand data, technical analyses, developments in energy security in the United States and abroad, changes in [National Environmental Policy Act] guidance, and other considerations that bear on the

public interest as the U.S. and global LNG export markets rapidly develop." *Id.*

**D.    The Department Conducts Studies and Issues Orders Concluding that LNG Exports Are in the Public Interest.**

While continuing to process LNG export applications in accordance with its statutory mandate, the Department has simultaneously conducted numerous studies regarding LNG exports. *See id.* at 20–21. These studies conducted "under multiple presidential administrations" have concluded LNG exports have domestic economic benefits, along with environmental and energy security benefits.  Ex. 17 at 2. Studies commission by the Department have shown LNG exports will add billions to the U.S. economy, create hundreds of thousands of jobs, and "can also create billions of dollars in revenues for federal, state and local governments, and increase downstream industries like manufacturing." *Id.*; *see* Ex. 18 at 20–21. Moreover, these findings have been supported by the Energy Information Administration's annual energy outlook, which concluded that domestic supply exceeds demand and LNG export demand drives domestic production growth. Ex. 20 at 6, 22, 27.

The Department has repeatedly—and unsurprisingly—also made factual findings that LNG exports are in the public interest in its case-by-case proceedings over the years. For example, it has found that LNG exports produce "substantial economic and public benefits, including reductions to the U.S. trade deficit and the generation of significant tax revenues for federal, state, and local governmental entities," and rejected arguments that the proposed exports would produce "deleterious economic and societal impacts." Ex. 21 at 121–22. And, in an order just last year, the Department revaluated prior studies, determined they remained sound, and supported a finding that it would "not be inconsistent with the public interest" to approve an increase in LNG exports. Ex. 22 at 55–58.

**E.    The Department Considers Environmental Factors and Repeatedly Concludes LNG Exports Are in the Public Interest.**

In its export review process, the Department has acknowledged that environmental considerations are best addressed directly by different actors—whether the Environmental Protection

Agency or state regulators—and not through the Department under the Natural Gas Act. *See* Ex. 23 at 86–87 (recognizing the Natural Gas Act "is too blunt an instrument to address these environmental concerns efficiently"). But that does not mean the Department has ignored the environmental effects of LNG exports.

To the contrary, the Department has "studied the environmental effects of natural gas production and LNG exports," recognizing that U.S. LNG production and exports are a cleaner alternative. Ex. 17 at 2. And it evaluates environmental considerations in adjudications, placing great weight on the environmental review conducted by the Federal Energy Regulatory Commission when considering whether to grant an export application. *See Sierra Club*, 867 F.3d at 197–99; Ex. 22 at 45–52, 65–70. Environmental considerations, however, have not rebutted the statutory presumption that exports are in the public interest in the Department's adjudications. *See* Ex. 22 at 59–62, 71; Ex. 24 at 28–33, 40–42. Instead, the Department has concluded that LNG exports "are likely to reduce global [greenhouse gas] emissions" if the recipient uses LNG rather than coal, that evidence does not provide "a reason to conclude that U.S. LNG exports will significantly exacerbate global [greenhouse gas] emissions," and that any incremental impact on the environment from expanding exports do not outweigh economic and other benefits. *See* Ex. 23 at 87, 92–94; *see also* Ex. 22 at 58–61, 68–70.

## IV.    THE DEPARTMENT DENIES A RULEMAKING PETITION TO CHANGE ITS LNG EXPORT APPROVAL PROCESS IN JULY 2023.

In July 2023, the Department reaffirmed its LNG export approval process. It did so by denying environmental groups' petition that asked the Department "to promulgate new regulations or guidance defining the process by which it will consider applications to export" LNG to non-Free Trade Agreement countries under § 717b(a). Ex. 16 at 1. The petitioners made three specific requests. *First*, they asked the Department to "[g]rant no more licenses for LNG export to non-Free Trade Agreement nations until it has completed a final revision of its policy guidelines . . . ." *Id.* at 9. *Second*,

they asked the Department to "[c]onduct a notice-and-comment process to develop new natural gas export policy guidelines . . . ." *Id. Third*, they asked the Department to "[s]upport the development of these guidelines with a thorough, careful, economic study and . . . a full programmatic Environmental Impact Statement." *Id.*

The Department rejected those requests in a denial decision that was consistent with its longstanding policy and statutory interpretation. It began by recounting its well-established approach to examining non-Free-Trade-Agreement LNG export applications—"consistently interpret[ing] [§ 717b(a)] as creating a rebuttable presumption that a proposed export of natural gas is in the public interest"—and noting its approach had been "affirmed by the D.C. Circuit." *Id.* at 10. The Department then explained that the petition's request to overhaul the LNG export review process and to halt LNG exports pending that overhaul was unjustified for five reasons.

*First*, the Department demonstrated that it "has reasonably (and repeatedly) determined that it is not necessary either to initiate a rulemaking or to develop new policy guidelines" and that "[t]he best way for [it] to consider and apply the public interest standard … is through the informal adjudications with which DOE has significant experience." *Id.* at 24. *Second*, the Department defended the appropriateness of using "the core principles set forth in the 1984 Policy Guidelines" in its public-interest analysis, including the principle that federal control should be minimized because the market is often the "most efficient means of allocating natural gas supplies" for the public's benefit. *Id.* at 25. *Third*, the Department explained the Petition's request to "consider a variety of economic and environmental impacts associated with the export of U.S. LNG" was unnecessary, because it already did so through its case-by-case adjudications. *Id. Fourth*, the Department touted the benefits of its case-by-case decisionmaking process, highlighting how its "cautious analytical approach" allows it to "adjudicate individual export applications on the basis of substantial administrative records (including public comment), while also developing and applying export-related policies." *Id.* at 26. *Fifth*, the

7

Department reiterated that its approval process does not impede it from considering long-term effects of LNG exports. *Id.* at 26–27.

In its conclusion, the Department was unequivocal about its position regarding the Petition's request to "halt approval" of LNG exports pending a final revision of policy: "there is no factual or legal basis for such action at this time." *Id.* at 27.

## V.    THE DEPARTMENT REVERSES COURSE SIX MONTHS LATER AND ADOPTS THE LNG EXPORT BAN WITHOUT EXPLANATION OR A RULEMAKING PROCESS.

After a sustained pressure campaign from special interests, that denial—and decades of longstanding policy—was undone six months later by Defendants in a single day. *See* Ex. 25. On January 26, 2024, President Biden declared that his "Administration is announcing today a temporary pause on pending decisions of [LNG] exports." Ex. 26. And it did. That same day, the Department announced it was "paus[ing] determinations" of applications to export LNG to non-Free-Trade-Agreement countries, Ex. 27, which effectively bans new authorizations of LNG exports to all but 18 countries, *see* Ex. 28 at 2 n.4. The LNG Export Ban comprises two pages and, other than stating that the Department wishes to review its public-interest analysis, does not explain why the Ban is necessary. Ex. 27. It does not cite statutory authority or acknowledge the Department's July 2023 Decision concluding that "halt[ing] approval" of LNG exports has "no factual or legal basis." *See* Ex. 16 at 27. The White House's "fact sheet" about the Ban is similarly devoid of explanation. Ex. 29.

Although there is plenty of reporting on improper motivations behind the LNG Export Ban, such as the desire to "energize" the "young and climate-focused voters" whom "the administration needs" in the upcoming November election, Ex. 30, *see* Ex. 31, Defendants have published nothing in the Federal Register that explains, justifies, or relates to its LNG Export Ban. It has not opened a rulemaking docket. It has not called for public comment. And it has not set an end date on the Ban.

## ARGUMENT

Plaintiff States seek a stay of the LNG Export Ban under 5 U.S.C. § 705, or alternatively, a

preliminary injunction under Federal Rule of Civil Procedure 65. The APA authorizes courts to "issue all necessary and appropriate process . . . to preserve status or rights pending [judicial review]." 5 U.S.C. § 705. This includes the power to stay agency actions and thereby "suspend administrative alteration of the status quo." *Wages & White Lion Invs. L.L.C. v. FDA*, 16 F.4th 1130, 1143–44 (5th Cir. 2021) (quotation and emphasis omitted); *see also, e.g.*, *Texas v. EPA*, 829 F.3d 405, 411, 435 (5th Cir. 2016). The stay and preliminary-injunction factors are essentially the same. *See Texas*, 829 F.3d at 405, 424–36 (applying the factors from *Nken v. Holder*, 556 U.S. 418 (2009), when staying an agency's action under § 705); *see also Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 893 (5th Cir. 2012) (per curiam) (describing factors as "virtually the same"). In deciding whether to grant preliminary relief, courts consider (1) plaintiffs' likelihood of success on the merits; (2) the threat of irreparable harm absent relief; (3) whether relief "will substantially injure the other parties"; and (4) the public interest. *Texas*, 829 F.3d at 424.

## I.    PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A.    The LNG Export Ban Is Contrary to Law and Exceeds Statutory Authority.

Because the LNG Export Ban violates the Natural Gas Act and is unauthorized by statutory authority, Plaintiff States are likely to succeed on their claims that the Ban is "not in accordance with law" and is "in excess of statutory . . . authority[] or limitations, or short of statutory right," 5 U.S.C. § 706(2)(A), (C), or, alternatively, that it is an ultra vires action, *see Apter v. HHS*, 80 F.4th 579, 587–88 (5th Cir. 2023).

#### 1. *The LNG Export Ban violates Section 3 of the Natural Gas Act, 15 U.S.C. § 717b(a).*

The LNG Export Ban violates the Natural Gas Act, which obligates the Department to review LNG export applications and approve them unless it finds the proposed exports are inconsistent with the public interest.

Section 717b(a) provides that the Department "shall issue" an order granting authorization to

export or import natural gas "upon application, unless, after opportunity for hearing, [the Department] finds that the proposed export or import will not be consistent with the public interest." 15 U.S.C. § 717b(a). Courts have long held that this text creates "a general presumption favoring . . . authorization" of exports and imports. *W.V. Pub. Servs. Comm'n*, 681 F.2d at 856. After all, the statute's use of "'shall' imposes a mandatory duty." *Cf., e.g.*, *Kingdomware Techs. Inc. v. United States*, 579 U.S. 162, 172 (2016); *Ingalls Shipbuilding, Inc. v. Asbestos Health Claimants*, 17 F.3d 130, 133 (5th Cir. 1994) (similar). Accordingly, the Department must consider and grant an export application unless "inconsistency with the public interest" is affirmatively shown. *Panhandle Producers*, 822 F.2d at 1111. And the statutory presumption that export applications should be granted is further underscored by Congress's decision to reverse the burden for different applications. *See id.* ("While [§ 717b(a)] requires an affirmative showing of inconsistency with the public interest to *deny* an application, [§ 717f(e)] requires an affirmative showing of public convenience and necessity to *grant* [a certificate of public convenience and necessity].").

The LNG Export Ban contravenes § 717b(a)'s unambiguous language. For starters, it is at odds with the statute's presumption. Whereas § 717b(a) *commands* the Department to consider and grant applications *unless* it makes a finding that the particular exports at issue would not further the public interest,[1] the Ban *forbids* the granting, or even consideration, of export applications *without* an affirmative public interest finding, Ex. 27. Furthermore, the LNG Export Ban flouts the case-by-case application process demanded by the statutory text. Section 717b(a) states that, "upon" an entity's "application," the Department "shall issue" authorization unless it finds "the proposed exportation

---

[1] *See, e.g.*, *Cia Mexicana De Gas, S.A. v. Fed. Power Comm'n*, 167 F.2d 804, 806 (5th Cir. 1948) (explaining "[a]n export permit . . . must be issued unless the commission makes" a finding that "it is not consistent with the public interest"); Ex. 32 at 32 (acknowledging the Department is "obligated to approve the export of LNG from [a specific project] unless it found that the exports would 'not be consistent with the public interest'").

… will not be consistent with the public interest." 15 U.S.C. § 717b(a). The provision's focus on "the proposed exportation" indicates that the Department must review individual applications and cannot issue a blanket moratorium on granting or considering applications like the Ban does. Similarly, the provision's requirement that the Department act "upon application" confirms that the Department lacks authority to indefinitely halt consideration and approval of all export applications. *See Ingalls Shipbuilding*, 17 F. 3d at 134 (concluding agency has no discretion to delay ordering a hearing where the statute provides that the agency "upon application of any interested party *shall* order a hearing thereon").

The broader statutory context likewise compels the conclusion that the LNG Export Ban violates the Natural Gas Act. For example, 15 U.S.C. § 717n(c)(1)(A) dictates "expeditious completion of all such proceedings." This type of language places the Department "under a duty to act by either granting or denying a permit" and does not allow it to stop export authorizations "indefinitely." *Cf. Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 333, 336–37 (E.D. La. 2011). Regardless of whether it is proper for the Department to review its public-interest analysis, the Department is not permitted to "ignor[e] acts of Congress and stop" consideration of export applications "while the review is being completed." *Cf. Louisiana v. Biden*, 622 F. Supp. 3d 267, 293 (W.D. La. 2022). Plaintiffs will therefore likely succeed on their claim that the Ban is irreconcilable with the Natural Gas Act.

### 2. The LNG Export Ban is not authorized by law.

Plaintiffs are also likely to succeed on their claim that the LNG Export Ban exceeds statutory authority. Indeed, Defendants cite no statutory authority supporting a blanket ban on LNG exports because no such authority exists. *See* Ex. 27. That is fatal. After all, the Department, like all agencies, "'literally has no power to act' … unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quoting *Louisiana Publ. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

Even if there could be any doubt about Defendants' lack of authority, the major questions

doctrine resolves it. When an executive action raises "a question of deep 'economic and political significance,'" courts do "not assume that Congress entrusted that task to an agency without a clear statement to that effect." *Biden v. Nebraska*, 143 S.Ct. 2355, 2375 (2023) "This expectation of clarity is rooted in the basic premise that Congress normally 'intends to make major policy decisions itself, not leave those decisions to agencies.'" *Id.* at 2380 (Barrett, J., concurring) (quoting *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of reh'g en banc)).

The LNG Export Ban triggers the major questions doctrine. By any measure, it is of vast economic significance. It disrupts the natural gas market, puts over $181 billion in energy-manufacturing investment at risk, threatens billions in GDP growth, and has detrimental ripple effects throughout the economy and society. *See* Ex. 5 at 6–18; *see also, e.g.*, Ex. 18 at 66–69; Ex. 33 at 23–24. This places the Ban well within the impacts the Court has found to satisfy the major questions doctrine. *See, e.g.*, *Alabama Ass'n of Realtors v. HHS*, 141 S.Ct. 2485, 2489 (2021). The Ban also reflects an "unheralded," "novel," and "unprecedented" interpretation of the statute. *See West Virginia v. EPA*, 597 U.S. 697, 716, 724, 729 (2022). Not only has no administration made a sweeping claim of executive authority to issue a categorical ban on new LNG exports, but the Department has also specifically rejected requests to impose such a moratorium on exports as legally unsound. *See* Ex. 16 at 27. Moreover, this Ban's political importance is underscored by the fact that banning LNG exports has been proposed in and rejected by Congress. *See, e.g.*, Exs. 34–35. These "unsuccessful attempt[s] … to secure from Congress an express grant of [the challenged] authority" reinforces that the major questions doctrine applies. *West Virginia*, 597 U.S. at 731 (quotation omitted). Because Defendants can cite no authority—much less clear authority—for the LNG Export Ban, Plaintiffs will likely succeed on their claim it exceeds statutory authority.

**B.     The LNG Export Ban Requires Notice-and-Comment Procedures.**

Plaintiffs' claim that the LNG Export Ban violated the APA's procedural requirements will

also likely succeed. *See* 5 U.S.C. § 706(2)(D). Under the APA, agencies must "subject their substantive rules to notice and comment" otherwise the rules "may not be enforced." *W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019) (citing 5 U.S.C. § 553). This is "to assure fairness and mature consideration of rules of general application," and it allows the agency "to educate itself." *Phillips Petro. Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir. 1994) (quotations omitted), *modified on other grounds,* No. 93–1377, 1994 WL 484506 (Sept. 7, 1994). Rules are "agency statement[s] of general or particular applicability" that are "designed to implement . . . or prescribe law or policy" or describe the "organization, procedure, or practice requirements of an agency," 5 U.S.C. § 551(4), and substantive rules are those that "impose[] any rights and obligations" and have a "binding effect on agency discretion or severely restrict[] it," *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (quotations omitted), *aff'd by equally divided court,* 579 U.S. 547 (2016); *see Louisiana*, 622 F. Supp. 3d at 295. Any "deference" to the agency's characterization of its action "is minimal," and courts primarily focus "on the actual characteristics of the agency action." *W&T Offshore, Inc.*, 946 F.3d at 237.

The LNG Export Ban is a substantive rule requiring notice and comment. The Ban plainly imposes a moratorium on considering export applications. This immediately alters the right to receive an order on an export application "unless the [Department] finds that it is not consistent with the public interest." *Cia Mexicana*, 167 F.2d at 806; *see Phillips Petro.*, 22 F.3d at 619–20 (an action that "effects a change in the method used" is "a new rule and cannot be interpretive"); *id.* at 620 ("An announcement stating a change in the method . . . is not a 'general statement of policy.'"). It also deprives the agency of the freedom to consider export applications or to authorize LNG exports, which means the Ban does "not genuinely leave the agency and its employees free to exercise discretion," *Texas*, 809 F.3d at 176; *see Texas v. EEOC*, 933 F.3d 433, 441–42 (5th Cir. 2019). Because the LNG Export Ban "is a new substantive rule for APA purposes" and "was never submitted for notice and comment," it "is invalid." *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 626 (5th Cir. 2001);

13

*see also Louisiana*, 622 F. Supp. 3d at 295–96 (concluding an order that effectively required an agency to "stop performing its obligations under [federal statutes] to sell oil and natural gas leases" was a substantive rule requiring notice-and-comment procedures). And no exception to notice and comment applies that would save it.

Indeed, the Department did not even invoke the good-cause exception. For good reason: Its "burden to show that good cause exists is a heavy one," *United States v. Cain*, 583 F.3d 408, 420 (6th Cir. 2009), and it cannot show this is an "emergency situation[]" that would justify the use of the good-cause exception, *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (quotation omitted). That is especially true in light of the Department's July 2023 finding that no facts justified "halt[ing] approval" of LNG exports. Ex. 16 at 27. Plaintiffs are therefore likely to succeed on their claim that the LNG Export Ban violates notice-and-comment requirements.

### C.    The LNG Export Ban Is Arbitrary and Capricious Under the APA.

Plaintiffs will also likely succeed on their arbitrary-and-capricious claims under 5 U.S.C. § 706(2)(A). That is because, while deferential, arbitrary-and-capricious review is not "toothless;" "it has 'serious bite.'" *Louisiana v. DOE*, 90 F.4th 461, 470 (5th Cir. 2024). And the LNG Export Ban fails this review for several reasons. *See* Compl. at 48–56. For the sake of brevity, Plaintiffs here focus on three: the Ban (1) ignores the Department's July 2023 Decision; (2) silently departs from decades of agency policies; and (3) is unreasoned.

#### 1. The LNG Export Ban ignores the Department's July 2023 Decision.

Because the LNG Export Ban failed to acknowledge the Department's July 2023 Decision, the Ban is arbitrary and capricious. Under the APA, an agency must "display awareness that it *is* changing position." *Wages & White Lion Invs., L.L.C. v. FDA*, 90 F.4th 357, 381 (5th Cir. 2024) (en banc) (quotation omitted). That means an agency must both "explicitly acknowledge the old policy and explain why its new one was better." *Id.* at 382.

14

The LNG Export Ban fails this basic test by "gloss[ing] over" and "swerv[ing] from" the July 2023 Decision "without discussion." *Id.* at 381. This failure is egregious because the July 2023 Decision and LNG Export Ban are in direct conflict. In its July 2023 Decision, the Department expressly considered—and rejected—banning LNG exports pending an assessment of its LNG export approval process. Ex. 16 at 27. What is more, the Department justified the July 2023 decision with factual findings and copious cites. It expressly found the Department did not need to overhaul its public-interest analysis, because it already was properly considering "a variety of economic and environmental associated with the export of U.S. LNG" and "conducting relevant economic and environmental analyses, including updating existing studies, as appropriate." *Id.* at 25. And it found it had demonstrated that it could "adjudicate individual export applications, . . . while also developing and applying export-related policies." *Id.* at 26. Defendants' failure to address these findings and "provide a 'detailed justification'" for changing its mind about banning new LNG exports pending an assessment of how it determines public interest is fatal to the LNG Export Ban. *See Wages & White Lion*, 90 F.4th at 381, 384 (failure to acknowledge a change "warrants vacatur of the agency actions").

### 2. The LNG Export Ban silently departs from longstanding agency policies.

Even aside from the July 2023 Decision, the LNG Export Ban violates the "change-in-position doctrine" and warrants vacatur. *See id.* at 381. An agency must "carefully compar[e]" its "statements at *T0* and *T1* to ensure that the agency has recognized the change, reasoned through it without factual or legal error, and balanced all relevant interests affected by the change." *Louisiana*, 90 F.4th at 469. When an agency instead "depart[s] from a prior policy *sub silentio*," its action is arbitrary and capricious. *Id.*; *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) ("[A] lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position results in a rule that cannot carry the force of law.").

The LNG Export Ban's violation of the change-in-position doctrine is flagrant. That is because it *sub silentio* makes multiple changes to longstanding Department policies by deciding to categorically ban new LNG exports until it revises its public-interest calculation. Consider four examples. *First*, a ban on *all* new LNG exports departs from the Department's longstanding policy of determining whether to authorize exports on a case-by-case basis. *See* Ex. 36. *Second*, the Ban departs from the policy of presuming that export applications will be granted because exports are in the public interest. *See* Ex. 22 at 26. *Third*, it conflicts with the longstanding policy, embodied in the 1984 Policy Guidance and elsewhere, that the Department should minimize federal involvement and promote free trade because the market is usually the most efficient at allocating gas supplies. *See, e.g.,* *id.* at 71; Ex. 37 at 14, 51. *Fourth*, banning new exports to conduct more environmental analysis departs from the Department's recognition that § 717b(a) is not the proper mechanism to address environmental concerns, the Department's heavy reliance on the environmental review conducted by the Federal Energy Regulatory Commission, and the Department's commissioning of environmental studies while continuing to process applications. *See* Ex. 23 at 86–94; Ex. 38; *Sierra Club*, 867 F.3d at 197–99. These unacknowledged and unexplained policy changes are yet another reason why Plaintiffs will likely be successful on the merits.

### 3. The LNG Export Ban is not the product of reasoned decisonmaking.

Plaintiffs are also likely to succeed on their arbitrary-and-capricious claims because the Ban is not the product of reasoned decisonmaking. To be lawful, agency action must consider "the relevant factors" and all "important aspect[s] of the problem." *Michigan v. EPA*, 576 U.S. 743, 750, 752 (2015). And the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[C]onclusory statements . . . do not constitute adequate agency consideration of an important aspect of a

problem." *Louisiana*, 90 F.4th at 473. Nor does "bare acknowledgment . . . substitute for reasoned consideration." *Id.* And "post hoc rationalizations" also cannot suffice, because "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses its action was based." *Id.* at 469 (quotation omitted).

By any metric, the LNG Export Ban is unexplained and unreasoned. It does not mention, much less consider, the Ban's impact on GDP, jobs, tax revenues and royalties, investor confidence, States and local communities, or a whole slew of other relevant considerations such as reliance interests. Nor does it contain the required examination of relevant data to justify its decision, *see State Farm*, 463 U.S. at 43, which is especially problematic given the Department's decades of specific factual findings that LNG exports are in the public interest based on an evaluation of economic, energy security, environmental, national security, and international relationship considerations. And the LNG Export Ban does not discuss the Natural Gas Act that governs LNG export decisions or provide any explanation of why a halt is permissible, much less necessary to conduct an assessment of the export approval process. "Because no rational explanation was given," Plaintiffs have demonstrated that the LNG Export Ban is likely "arbitrary and capricious action[] under the APA." *See Louisiana*, 622 F. Supp. 3d at 295.

### D.    No Procedural or Jurisdictional Issues Hinder Plaintiffs' Likelihood of Success.

#### *1. The LNG Export Ban is reviewable.*

Defendants cannot rebut the "strong presumption" that the LNG Export Ban is reviewable. *See Texas*, 809 F.3d at 163. Plaintiffs have a valid cause of action, because the LNG Export Ban is final agency action and Plaintiffs seek to protect interests within the Natural Gas Act's zone of interests. An action is "final" under the APA if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) has "legal consequences." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016). The LNG Export Ban satisfies both requirements. It is the "consummation" of the

"decisionmaking process," *id.*, because it immediately and finally decides that export applications should not be considered until the (undisclosed) date at which the (not-public) review of the public-interest determination will be completed, *see Natural Res. Defense Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) ("[A]n interim agency resolution counts as final agency action despite the potential for a different permanent decision . . . ."); *Louisiana*, 622 F. Supp. 3d at 291–92 (collecting cases). And legal consequences flow from this action—entities are no longer entitled to have their applications considered, and presumptively granted (absent an adverse finding), by the Department. *See supra* pp. 2–4, 13; *Louisiana*, 622 F. Supp. 3d at 291 (stopping new leases on federal lands has "legal consequences"); *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627, 630, 636 (E.D. La. 2010) ("six-month moratorium on offshore drilling operations" was "final agency action"); *Ensco Offshore*, 781 F. Supp. 2d at 336 ( "[A]gency delay in issuing or denying a permit [for deepwater drilling], or the failure to act at all, is a final agency action . . . ."). In any event, even if the LNG Export Ban were not final, the Court could review Plaintiffs' claims that, in issuing and enforcing the LNG Export Ban, Defendants (1) act ultra vires and outside their statutory authority; and (2) violate the Constitution. *See* Compl. at 57–59; *Apter*, 80 F.4th at 589; *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91 (1949); *supra* pp. 9–12.

Moreover, the Plaintiffs easily satisfy the not "especially demanding" zone-of-interests test, and Defendants cannot rebut the presumption that the Ban is reviewable. *See Texas*, 809 F.3d at 162. After all, the LNG Export Ban harms Plaintiffs, *see infra* pp. 19–24, and the Natural Gas Act evinces Congress's concern for the public interest, 15 U.S.C. § 717b(a), including social and economic interests related to natural gas exports, *see ANR Pipeline Co. v. FERC*, 771 F.2d 507, 516 (D.C. Cir. 1985) (gas customers within zone of interests); *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1306, 1316 (D.C. Cir. 2015) (local citizens near proposed facility within zone of interests); *Panhandle Producers.*, 822 F.2d at 1109 (competitors within zone of interests); *cf. Nat'l Wildlife Fed'n v. Burford*, 871

F.2d 849, 853–54 (9th Cir. 1989) (economic and environmental injuries within the zone of interests of a statute intended to provide an orderly procedure for developing coal).

### 2. Plaintiff States have standing.

Plaintiffs more than satisfy the standing showing required at this stage: a "show[ing] only that each element of standing is *likely* to obtain in the case at hand." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (emphasis added). The standing elements are that plaintiffs have (1) "suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Id.* Each element is satisfied here.

The LNG Export Ban will cause Plaintiffs concrete and particularized injuries. Plaintiffs will provide just a few examples here. For starters, the Ban will deprive them of specific tax revenues tied to LNG. The LNG Export Ban will not only decrease future export capacity, future marketability, and future production volumes, but it also will reduce or even eliminate investment in the development and production of natural gas and supporting infrastructure (such as pipelines and storage capacity). *See* Ex. 5 at 4, 6, 8–15; Ex. 39. Far from speculative, these negative effects have already begun: Due to the Ban, "[s]everal LNG buyers delayed signing new long-term contracts with U.S. producers," one company "has deferred its investment decision on its planned [LNG export facility] in Louisiana," and another company "has delayed construction of an export terminal in [Louisiana]." Ex. 1; *see* Ex. 40.

The reduced future export capacity, marketability, and production resulting from the LNG Export Ban means Plaintiffs, such as Louisiana, Texas, and West Virginia, that impose severance or production taxes on natural gas will collect less revenues in the future than they otherwise would have. *See, e.g.*, Ex. 5 at 17–18; La. Rev. Stat. 47:633(8); Tex. Tax Code §§ 201.001, 201.051–.052(a); W. Va. Code R. §§ 11-13A-3(a), 110-1J-1 et seq. This harm will be particularly acute to Plaintiffs that have substantial natural gas resources, Ex. 8 at 14; Ex. 11 at 11, Ex. 15 at 15, 28–30, and rely on such

revenues, *see* Exs. 41–43 (showing 2023 severance/production tax revenues of $549 million for Louisiana and over $551 million for West Virginia). Even if the LNG Export Ban causes only a delay in increasing export capacity—which it has already caused, Exs. 1, 40—that delay imposes significant and irreparable harms by causing Plaintiffs to receive less severance tax revenues in future years, Ex. 5 at 17–18. For example, Texas conservatively projects a loss of $259.8 million in production tax revenues over five years even assuming the LNG Export Ban causes only a two-year delay for those LNG export facilities with currently pending applications. Ex. 44. Texas, along with the other Plaintiff States, will of course suffer even greater irreparable harm and more lost tax revenues if the LNG Export Ban causes some of the pending LNG projects to be canceled altogether or if eliminates some future LNG project applications. *See id.;* Ex. 5 at 6, 17–18.

Plaintiffs' loss of severance or production tax revenues is a cognizable injury even standing alone. *See Wyoming v. Oklahoma*, 502 U.S. 437, 440–41, 447–48 (concluding Wyoming had standing to challenge a law that decreased sales of Wyoming-mined coal based on diminished severance tax revenues); *El Paso County v. Trump*, 982 F.3d 332, 340 (5th Cir. 2020) (distinguishing between the loss of general tax revenues, which did not support standing in that case, with "the loss of a specific tax revenue" that do support standing); *City of Oakland v. Lynch*, 798 F.3d 1159, 1163–64 (9th Cir. 2015) (concluding city had Article III standing to challenge federal government's forfeiture action against medical marijuana dispensary based on loss of tax revenues); *New York v. Yellen*, 15 F.4th 569, 576–77 (2d Cir. 2021) (concluding loss of tax revenue was a cognizable injury where States showed a "realistic" "chain of economic events" tying the loss to the challenged statute); *Florida v. Becerra*, 544 F.Supp.3d 1241, 1253 (M.D. Fla. 2021) (similar). In any event, the LNG Export Ban jeopardizes Plaintiffs' concrete interests in severance tax revenues (along with other concrete interests like royalty payments and responsible development of natural resources). This means Defendants' "violation of the APA's notice-and-comment requirements is . . . a deprivation of a procedural right" that constitutes "a

20

cognizable injury" for standing purposes. *See Texas*, 933 F.3d at 447.

What is more, the LNG Export Ban harms Plaintiffs' propriety interests as land and mineral owners. The Ban undermines Plaintiffs' interest in developing natural gas resources on their land to increase royalties, bonus payments, rent, and other revenues. *See, e.g.*, Exs. 45–47.[2] Last year, Louisiana earned over $142.7 million in natural gas royalties on state-owned land, and Texas earned $339 million in natural gas production revenue on state-owned minerals alone. *Id.* The LNG Export Ban hamstrings the Plaintiffs' ability to develop natural resources by limiting the market and reducing investment. *See supra* pp. 19–20, *infra* p. 22. It will also lead to increased flaring of excess natural gas that becomes a "useless byproduct" of oil production, which wastes valuable natural resources and increases methane emissions. Ex. 46; *see* Ex. 11 at 12–13, 29. These additional harms are yet another basis to conclude Plaintiffs have standing. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160–62 (1981) (concluding State had standing to challenge agency's choice of bidding systems to award oil-and-gas leases based on State's financial interests in lease revenues); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Bd. of Nat. Res. of State of Wash. v. Brown*, 992 F.2d 937, 941–42, 945 (9th Cir. 1993) (standing existed to challenge timber export ban where it would cause loss of income from state-owned land); *Louisiana*, 622 F. Supp. 3d at 285 (finding "loss of proceeds as a result of [stopping] new oil and gas leases on federal lands and waters, from bonuses, land rents, royalties, and other income" to be "particularized and concrete" injuries).

These harms are a "predictable" effect of the LNG Export Ban, *Dep't of Commerce v. New York*,

---

[2] Relatedly, the LNG Export Ban could cause Plaintiffs to lose revenues from natural gas production on federal onshore and offshore leases. *See Louisiana v. Biden*, No. 2:21-CV-778, 2021 WL 4312502, at *3 (W.D. La. Aug. 23, 2021) (recognizing that States "benefit economically from oil and gas leasing production on the [Outer Continental Shelf]," in the Gulf of Mexico, and on federal lands under the Mineral Leasing Act); Ex. 48.

139 S.Ct. 2551, 2566 (2019), and "basic economic logic" of how export bans work: they limit the market artificially, reduce production, and disincentivize investment (which has already occurred, Exs. 1, 40), *cf. Am. Inst. of Certified Pub. Accountants v. IRS*, 804 F.3d 1193, 1198 (D.C. Cir. 2015); *cf.* Ex. 5. In contrast, increasing exports increases demand, investment, infrastructure, and production. *See, e.g.*, Ex. 18 at 21, 64, 77–79; Ex. 5 at 3, 7, 15; Ex. 8 at 9–10. This shows the harms are more than fairly traceable to the LNG Export Ban and that the requested judicial relief would redress the harm. *See Texas v. United States*, 50 F.4th 498, 519 (5th Cir. 2022) (recognizing traceability is satisfied when the challenged action "exacerbate[s]" an injury, even when it "is not the sole cause"); *General Land Office v. Biden*, 71 F.4th 264, 274 (5th Cir. 2023) (finding redressability satisfied even if there would be a delay in the remedy's effectiveness). Vacating the LNG Export Ban would, like the repeal of the crude oil export ban, increase investment, development, and production—to the benefit of producers, land and mineral right owners (including the Plaintiffs), royalty owners (including the Plaintiffs), and States (including the Plaintiffs) who receive significant revenues and benefits tied to production. *See* Ex.49; *see also* Ex. 18 at 64, 77–79; Ex. 33 at 8, 12, 24–25, 82-83; Ex. 50. This is more than sufficient to establish standing, especially when "the Fifth Circuit found redressability on facts less certain than those in this case," *see Texas v. United States*, 328 F. Supp. 3d 662, 699 (S.D. Tex. 2018) (citing *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1385–86 (5th Cir. 1986)), and when Plaintiffs "assert[] deprivation of a procedural right," which entails a "lighter" redressability requirement, *Texas*, 933 F.3d at 447.

 In any event, Plaintiffs not only satisfy all three standing elements under the typical standards, but they also receive "special solicitude" here. *Massachusetts v. EPA*, 549 U.S. 497, 518–520 (2007).[3]

---

[3] *United States v. Texas*, 559 U.S. 670 (2023), is not to the contrary. In that case, the Court concluded that *Massachusetts v. EPA* did not apply because States challenged a failure to act under the Executive's enforcement discretion. *See id.* at 685 n.6. But here, Plaintiffs challenge an affirmative agency action like the state plaintiffs in *Massachusetts v. EPA*. There are, of course, several other differences between *United States v. Texas* and this case, including that Plaintiffs challenge an action that harms their property interests and are not seeking unprecedented relief. *See id.* at 676–79.

That is because (1) States have "a procedural right under the APA to challenge agency action," and (2) the LNG Export Ban affects Plaintiffs' "quasi-sovereign interests." *Texas*, 50 F.4th at 514–15; *see Gen. Land Office*, 71 F.4th at 274. The Ban affects Plaintiffs' interests in the economic well-being of its residents, in energy security, and "in securing observance of the terms under which it participates in the federal system." *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 607–08 (1982); E. A. Young, *State Standing and Cooperative Federalism*, 94 Notre Dame L. Rev. 1893, 1908–09 (2019); *cf. Cook Inletkeeper v. DOI*, No. 3:22-cv-00279, 2023 WL 3892486, at *2 (D. Alaska June 8, 2023) (noting State's "unique role in representing the interests of its citizens" and its interests in "energy security and oil and gas development"); ALASKA CONST. Art. 8, § 1; Exs. 51–52.

## II.    Plaintiff States Will Suffer Irreparable Harm Without Relief.

Not only have Plaintiffs shown a strong likelihood of success, but they also more than satisfy the second factor to obtain relief—that irreparable injury is likely in the absence of preliminary relief. *See Texas*, 809 F.3d at 186. Because "the key inquiry" is "not so much the magnitude but the irreparability," financial injury qualifies as irreparable when costs "cannot be recovered in the ordinary course of litigation." *Rest. Law Ctr. v. United States Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) (quotations omitted). That means financial harm is irreparable where federal agencies "enjoy sovereign immunity for any monetary damages" and plaintiffs lack "a guarantee of eventual recovery." *Wages & White Lion*, 16 F.4th at 1142 (quotation omitted).

Therefore, the LNG Export Ban necessarily causes irreparable harm to Plaintiffs because it causes unrecoverable financial injury. Plaintiffs will collect less severance taxes and earn less royalties, rents, and related payments than they otherwise would have. *See supra* pp. 19–22. These future losses, "from which [Plaintiffs] will likely not be able to recover," is "a substantial threat of irreparable injury." *See Louisiana*, 622 F. Supp. 3d at 297. Moreover, Plaintiffs' deprivation of their "procedural right" to participate in the APA's notice-and-comment process is also "irreparable injury" or, at the very least,

aggravates their irreparable injury. *Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478, 499 (W.D. La. 2022); *see Texas v. Becerra*, 577 F. Supp. 3d 527, 560 (N.D. Tex. 2021) (similar), *cf. VanDerStok v. Garland*, 633 F. Supp. 3d 847, 858 (N.D. Tex. 2022) (finding that, while "obligatory compliance with a 'likely unlawful' regulation during the course of litigation" is insufficient "to comprise irreparable harm on its own," it "aggravate[s]" the plaintiffs' fear of prosecution, and concluding that plaintiffs showed "a substantial threat of irreparable harm").

In addition, the LNG Export Ban threatens irreparable harm in the form of reduced energy security and institutional injury. Reduced production of natural gas, along with the reduced investment and infrastructure, threatens Plaintiffs' ability to access reliable energy, especially when dealing with emergencies. *See* Ex. 51; Ex. 5 at 4–9, 11–16. As if that were not bad enough, the LNG Export Ban also cuts Plaintiffs out of their role in the federalist system. That is because (1) the Ban is contrary to law and exceeds statutory authority, which undercuts Plaintiffs' participation in federal policy through their congressional representatives, and (2) the Ban was not issued through notice-and-comment rulemaking that would have afforded Plaintiffs at least some ability to assert "their own independent voice in federal policymaking." *See* Young, *supra*, at 1907–09. The LNG Export Ban's threat to energy security and undermining of federalism principles is another irreparable harm justifying preliminary relief. *Cf. Texas*, 829 F.3d at 434 ("[I]f the Final Rule causes plant closures, the threat of grid instability and potential brownouts alone constitute irreparable injury to Texans. Similarly, the institutional injury to Texas from the inversion of the federalism principles enshrined in the Clean Air Act may constitute irreparable injury."); *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (being regulated in violation of the Constitution is "irreparable injury").

## III.    Preliminary Relief Would Not Harm Defendants or Disserve the Public Interest.

Plaintiffs likewise satisfy the third and fourth factors, because a stay or injunction is in the public interest and would not harm Defendants. *See Texas*, 829 F.3d at 424.

As a preliminary matter, "[a]ny interest [Defendants] may claim in enforcing an unlawful (and likely unconstitutional) [LNG Export Ban] is illegitimate." *See BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Defendants are simply not harmed by following the statutory mandates of § 717b(a), nor can they plausibly claim otherwise when they recently confirmed their longstanding case-by-case approach is "[t]he best way . . . to apply the public interest standard to export authorization decisions." Ex. 16 at 24.

Furthermore, the public interest would be served by a § 705 stay or injunction. After all, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022). This general rule applies with particular force here, because the unlawful LNG Export Ban causes significant harms to the Nation, including hindering job and GDP growth. *See, e.g.,* Ex. 17. Nor can Defendants plausibly dispute these harms when a 2018 study commissioned by the Department found that, "if the market is allowed to determine exports, changes in global markets that bring forth increased LNG exports will also lead to an increase in overall economic activity leading to higher GDP," and that "U.S. consumer well-being increases with rising LNG exports." Ex. 18 at 65–68. The LNG Export Ban also causes pronounced harms to Plaintiff States and their residents who would have otherwise continued to experience increased job opportunities in the oil-and-gas sector, in supporting industries (like manufacturing and construction), and in "industries relying on the increased spending power of people employed directly or indirectly . . . such as retail and hospitality sectors." Ex. 11 at 28; *see supra* p. 2. All factors point in the same direction—a stay, or alternatively an injunction—is necessary.

## CONCLUSION

For the foregoing reasons, this Court should stay the LNG Export Ban under 5 U.S.C. § 705, or in the alternative, enjoin Defendants from enforcing the LNG Export Ban.

Dated: March 28, 2024

Tyler R. Green*
Daniel Shapiro*
CONSOVOY MCCARTHY PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423

Respectfully submitted,

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

  _/s/_ Morgan Brungard
Morgan Brungard (La #40298)
  *Deputy Solicitor General*
Autumn Hamit Patterson*
  *Special Assistant Solicitor General*
OFFICE OF THE LOUISIANA ATTORNEY
GENERAL
1885 North Third Street
Baton Rouge, LA 70804
(225) 326-6766
brungardm@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

KEN PAXTON
**Attorney General of Texas**
BRENT WEBSTER
**First Assistant Attorney General**
JAMES LLOYD
**Deputy Attorney General for Civil Litigation**
KELLIE E. BILLINGS-RAY
**Chief, Environmental Protection Division**

*/s/ J. Amber Ahmed*
J. Amber Ahmed*
  *Assistant Attorney General*
Ian M. Lancaster*
  *Assistant Attorney General*
H. Carl Myers*
  *Assistant Attorney General*
OFFICE OF THE ATTORNEY
GENERAL OF TEXAS
ENVIRONMENTAL PROTECTION DIVISION
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Telephone (512) 463-2012
Facsimile (512) 320-0911
Amber.Ahmed@oag.texas.gov
Ian.Lancaster@oag.texas.gov
Carl.Myers@oag.texas.gov

*Counsel for Plaintiff State of Texas*

LYNN FITCH
**Attorney General of Mississippi**

*/s/ Justin L. Matheny*
Justin L. Matheny*
  *Deputy Solicitor General*
MISSISSIPPI ATTORNEY GENERAL'S
OFFICE
P.O. Box 220
Jackson, MS 39205
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

STEVE MARSHALL
**Attorney General of Alabama**

*/s/ Edmund G. LaCour Jr.*
Edmund G. LaCour Jr.*
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

27

**TREG TAYLOR**
**Attorney General of Alaska**

*/s/ Mary Hunter Gramling*
Mary Hunter Gramling*
STATE OF ALASKA
DEPARTMENT OF LAW
P.O. Box 110300
Juneau, AK 99811-0300
Telephone: (907) 465-3600
Facsimile: (907) 465-2520
Email: mary.gramling@alaska.gov

*Counsel for Plaintiff State of Alaska*


**TIM GRIFFIN**
**Attorney General of Arkansas**

*/s/ Nicholas J. Bronni*
Nicholas J. Bronni*
  *Solicitor General*
Dylan L. Jacobs*
  *Deputy Solicitor General*
OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov
dylan.jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*


**ASHLEY MOODY**
**Attorney General of Florida**

*/s/ Natalie P. Christmas*
Natalie P. Christmas*
  *Counselor to the Attorney General*
OFFICE OF THE FLORIDA ATTORNEY
GENERAL
PL-01 the Capitol
Tallahassee, Florida 32399
(850) 414-3300
natalie.christmas@myfloridalegal.com

*Counsel for Plaintiff State of Florida*


**CHRISTOPHER M. CARR**
**Attorney General of Georgia**

*/s/ Stephen J. Petrany*
Stephen J. Petrany*
  *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*


**KRIS W. KOBACH**
**Attorney General of Kansas**

*/s/ Erin B. Gaide*
Erin B. Gaide*
  *Assistant Attorney General*
Memorial Building, 2nd Floor
120 S.W. 10th Avenue
Topeka, Kansas 66612-1597
Tel: (785) 296-2215
Fax: (785) 296-2218
Email: erin.gaide@ag.ks.gov

*Counsel for Plaintiff State of Kansas*


**AUSTIN KNUDSEN**
**Attorney General of Montana**

*/s/ Christian B. Corrigan*
Christian B. Corrigan*
  *Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for Plaintiff State of Montana*

**MICHAEL T. HILGERS**
**Attorney General of Nebraska**

*/s/ Grant D. Strobl*
Grant D. Strobl*
  *Assistant Solicitor General*
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.Strobl@nebraska.gov

*Counsel for Plaintiff State of Nebraska*


**ALAN WILSON**
**Attorney General of South Carolina**

*/s/ Joseph D. Spate*
Joseph D. Spate*
  *Assistant Deputy Solicitor General*
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Plaintiff State of South Carolina*


**GENTNER DRUMMOND**
**Attorney General of Oklahoma**

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II*
  *Solicitor General*
OFFICE OF OKLAHOMA ATTORNEY
GENERAL
313 NE 21st Street
Oklahoma City, Oklahoma 73105
(405) 521-3921
Garry.Gaskins@oag.ok.gov

*Counsel for Plaintiff State of Oklahoma*


**SEAN D. REYES**
**Attorney General of Utah**

*/s/ Stanford E. Purser*
Stanford E. Purser*
  *Utah Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Telephone: (801) 538-9600
spurser@agutah.gov

*Counsel for Plaintiff State of Utah*

29

**PATRICK MORRISEY**
**Attorney General of West Virginia**

*/s/ Michael R. Williams*
Michael R. Williams*
  *Principal Deputy Solicitor General*
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd. East
Building 1, Room E-26
Charleston, WV 25305
Tel: (304) 558-2021
Michael.R.Williams@wvago.gov

*Counsel for Plaintiff State of
West Virginia*


*\*Pro Hac Vice admission application pending or
forthcoming*

**BRIDGET HILL**
**Attorney General of Wyoming**

*/s/ D. David DeWald*
D. David DeWald*
  *Deputy Attorney General*
OFFICE OF THE ATTORNEY GENERAL
OF WYOMING
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for Plaintiff State of Wyoming*