**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

STATE OF LOUISIANA, *et al.,*

    Plaintiffs,

    v.

JOSEPH R. BIDEN, JR., *et al.,*

    Defendants.

Case No. 2:24-cv-00406

Hon. Judge James D. Cain, Jr.

Hon. Magistrate Judge Thomas P. LeBlanc

**DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR STAY OR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

STATUTORY BACKGROUND .........................................................................................3

    I.      Natural Gas Act, Section 3(a), and the National Environmental Policy Act ...............3

    II.     Administrative Procedure Act ...................................................................................5

FACTUAL BACKGROUND ...............................................................................................7

    I.      The United States leads the world in LNG exports .........................................................7

    II.     Approved LNG exports significantly outpace realized LNG projects and exports ....................................................................................................................8

    III.   DOE relies on economic and environmental studies to inform its public interest determinations under the Natural Gas Act .......................................................10

    IV.   DOE has deferred final determinations on LNG export applications in the past to update studies for its public interest determinations ..........................................11

    V.    DOE affirms it will continue to update its existing studies to inform the public interest, when appropriate ............................................................................................12

    VI.   DOE initiates a process to update economic and environmental analyses used in public interest determinations ...............................................................................13

        A.     Timing ...................................................................................................14

        B.     The Update affects only a limited number of applications and has no retroactive effects ..............................................................................15

STANDARDS OF REVIEW .................................................................................................17

    I.      Motion to dismiss for lack of jurisdiction under Rule 12(b)(1). .................................17

    II.     Motion to dismiss for failure to state a claim under Rule 12(b)(6) .............................18

    III.   Motion for preliminary injunction ...........................................................................19

ARGUMENT .........................................................................................................................20

    I.      The Court should dismiss Plaintiffs' complaint ...........................................................20

        A.     The Natural Gas Act vests exclusive jurisdiction in the courts of appeals ..................................................................................................20

B.    Plaintiffs fail to establish standing for any of their claims ................................25

    1.    Plaintiffs fail to allege any non-speculative injury.............................25

    2.    Plaintiffs fail to establish a causal connection between their speculative injuries and the Update .........................................29

    3.    A favorable decision will not redress Plaintiffs' alleged injuries.........32

    4.    Plaintiffs are not entitled to special solicitude.....................................33

C.    Plaintiffs do not challenge a final agency action under the APA....................34

D.    Plaintiffs fail to state a claim for relief .........................................................38

    1.    Counts I–IV, XII, and XIV–XVI should be dismissed for failure to state a claim for relief...............................................38

    2.    Any APA claims against the President must be dismissed because the President is not subject to suit under the APA ..............38

II.    Even if the Court allows Plaintiffs' claims to proceed, their motion for a preliminary injunction should be denied..............................................................39

A.    Plaintiffs' claims are unlikely to succeed on the merits. ...................................39

    1.    The Court lacks jurisdiction over Plaintiffs' claims.............................39

    2.    Plaintiffs' claims lack merit ....................................................40

        a.    Counts I and II: DOE is acting within its statutory authority to defer final determinations during the pendency of the Update...............................................40

        b.    Count III: The Update is not a rule that would trigger the APA's notice-and-comment procedures ..........................44

        c.    Counts IV, VI, VIII, and IX: The Update is consistent with DOE's longstanding procedures, including its July 2023 decision, and is not a change that requires consideration of reliance interests or alternatives within the existing policy .....................................................46

        d.    Counts V, VII and X: DOE's Update is not arbitrary and capricious because the Update is reasoned, DOE did not fail to consider important aspects of the problem, and DOE was not required to and did not fail to conduct a cost/benefit analysis..............................................49

e.    Count XI: The Update is not pretext; it is sound policy in conformance with statutory obligations ..............................52

f.    Count XII: The Congressional Review Act does not apply to the Update ....................................................................53

g.    Count XIII: The Update does not unreasonably delay DOE's approval of pending or future export applications ................................................................................54

h.    Count XIV: Because DOE acted within the statutory authority conferred on it by Congress, the Update does not violate the separation of powers or the Foreign Commerce Clause ................................................................ 5858

i.    Counts XV and XVI: DOE, its officials, and the President acted within the scope of their authority ...............58

B.    The Update will not cause Plaintiffs any irreparable harm ..............................60

C.    The equities lean sharply in favor of allowing DOE to complete its public interest Update as contemplated by the Natural Gas Act, and the Update is in the public's interest ....................................................................62

CONCLUSION ....................................................................................................................65

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adorers of the Blood of Christ v. FERC,*
   897 F.3d 187 (3d Cir. 2018)...................................................................................21, 24

*Am Petroleum Inst. v. U.S. Dep't of Interior,*
   2:21-CV-02506, 2022 WL 16704444 (W.D. La. Oct. 5, 2022).........................................22

*Am. Airlines, Inc. v. Herman,*
   176 F.3d 283 (5th Cir. 1999)........................................................................................34

*Am. Energy Corp. v. Rockies Exp. Pipeline LLC,*
   622 F.3d 602 (6th Cir. 2010)...................................................................................20, 21

*Am. Petroleum Inst. v. EPA,*
   216 F.3d 50 (D.C. Cir. 2000)........................................................................................34

*Amoco Prod. Co. v. Village of Gambell,*
   480 U.S. 531 (1987).......................................................................................................62

*Arguello v. Conoco, Inc.,*
   330 F.3d 355 (5th Cir. 2003)........................................................................................25

*Armstrong v. Bush,*
   924 F.2d 282 (D.C. Cir. 1991)......................................................................................38

*Ashland Oil, Inc. v. FTC,*
   409 F. Supp. 297 (D.D.C.)............................................................................................60

*Ashland Oil, Inc. v. FTC,*
   548 F.2d 977 (D.C. Cir. 1976)......................................................................................60

*Bank of La. v. FDIC.,*
   919 F.3d 916 (5th Cir. 2019)........................................................................................20

*Barber v. Bryant,*
   860 F.3d 345 (5th Cir. 2017)...................................................................................25, 39

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007).......................................................................................................18

*Bennett v. Spear,*
   520 U.S. 154 (1997).......................................................................................................34

*Berkley v. Mountain Valley Pipeline, LLC,*
   896 F.3d 624 (4th Cir. 2018)........................................................................................24

*Biden v. Missouri,*
   142 S. Ct. 647 (2022).....................................................................................................43

iv

*Bienestar de la Comunidad Costera v. FERC,*
  6 F.4th 1321 (D.C. Cir. 2021) ................................................................43

*Blackburn v. City of Marshall,*
  42 F.3d 925 (5th Cir. 1995) ...................................................................18

*Bognet v. Sec'y of the Commonwealth of Pennsylvania,*
  980 F.3d 336 (3d Cir. 2020) ..................................................................28

*Bostock v. Clayton Cnty., Georgia,*
  590 U.S. 644 (2020) ..............................................................................40

*Bustos v. Martini Club, Inc.,*
  599 F.3d 458 (5th Cir. 2010) .................................................................18

*Bywater Neighborhood Ass'n v. Tricarico,*
  879 F.2d 165 (5th Cir. 1989) ...........................................................22, 23

*Cal. Gas Producers Ass'n v. Fed. Power Comm'n,*
  383 F.2d 645 (9th Cir. 1967) .................................................................41

*Campbell v. City of San Antonio,*
  43 F.3d 973 (5th Cir. 1995) ...................................................................18

*China Telecom (Americas) Corp. v. FCC,*
  57 F.4th 256 (D.C. Cir. 2022) ...............................................................41

*City of Arlington v. FCC,*
  569 U.S. 290 (2013) ..............................................................................44

*City of Arlington v. FCC,*
  668 F.3d 229 (5th Cir. 2012) .................................................................44

*City of Tacoma v. Taxpayers of Tacoma,*
  357 U.S. 320 (1958) ..............................................................................21

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...................................................................25, 27, 29

*Crochet v. Seadrill Americas Inc.,*
  No. 6:22-CV-01076, 2022 WL 16752304 (W.D. La. Sept. 19, 2022) ...........17

*Ctr. for Biological Diversity v. FERC,*
  67 F.4th 1176 (D.C. Cir. 2023) .................................................................4

*Ctr. for Envtl. Health v. Wheeler,*
  429 F. Supp. 3d 702 (N.D. Cal. 2019) ..................................................34

*Da Costa v. Immigr. Inv. Program Off.,*
  80 F.4th 330 (D.C. Cir. 2023) ...............................................................55

*Daniels Health Scis., LLC. v. Vascular Health Scis., LLC,*
  710 F.3d 579 (5th Cir. 2013) .................................................................60

*Dep't of Com. v. New York,*
 139 S. Ct. 2551 (2019) .................................................................................................52

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.,*
 140 S. Ct. 1891 (2020) ......................................................................................5, 46, 47

*Dep't of Nat. Res. & Envtl. Control v. EPA,*
 746 F. App'x 131 (3d Cir. 2018) ................................................................................34

*Deutsch v. Travis Cnty. Shoe Hosp., Inc.,*
 721 F. App'x 336 (5th Cir. 2018) ..............................................................................28

*Distrigas Corp. v. Fed. Power Comm'n,*
 495 F.2d 1057 (D.C. Cir. 1974) .................................................................................41

*Eagle TX I SPE, L.L.C. v. Sharif & Munir Enterprises, Inc.,*
 602 F. App'x 576 (5th Cir. 2015) ..............................................................................17

*El Paso Cnty., Texas v. Trump,*
 982 F.3d 332 (5th Cir. 2020) ................................................................. 26, 29, 31, 32

*Elgin v. Dep't of Treasury,*
 567 U.S. 1 (2012)....................................................................................... 23, 24, 48, 51

*Encino Motorcars, LLC v. Navarro,*
 579 U.S. 211 (2016) ...................................................................................................46

*Ensco Offshore Co. v. Salazar,*
 781 F Supp. 2d 332 (E.D. La. 2011) ............................................................36, 56, 57

*FCC v. Fox Television Stations, Inc.,*
 556 U.S. 502 (2009) ...................................................................................................46

*FCC v. Schreiber,*
 381 U.S. 279 (1965) ...................................................................................................41

*Fed. Express Corp. v. U.S. Dep't of Com.,*
 39 F.4th 756 (D.C. Cir. 2022) .............................................................................58, 59

*Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp.,*
 423 U.S. 326 (1976) ...................................................................................................41

*Fernandez-Montes v. Allied Pilots Ass'n,*
 987 F.2d 278 (5th Cir. 1993) .....................................................................................18

*Forest Guardians v. Babbitt,*
 174 F.3d 1178 (10th Cir. 1999) .................................................................................54

*Franklin v. Massachusetts,*
 505 U.S. 788 (1992) ...................................................................................................38

*Griffith v. Fed. Lab. Rels. Auth.,*
 842 F.2d 487 (D.C. Cir. 1988).....................................................................................58

*Gulfport Energy Corp. v. FERC,*
   41 F.4th 667 (5th Cir. 2022) ................................................................................28

*Hall v. Hodgkins,*
   305 Fed. App'x 224 (5th Cir. 2008) ..................................................................18

*Hartford Cas. Ins. Co. v. F.D.I.C.,*
   21 F.3d 696 (5th Cir. 1994) ................................................................................6

*Henry v. First Nat'l Bank of Clarksdale,*
   595 F.2d 291 (5th Cir. 1979) ............................................................................39

*Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Eng'rs,*
   335 F.3d 607 (7th Cir. 2003) ............................................................................54

*Hornbeck Offshore Servs., L.L.C. v. Salazar,*
   696 F. Supp. 2d 627 (E.D. La. 2010) ...............................................................36

*In re Belden Invs. LLC,*
   No. 2:20-CV-01486, 2021 WL 2315841 (W.D. La. June 7, 2021) ...................18

*In re Core Commc'ns, Inc.,*
   531 F.3d 849 (D.C. Cir. 2008) .........................................................................55

*In re Howard,*
   570 F.3d 752 (6th Cir. 2009) ............................................................................22

*In re Katrina Canal Breaches Litig.,*
   495 F.3d 191 (5th Cir. 2007) ............................................................................18

*Ingalls Shipbldg., Inc. v. Asbestos,*
   17 F.3d 130 (5th Cir. 1994) .........................................................................54, 55

*JTB Tools & Oilfield Servs., L.L.C. v. United States,*
   831 F.3d 597 (5th Cir. 2016) .........................................................................22, 23

*Kleppe v. Sierra Club,*
   427 U.S. 390 (1976) ...........................................................................................6

*La. Pub. Serv. Comm'n v. FERC,*
   761 F.3d 540 (5th Cir. 2014) ..............................................................................6

*Labrador v. Poe,*
   144 S. Ct. 921(2024) ........................................................................................65

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.,*
   328 F.3d 192 (5th Cir. 2003) .........................................................................19, 39

*League of Women Voters of United States v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ..........................................................................63, 64

*Ligon v. LaHood,*
   614 F.3d 150 (5th Cir. 2010) .....................................................................20, 21, 22

*Lone Star Fund v (U.S.), L.P. v. Barclays Bank PLC*,
  594 F.3d 383 (5th Cir. 2010) ...................................................................................18

*Louisiana v. Biden*,
  622 F. Supp. 3d 267 (W.D. La. 2022) .....................................................................35

*Louisiana v. Biden*,
  64 F.4th 674 (5th Cir. 2023) ..............................................................25, 29, 31, 32, 33

*Louisiana v. Dep't of Homeland Sec.*,
  No. CV 23-1839, 2024 WL 1328434 (E.D. La. Mar. 28, 2024) ............................29

*Louisiana v. Horseracing Integrity & Safety Auth. Inc.*,
  617 F. Supp. 3d 478 (W.D. La. 2022) .....................................................................60

*Louisiana v. U.S. Army Corps of Eng'rs*,
  834 F.3d 574 (5th Cir. 2016) ..................................................................................34

*Lovelace v. United States*,
  No. 15-cv-30131-MAP, 2016 WL 10826764, (D. Mass. Feb. 18, 2016).................22

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..........................................................................25, 28, 29, 60

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ..................................................................................................6

*Martinez v. Mathews*,
  544 F.2d 1233 (5th Cir. 1976) ...........................................................................19, 65

*Mashni v. U.S. Army Corps of Eng'rs*,
  535 F. Supp. 3d 475 (D.S.C. 2021) .........................................................................34

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003) ...............................................................................55

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ................................................................................................33

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ................................................................................................60

*Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*,
  602 F.3d 687 (5th Cir. 2010) ....................................................................................5

*Milena Ship Mgmt. Co. v. Newcomb*,
  804 F. Supp. 846 (E.D. La. 1992) ............................................................................34

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ....................................................................................19

*Montanans for Multiple Use v. Barbouletos*,
  568 F.3d 225 (D.C. Cir. 2009) .................................................................................53

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................................... 5

*Nat. Res. Def. Council v. Wheeler,*
    955 F.3d 68 (D.C. Cir. 2020) .............................................................................. 37

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,*
    26 F.4th 960 (D.C. Cir. 2022) ............................................................................. 59

*Nat'l Parks & Conservation Ass'n v. F.A.A.,*
    998 F.2d 1523 (10th Cir. 1993) .......................................................................... 20

*Nat'l Pork Producers Council v. EPA,*
    635 F.3d 738 (5th Cir. 2011) .............................................................................. 35

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................ 62

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ...................................................................................... 4, 6, 54

*Oestereich v. Selective Serv. Sys. Loc. Board No. 11,*
    393 U.S. 233 (1968) ............................................................................................ 59

*Painsolvers, Inc. v. State Farm Mut. Auto. Ins. Co.,*
    685 F. Supp. 2d 1123 (D. Haw. 2010) ................................................................ 51

*Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.,*
    822 F.2d 1105 (D.C. Cir. 1987) ............................................................................ 4

*Pennsylvania Pub. Util. Comm'n v. Bodman,*
    No. CIV. 1:CV-07-2002, 2008 WL 3925840 (M.D. Pa. Aug. 21, 2008) .............. 4

*Pennzoil Co. v. FERC,*
    645 F.2d 394 (5th Cir. 1981) .............................................................................. 29

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.,*
    45 F.4th 816 (5th Cir. 2022) .............................................................................. 25

*Peters v. Davis,*
    No. 6:17CV595, 2018 WL 11463602 (E.D. Tex. Mar. 28, 2018) ...................... 19

*Phillips Petroleum Co. v. Johnson,*
    22 F.3d 616 (5th Cir. 1994) ................................................................................ 45

*Preminger v. Principi,*
    422 F.3d 815 (9th Cir. 2005) .............................................................................. 20

*Prestage Farms, Inc. v. Bd. of Sup'rs of Noxubee Cnty., Miss.,*
    205 F.3d 265 (5th Cir. 2000) ........................................................................ 25, 27

*Pub. Citizen, Inc. v. Bomer,*
    274 F.3d 212 (5th Cir. 2001) .............................................................................. 17

*Pub. Citizen, Inc. v. U.S. EPA,*
  343 F.3d 449 (5th Cir. 2003) ................................................................................6

*Ramming v. United States,*
  281 F.3d 158 (5th Cir. 2001) ..............................................................................17

*Richard Roe W.M. v. Devereux Found.,*
  650 F. Supp. 3d 319 (E.D. Pa. 2023) ..................................................................28

*Rsch. & Action Ctr. v. FCC,*
  750 F.2d 70 (D.C. Cir. 1984) ................................................................22, 54, 55

*Shell Offshore Inc. v. Babbitt,*
  238 F.3d 622 (5th Cir. 2001) ..............................................................................45

*Sierra Club v. Costle,*
  657 F.2d 298 (D.C. Cir. 1981) ......................................................................52, 53

*Sierra Club v. EPA,*
  671 F.3d 955 (9th Cir. 2012) ..............................................................................40

*Sierra Club v. Glickman,*
  67 F.3d 90 (5th Cir. 1995) ....................................................................................6

*Sierra Club v. Peterson,*
  185 F.3d 349 (5th Cir. 1999) ........................................................................43, 44

*Sierra Club v. U.S. Dep't of Energy,*
  867 F.3d 189 (D.C. Cir. 2017) ....................................4, 10, 11, 42, 47, 64

*Sierra Club v. U.S. Dep't of Energy,*
  703 F. App'x  1 (D.C. Cir. 2017) ........................................................................64

*Simon v. E. Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976) ........................................................................................32, 33

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ............................................................................................25

*Stem v. Gomez,*
  813 F.3d 205 (5th Cir. 2016) ..............................................................................59

*Stewart v. Cooley,*
  648 F. Supp. 3d 772 (W.D. La. 2022) .................................................................17

*Stockman v. Fed. Election Comm'n,*
  138 F.3d 144 (5th Cir. 1998) ..............................................................................17

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ............................................................................................29

*Sw. Elec. Power Co. v. U.S. EPA,*
  920 F.3d 999 (5th Cir. 2019) ..............................................................................40

*Tenneco, Inc. v. FERC,*
  688 F.2d 1018 (5th Cir. 1982) ................................................................29

*Texas v. U.S. Envtl. Prot. Agency,*
  829 F.3d 405 (5th Cir. 2016) .................................................................61

*Texas v. United States,*
  555 F. Supp. 3d 351 (S.D. Tex. 2021) ..................................................61

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) .................................................................33

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) .........................................................................23, 24

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ...............................................................................25

*Trump v. Int'l Refugee Assistance Project,*
  582 U.S. 571 (2017) .................................................................................3

*U.S. Dep't of Homeland Sec.,*
  892 F.3d 332 (D.C. Cir. 2018) ...............................................................53

*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981) ...............................................................................19

*Urban v. FERC,*
  No. 5:17CV1005, 2017 WL 6461823 (N.D. Ohio Dec. 19, 2017) .........22

*Valley v. Rapides Par. Sch. Bd.,*
  118 F.3d 1047 (5th Cir. 1997) .........................................................18, 38

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
  435 U.S. 519 (1978) ...............................................................................41

*W&T Offshore Inc. v. Bernhardt,*
  946 F.3d 227 (5th Cir. 2019) .................................................................45

*W. Va. Pub. Serv. Comm'n v. U.S. Dep't of Energy,*
  681 F.2d 847 (D.C. Cir. 1982) ...........................................................4, 63

*Walker v. Motorola Mobility LLC,*
  670 F. Supp. 3d 387 (W.D. La. 2023) ...................................................18

*Warth v. Seldin,*
  422 U.S. 490 (1975) ...............................................................................25

*Washington v. Reno,*
  35 F.3d 1093 (6th Cir. 1994) .................................................................63

*Williamson v. Tucker,*
  645 F.2d 404 (5th Cir. 1981) .................................................................17

*Wilson v. Birnberg,*
    667 F.3d 591 (5th Cir. 2012) ........................................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................... 19, 62

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ................................................................. 60, 61

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ........................................................................................ 31

**Statutes**

15 U.S.C. § 717b .......................................................................................... 3, 58

15 U.S.C. § 717b(a) ............................................................................... 4, 40, 59

15 U.S.C. § 717b(e)(1) ..................................................................................... 5

15 U.S.C. § 717f(h) ........................................................................................ 21

15 U.S.C. § 717r ....................................................................................... 20, 21

15 U.S.C. § 717r(b) ..................................................................................... 5, 24

19 U.S.C. § 717b(a) ........................................................................................ 44

28 U.S.C. § 1331 ............................................................................................ 20

28 U.S.C. § 2201 ............................................................................................ 23

33 U.S.C. § 1502(9)(A) .................................................................................... 5

42 U.S.C. § 4321 .............................................................................................. 4

5 U.S.C. § 551(4) ........................................................................................... 44

5 U.S.C. § 551(5) ...................................................................................... 43, 62

5 U.S.C. § 551(6) ........................................................................................... 44

5 U.S.C. § 551(7) ........................................................................................... 44

5 U.S.C. § 553 ............................................................................................... 44

5 U.S.C. § 553(b)(A) ...................................................................................... 46

5 U.S.C. § 555(b) ........................................................................................... 56

5 U.S.C. § 703 ........................................................................................... 5, 23

5 U.S.C. § 704 ........................................................................................... 5, 34

5 U.S.C. § 705 ......................................................................................... 22, 65

5 U.S.C. § 706(1) ....................................................................................... 6, 54

5 U.S.C. § 706(2)(A) .................................................................................. 5, 40

5 U.S.C. § 801 ................................................................................................................ 53

5 U.S.C. § 805 ................................................................................................................ 53

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ...................................................................... 17

Federal Rule of Civil Procedure 12(b)(6) ............................................................... 18, 38

**Regulations**

10 C.F.R. § 590.202 ....................................................................................................... 42

10 C.F.R. § 590.203 ....................................................................................................... 41

49 C.F.R. § 1.93(h)(1) ...................................................................................................... 5

**Other Authorities**

48 Fed. Reg. 34,501 (July 29, 1983) .............................................................................. 11

77 Fed. Reg. 73,627 (Dec. 11, 2012) ............................................................................. 12

79 Fed. Reg. 32,261 (June 4, 2014) ............................................................................... 10

79 Fed. Reg. 48,132 (Aug. 15, 2014) ............................................................................ 45

83 Fed. Reg. 27,314 (June 12, 2018) ............................................................................... 7

83 Fed. Reg. 35,106 (July 25, 2018) .............................................................................. 16

88 Fed. Reg. 25,272 (Apr. 26, 2023) ............................................................................... 8

## TABLE OF ACRONYMS

| Abbreviation | Description |
|---|---|
| APA | Administrative Procedure Act |
| CRA | Congressional Review Act |
| DOE | Department of Energy |
| EIA | Energy Information Administration |
| EIS | Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| FPC | Federal Power Commission |
| FTA | Free Trade Agreement |
| LNG | Liquefied Natural Gas |
| MARAD | U.S. Department of Transportation's Maritime Administration |
| NEPA | National Environmental Policy Act |

## INTRODUCTION

Various states (collectively, "Plaintiffs")—none of which have pending applications before the Department of Energy ("DOE") to export natural gas—claim the DOE has "banned" exportation of liquefied natural gas ("LNG") to countries without a free trade agreement ("non-FTA countries") in violation of the Administrative Procedure Act ("APA"), Congressional Review Act, and U.S. Constitution. Plaintiffs' claims should be dismissed and their request for a preliminary injunction should be denied.

DOE announced a temporary pause on authorizing LNG export applications to non-FTA countries (the "pause") so that DOE could update stale economic and environmental analyses that underpin its public interest determination under the Natural Gas Act (the "Update"). The existing studies do not reflect the unprecedented growth in the LNG export market since they were last updated, which implicates both economic and environmental concerns. They also do not address the specific concerns raised by business groups and legislators about the effects of increased LNG exports on domestic energy prices and security. DOE announced the pause because it could not approve or deny pending non-FTA applications based on stale economic and environmental information, and because DOE wanted to be transparent and set expectations for applicants and the public on the timing of pending non-FTA decisions.

Plaintiffs' 16-count complaint grossly mischaracterizes DOE's Update and the attendant pause by creating a false narrative. For example, Plaintiffs allege that DOE banned new LNG exports, Compl., ECF No. 1, ¶ 1, and that said "[ban] has no end date," *id.* ¶ 104. Plaintiffs then catalogue a list of purported harms that allegedly flow from these mistruths,[1] including loss of jobs

---

[1] To be clear, there is no ban on LNG exports. The Natural Gas Act requires DOE to make a public interest determination before authorizing non-FTA export requests, and the Update is part of DOE's well-established process for making public interest determinations rather than a cessation of that process. Any minimal delay

1

and tax and royalty revenue that would have supposedly been generated by non-delayed export authorizations. *Id.* ¶¶ 112-151; *see also* Pl. Brief, ECF No. 13-1 at 19-21. Aside from peddling distortions, Plaintiffs' complaint suffers from numerous, fatal jurisdictional and other defects and should be dismissed. First, Plaintiffs may only seek judicial review under the Natural Gas Act in the courts of appeals. Second, Plaintiffs lack standing because, as non-applicants, they are at best indirectly affected by DOE's Update and the attendant pause and they assert only speculative economic injuries by claiming the Update will result in a permanent loss of future LNG exports. Third, Plaintiffs improperly challenge an interim step in DOE's public interest review process, rather than a "final agency action" that consummates its decision-making process and determines rights and obligations, as required by the APA. Fourth, many of Plaintiffs' claims fail as a matter of law for other reasons more thoroughly discussed below. Because Plaintiffs ask this Court to exercise jurisdiction it does not have and their claims are otherwise legally deficient, their complaint should be dismissed.

But even if the Court denies Defendants' motion to dismiss, Plaintiffs cannot meet their high burden for preliminary injunctive relief. First, Plaintiffs are not likely to prevail on the merits because it is entirely prudent, reasonable, and consistent with the statutory authority granted by Congress for DOE to update stale analyses to account for, among other things, the exponential growth of LNG exports from the United States to the rest of the world. Second, Plaintiffs cannot show they face irreparable harm because they have, at most, alleged deferred or delayed investment, which, by definition, is temporary and not irreparable. And finally, Plaintiffs cannot reasonably contend that DOE is acting contrary to the public interest or the balance of the equities. Completing the Update is necessary to ensure DOE understands the economic and environmental

---

finalizing pending applications is necessary for DOE to complete the Update, which will be done by March 2025, at the latest.

impacts of future export authorizations—an understanding that is required by statute for granting or denying export authorizations.

Plaintiffs' request for a preliminary injunction is particularly unsupportable where, as here, they seek an accelerated order granting their requested ultimate relief—*i.e.*, ending the temporary pause on final export authorizations associated with the Update—rather than an order preserving the status quo to allow the Court to render a meaningful decision on the merits. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) ("The purpose of [] interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward."). This is not a case where the proverbial tree will be chopped down before the Court can rule on the appropriateness of the cutting. Because DOE is acting within the scope of its statutory authority by exercising its discretion to update the economic and environmental analyses that inform its public interest review and because DOE has committed to completing this process expeditiously, no relief—much less the extraordinary relief of a preliminary injunction—should be granted.

## STATUTORY BACKGROUND

### I.    Natural Gas Act, Section 3(a), and the National Environmental Policy Act.

DOE is responsible for authorizing exports of domestically produced natural gas, including LNG, to foreign countries under Natural Gas Act, Section 3. *See* 15 U.S.C. § 717b. For applications to export natural gas to non-FTA countries,[2] Section 3(a) sets forth the following standard for DOE's review of export applications:

> [N]o person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order

---

[2] This case only implicates export requests to non-FTA countries. Export requests to FTA countries—Australia, Bahrain, Canada, Chile, Colombia, Dominican Republic, El Salvador, Guatemala, Honduras, Jordan, Mexico, Morocco, Nicaragua, Oman, Panama, Peru, Republic of Korea, and Singapore—are not implicated here. Jennifer L. Wade Declaration, n. 6, attached as Ex. A.

of the Commission[3] authorizing it to do so.  The [Secretary of Energy] shall issue such order upon application, unless, after opportunity for hearing, [the Secretary] finds that the proposed exportation or importation will not be consistent with the public interest.  The [Secretary] may by [the Secretary's] order grant such application, in whole or in part, with such modification and upon such terms and conditions as the [Secretary] may find necessary or appropriate.

15 U.S.C. § 717b(a).  DOE, as affirmed by the U.S. Court of Appeals for the D.C. Circuit, has consistently interpreted this provision as creating a rebuttable presumption that a proposed export of natural gas is in the public interest.[4]  But before granting any application, DOE must take two additional steps.

First, DOE must conduct an adjudication of each non-FTA export application and ensure that the proposed exportation is not inconsistent with the public interest.[5]  Second, before reaching a final decision on any non-FTA application, DOE must also comply with the National Environmental Policy Act ("NEPA").  42 U.S.C. § 4321 *et seq.*; *see Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 192 (D.C. Cir. 2017) (*Sierra Club I*).  "NEPA requires a federal agency to prepare an environmental impact statement (EIS) as part of any 'proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.'"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 72 (2004) ("*SUWA*") (quoting 42 U.S.C. § 4332(2)(C)).  Typically, the federal agency responsible for permitting the export facility—either the Federal Energy Regulatory Commission ("FERC") or the U.S. Department of Transportation's Maritime Administration

---

[3] When the Natural Gas Act refers to the "Commission," it means the Federal Power Commission ("FPC"). Since the FPC's abolition, courts have interpreted "Commission" to refer to the Federal Energy Regulatory Commission ("FERC") and DOE, both of which inherited some of the FPC's functions.  *See Pennsylvania Pub. Util. Comm'n v. Bodman*, No. CIV. 1:CV-07-2002, 2008 WL 3925840, at *2 (M.D. Pa. Aug. 21, 2008).

[4] *See Sierra Club v. U.S. Dep't of Energy, 867 F.3d 189, 203 (D.C. Cir. 2017) (Sierra Club I)* ("We have construed [Section 3(a)] as containing a 'general presumption favoring [export] authorization.'") (quoting *W. Va. Pub. Serv. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 856 (D.C. Cir. 1982)); *see also Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1188 (D.C. Cir. 2023) (same).

[5] *See Sierra Club I*, 867 F.3d at 203 ("there must be 'an affirmative showing of inconsistency with the public interest' to deny the application" under Section 3(a)) (quoting *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 822 F.2d 1105, 1111 (D.C. Cir. 1987)).

("MARAD")—serves as the lead agency in the NEPA review process, and DOE serves as a cooperating agency. *See* 33 U.S.C. § 1502(9)(A) and 49 C.F.R. § 1.93(h)(1) (for MARAD authority); 15 U.S.C. §§ 717b(e)(1) and 717a(11) (for FERC authority); *see also* Jennifer L. Wade Declaration, ¶¶ 6–8, 22, attached as Ex. A.  In certain circumstances, DOE may serve as the lead agency in the NEPA review process and conduct its own NEPA analysis on the proposed exports. *See*, *e.g.*, Wade Decl. ¶ 8; NFE Altamira FLNG, DOE Docket. No. 22-110-LNG (Dec. 12, 2023).[6]

If a party seeks to challenge DOE's authorization (or lack thereof), Section 19(b) provides "exclusive" jurisdiction to the appropriate court of appeals to "affirm, modify, or set aside" DOE's orders on such applications "in whole or in part." 15 U.S.C. § 717r(b).

## II.    Administrative Procedure Act.

The APA sets forth procedures by which certain actions of federal agencies are subject to review by the courts.  *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020). The APA limits review to "[a]gency action made reviewable by statute and *final agency action* for which there is no other adequate remedy."  5 U.S.C. § 704 (emphasis added).  Where a separate statute provides the "form of proceeding for judicial review," including the court in which an action shall be filed, the APA directs adherence to those "special statutory [] proceedings."  5 U.S.C. § 703.  Where APA review is available, judicial review under the APA is deferential, particularly in areas involving the agency's technical expertise, *Medina Cnty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010), and the reviewing court may not substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Under APA Section 706(2)(A), a court may review only final agency action to determine if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

---

[6] Available at https://www.energy.gov/fecm/articles/nfe-altamira-flng-s-de-rl-de-cv-fecm-docket-no-22-110-lng.

U.S.C. § 706(2)(A). Under this highly deferential standard, agency actions are presumed valid, *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 588 (5th Cir. 2014), and courts must uphold "an agency's actions if its reasons and policy choices satisfy minimum standards of rationality." *Pub. Citizen, Inc. v. U.S. EPA*, 343 F.3d 449, 455 (5th Cir. 2003). In undertaking this review, courts must assure themselves "that the agency considered the relevant factors in making the decision, its action bears a rational relationship to the statute's purposes, and there is substantial evidence in the record to support it." *Id.* An action is only arbitrary and capricious if the agency made "a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (cleaned up). The court must not "substitute its judgment for that of the agency as to which particular features might be most desirable or efficacious." *Sierra Club v. Glickman*, 67 F.3d 90, 97 (5th Cir. 1995). Plaintiffs have the burden to demonstrate that the agency failed to meet this highly deferential standard. *See Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976); *see also Hartford Cas. Ins. Co. v. F.D.I.C.*, 21 F.3d 696, 704 (5th Cir. 1994).

Under APA Section 706(1), courts may also "compel" unreasonably delayed agency action. 5 U.S.C. § 706(1). When a party asserts a failure to act under APA § 706(1), the claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *SUWA*, 542 U.S. at 64 (emphasis in original). This standard precludes a "broad programmatic attack," *id.*, under a statute that is "mandatory as to the object to be achieved," but which leaves a federal agency "a great deal of discretion in deciding how to achieve it." *Id.* at 66. The principal purpose of this rule "is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Id.*

## FACTUAL BACKGROUND

I.    **The United States leads the world in LNG exports**.

In less than two decades, the LNG sector has undergone a profound shift in the United States.  *See* U.S. Dep't of Energy, *DOE to Update Public Interest Analysis to Enhance National Security, Achieve Clean Energy Goals and Continue Support for Global Allies* (Jan. 26, 2024) ("DOE Announcement"), attached as Ex. B; Wade Decl. ¶¶ 48–57.  "Based on a domestic boom in natural gas production enabled by the expanded use of technologies and fueled by increased demand overseas, the United States has transformed in just over a decade from a net importer of LNG" to the world's top LNG exporter.  Wade Decl. ¶ 48; *see* U.S. Dep't of Energy, *The Temporary Pause on Review of Pending Applications to Export Liquefied Natural Gas DOE Fact Sheet*, at 1 (Feb. 2024) ("DOE Fact Sheet"), attached as Ex. C.

DOE approved its first non-FTA export application in 2012.  *See* Commonwealth LNG, LLC, DOE Docket No. 19-134-LNG, "Notice Dismissing Request for Rehearing," at 3 n.12 (Mar. 27, 2024) ("Commonwealth Notice") (citing final order issued to Sabine Pass Liquefaction, LLC), attached as Ex. D.  Since that first approval, DOE has approved a cumulative volume of over 48 billion cubic feet per day (Bcf/d) of LNG exports to non-FTA countries—an amount that currently equates to more than 45 percent of domestic dry natural gas production.  DOE Fact Sheet at 1; Wade Decl. ¶¶ 49–50.  This cumulative volume of approved non-FTA exports has increased sharply since 2018 when DOE last updated its economic study, reflecting significant shifts in the U.S. and global LNG markets.  Amy Sweeney Declaration ¶¶ 13–16, attached as Ex. E.  From 2018 to the present, for example, DOE has approved a volume of LNG exportation that is greater than all LNG exportation approved in all years prior to 2018.  *See id.* ¶ 14; Study on Macroeconomic Outcomes of LNG Exports, 83 Fed. Reg. 27314, 27315 (June 12, 2018).  Export capacity has likewise dramatically increased—the United States' current export capacity of just over 14 Bcf/d is more than three times

greater than U.S. export capacity in 2018.  DOE Fact Sheet at 1; Sweeney Decl. ¶ 14.  Another "12 Bcf/d of export capacity is currently under construction" after reaching a final investment decision and is expected to come online by 2030. Wade Decl. ¶ 50; DOE Fact Sheet at 1.  And DOE already has approved more than 22 Bcf/d of *additional* export capacity that is not yet operating or under construction.  DOE Fact Sheet at 1; Wade Decl. ¶ 50.  With these ongoing exports and additional approvals (none affected by the Update), DOE projects that "U.S. LNG exports will double by the end of this decade." Commonwealth Notice at 4; Sweeney Decl. ¶ 48.  Indeed, considering "there has been a 26 [percent] increase in approved non-FTA exports" in just the past year, "the United States is on track to exceed the export capacity of any other country by approximately 40 percent". Sweeney Dec. ¶ 16; *see* DOE Announcement.

## II.    Approved LNG exports significantly outpace realized LNG projects and exports.

In the more than 10 years since DOE approved its first non-FTA export application in 2012, there are currently 40, long-term non-FTA authorizations for the export of U.S.-sourced LNG. Wade Decl. ¶ 49; Commonwealth Notice at 3.  Significantly more non-FTA exports have been approved than have been realized through the construction and operation of export projects.  *See* Wade Decl. ¶¶ 58–67; Policy Statement on Export Commencement Deadlines in Authorizations To Export Natural Gas to Non-Free Trade Agreement Countries, 88 Fed. Reg. 25272, 25276-77 (Apr. 26, 2023).  This gap between approvals and realized exports, which DOE calls an "authorization overhang," is growing.  88 Fed. Reg. at 25,276-77; Sweeney Decl. ¶ 58.  DOE has long noted the "continuing uncertainty that all or even most of the proposed LNG export projects will ever be realized because of the time, difficulty, and expense of commercializing, financing, and constructing LNG export terminals, as well as the uncertainties and competition inherent in the global market for LNG."  88 Fed. Reg. at 25,276; Wade Decl. ¶ 63; *Freeport LNG Expansion, L.P., et al.*, DOE/FE Order No. 3282-C, DOE Docket No. 10-161-LNG, Final Opinion and Order, at 86 (Nov. 14,

2014).[7]  Because DOE's cumulative volume of approved non-FTA exports is far greater than the existing physical capacity to export these volumes, it likely will be several years before LNG suppliers have sufficient physical export capacity to meet the currently approved non-FTA exports. *See* 88 Fed. Reg. at 25,276-27; Sweeney Decl. ¶¶ 55–57, 59–61.

In general, to build an LNG export facility and commence exports of U.S. LNG to non-FTA countries, an exporter must obtain:

    (i)    An authorization to site and construct the facility (if built in the United States), typically obtained through FERC, which also requires applicants to obtain other necessary state and federal permits as part of the authorization;

    (ii)    "An authorization to export the LNG from the United States[,] obtained through DOE under Section 3(a) of the Natural Gas Act"; and

    (iii)    The financial and other commercial commitments necessary to support the planned facility.  These include, but are not limited to, investment capital for the export facility, and signed sales & purchase agreements for the LNG to be exported.  Most projects require at least 50 percent of their export capital to be under long-term contract before reaching a financial investment decision.

*See* Sean T. Dixon, Jonathan Panico, *Extraction for Exportation: Is There Such A Thing As "Net Energy Independence"?*, Nat. Resources & Env't 38, 40 (Winter 2013); Wade Decl. ¶ 59.  Once a company obtains the necessary permits and makes a final investment decision to build an export project, exports usually commence between three to five years after DOE issues the non-FTA export authorization. *See* Wade Decl. ¶¶ 65–67; Sweeney Decl. ¶ 59.

For the cumulative volume of over 48 Bcf/d that DOE has already approved, which is connected to 22 large-scale export projects, ten of those projects are currently not constructed and not operating. Wade Decl. ¶ 66.  Of the numerous applications received by DOE over the years for the long-term export of "LNG to non-FTA countries, applicants have withdrawn more than a dozen." *Id.* ¶ 67.  "To date, DOE has also vacated nine long-term non-FTA authorizations (none

---

[7] Available at https://www.energy.gov/sites/prod/files/2014/11/f19/ord3282-C.pdf

over the objection of the authorization holder), and one authorization for a large-scale facility has

expired." *Id.* ¶ 67. Authorizations are typically vacated or expire because of "authorization holder's

inaction or upon the authorization holder's request—such as where the holder has made a business

decision not to proceed with the exports or the project facilities."[8] *Id.*

### III. DOE relies on economic and environmental studies to inform its public interest determinations under the Natural Gas Act.

DOE reviews export applications on a case-by-case basis. *See* U.S. Dep't of Energy, *Order

Denying Petition for Rulemaking on Exports of Liquefied Natural Gas*, at 4 (July 18, 2023) ("July 2023

Order"), attached as Ex. F;[9] Wade Decl. ¶¶ 5, 19, 25.  As part of each review, DOE considers record

evidence to determine whether approving an export application would be inconsistent with the

public interest, as required by the Natural Gas Act, including public comments, policy guidelines,

prior authorizations, and economic and environmental studies.  *See* Commonwealth Notice at 4;

*Sierra Club I* , 867 F.3d at 203; Wade Decl. ¶ 19.  Since 2014, DOE's Procedures for Liquefied

Natural Gas Export Decisions, which DOE noticed in the Federal Register, have alerted LNG non-

FTA export applicants that final actions can only occur "when DOE has sufficient information on

which to base a public interest determination."  Proposed Procedures for Liquefied Natural Gas

Export Decisions, 79 Fed. Reg. 32261, 32263 (June 4, 2014).

---

[8] *See, e.g.*, Letter from Matthew R. Rudolphi, Thompson Coburn LLP, to U.S. Dep't of Energy (Mar. 28, 2023), https://perma.cc/K8LX-K6JH (requesting the DOE vacate GC LNG's FTA authorization and withdraw GC LNG's pending non-FTA application because its "corporate focus has shifted away from LNG export activities to development of net-zero greenhouse gas emission energy products"); Dep't of Energy, Order Granting Request to Vacate Long-Term Authorizations to Export U.S.-Sourced Natural Gas by Pipeline to Canada for Liquefaction and Re-Export In the Form of Liquefied Natural Gas to Free Trade Agreement and Non-Free Trade Agreement Nations (Jan. 20, 2023), https://perma.cc/A38P-NSEX (vacating export authorizations at the holder's request due to a change in corporate status and because "as a commercial matter [] it will no longer be pursuing the development of the natural gas liquefaction and export facility [it] proposed in its application.").

[9] *Available at* https://perma.cc/BC8Q-WXFT.

To keep pace with the rapidly changing natural gas market, DOE has previously updated the studies it relies on to better inform its decision-making, and DOE has long treated economic and environmental analyses as a critical component of its public interest determination. *See* Commonwealth Notice at 4-5; *see also, e.g., Sierra Club I*, 867 F.3d at 203; Wade Decl. ¶¶ 30–39. Updated economic studies provide DOE with valuable analysis relating to how LNG "exports may impact U.S. natural gas prices, Gross Domestic Product, household income, consumer welfare, and other metrics affecting the public interest." Wade Decl. ¶¶ 35–36; Commonwealth Notice at 5*; see also Sierra Club I*, 867 F.3d at 194-95. DOE likewise updates its environmental studies to accurately gauge the potential direct and indirect environmental impacts from LNG exports, such as projected lifecycle greenhouse gas emissions. Wade Decl. ¶ 19; Commonwealth Notice at 5; *Sierra Club I*, 867 F.3d at 195-96.

### IV. DOE has deferred final determinations on LNG export applications in the past to update studies for its public interest determinations.

DOE has deferred final decisions under the Natural Gas Act before. In 1983, DOE deferred final decisions on 20 natural gas import applications so it could re-assess its applicable criteria for importing natural gas. Review of Government Policy in Authorizing Imports of Natural Gas, 48 Fed. Reg. 34,501 (July 29, 1983). There it convened a conference to assess issues related to importing natural gas and solicited comments through the Federal Register. *Id.* DOE explained that, following receipt of the requested comments and results of the conference, it would then move expeditiously to consider all pending import applications and the pause lasted approximately seven months. *Id.* at 34,501-02; Wade Decl. ¶ 44.

DOE has also deferred final decisions on non-FTA LNG export applications in the past to update the underlying studies used in its public interest determination. On December 11, 2012, DOE announced in the Federal Register that it had completed a new study and that it "invite[d]

comments regarding the LNG Export Study . . . to inform DOE in its public interest determinations of the authorizations sought in the 15 pending applications." 2012 LNG Export Study, 77 Fed. Reg. 73627, 73629 (Dec. 11, 2012). In the notice, DOE stated that "*no final decisions will be issued in the 15 pending proceedings until DOE has received and evaluated the comments requested herein.*" *Id.* (emphasis added). In March 2013, while DOE was reviewing public comments on the new study, then-acting Assistant Secretary for Fossil Energy Christopher Smith reiterated in congressional testimony that, "DOE will make no final decisions on currently pending [non-FTA] applications until it has evaluated both the [2012 LNG Export Study] and the comments." *See* Statement of Christopher Smith, at 4 (Mar. 19, 2013).[10] DOE took no action on any pending non-FTA export applications until it issued the *Freeport LNG* conditional authorization on May 17, 2013, following the issuance of its new economic study. Wade Decl. ¶ 47. Final decisions on applications were temporarily delayed by approximately nine months. *Id.*; Commonwealth Notice at 8 n.35.

## V.    DOE affirms it will continue to update its existing studies to inform the public interest, when appropriate.

In 2022, several environmental groups resubmitted a petition urging DOE to promulgate new regulations or guidance defining DOE's process for considering LNG exports to non-FTA countries. July 2023 Order at 1. As part of this sweeping request, the environmental groups asked DOE to halt approval of pending non-FTA applications until this new rulemaking was completed through public notice and comment.

DOE declined to create new rules for its non-FTA export application procedures and rejected the Petition, determining instead that its case-by-case review process (which relies on periodic updates to economic and environmental analyses) was sufficient. Wade Decl. ¶¶ 24–25. DOE stated that its existing approach conforms with the Natural Gas Act and provides DOE with

---

[10] Available at https://perma.cc/884Y-PCXL.

the flexibility to incorporate new developments in the U.S. and global LNG markets into its decision-making, along with evolving considerations related to the consumer protection, global energy markets, national security, environment, and other matters bearing on the public interest. *Id.* at 4-5. Because DOE determined that environmental groups' requested rulemaking was not necessary, DOE likewise stated that there "[was] no factual or legal basis" to halt non-FTA export approvals "*at this time.*" *Id.* (emphasis added). DOE reiterated that "the LNG export program is best served by *continuing to update the economic and environmental studies, analytical approaches, and public interest factors* that [it] considers in an iterative fashion, based on developing facts and circumstances." *Id.* at 28 (emphasis added); *see also* Wade Decl. ¶¶ 24–25.

## VI.    DOE initiates a process to update economic and environmental analyses used in public interest determinations.

Consistent with DOE's prior deferral of export authorizations and its statements in the 2023 Order, on January 26, 2024, DOE issued a statement providing notice that it would initiate a process to update the economic and environmental assessments used to inform whether additional LNG exports to non-FTA countries would be inconsistent with the public interest under Section 3(a) of the Natural Gas Act. *See* DOE Announcement. The Update results in a temporary pause on issuing final decisions on applications to export LNG to non-FTA countries. DOE Fact Sheet at 1.

The most recent economic study was published in 2014, and the environmental analyses were published in 2014 and 2019. DOE Fact Sheet at 2; *see* Wade Decl. ¶ 20. As discussed above, the United States LNG export sector has significantly grown since then, as have the potential direct and indirect impacts from LNG exports. DOE Fact Sheet at 2; *see* Wade Decl. ¶¶ 48–56. Today, actual exports of U.S. LNG are four times greater than exports were at the time of completion of the 2018 study (12 Bcf/d (now) v. 3 Bcf/d (then)), and export capacity has more than tripled (14 Bcf/d (now) vs. 4 Bcf/d (then)). Wade Decl. ¶ 55; DOE Fact Sheet at 1.

Foreign affairs have also had a profound effect on natural gas markets in the past five years. As DOE explained, "U.S. LNG exports were still just getting underway" at the time of the 2018 and 2019 economic and environmental analyses. DOE Fact Sheet at 2. Since then, the "world and the global natural gas sector have changed significantly in just a few years with Russia's invasion of Ukraine and use of energy as a weapon to undermine European and global security." *Id.* The "practical action" of updating these analyses "will ensure the most up-to-date economic and environmental analyses are being utilized" by DOE when it makes its public interest determinations going forward. *Id.* The Update was driven, in part, by concerns raised by business interests and political leaders about the effects of the unprecedented growth of the LNG export market on domestic energy prices, among other things. *See* LNG Letter to the Honorable Jennifer Granholm, Secretary of Energy (Jan 24, 2024), https://perma.cc/YVF2-795A; *see also* Letter from U.S. Senator Jeffrey A. Merkley, et al. to the Honorable Jennifer Granholm, Secretary of Energy (Nov. 14, 2023), https://perma.cc/5E9U-RLDN.

   **A. Timing**.

DOE is devoting substantial resources to complete the Update, so that it can finish its required NEPA analyses and make its public interest determinations for the seven pending non-FTA applications that are currently subject to the pause. DOE, in connection with its National Laboratories—which have been at the forefront of scientific innovation for 70 years—are currently working on the updates to the existing analyses. Sweeney Decl. ¶¶ 29–31. The economic study will assess the potential economic impacts of LNG exports on American consumers and U.S. manufacturers. *Id.* ¶ 30. Since LNG global supply could outpace demand in the coming years, the updated studies will assess how that trend could affect domestic and global natural gas prices, as well as energy security at home and abroad. *Id.* ¶ 50. For the environmental studies, DOE is updating its lifecycle greenhouse gas analysis as well as conducting, among other things, an analysis of peer-

reviewed, scientific literature related to the potential environmental consequences of unconventional natural gas production, natural gas liquefaction, and LNG exports. *Id.* ¶ 32.  Once the studies are completed, and consistent with the procedures DOE followed during the 2012–2013 update process, DOE will initiate a 60-day public comment period through an announcement in the Federal Register.  *Id.* ¶ 28.  DOE will review and respond to these public comments, which DOE expects to be voluminous.  *Id.*  DOE has publicly stated that the entire process will take "months, not years," and that the temporary deferral of final decisions is "subject to exception for unanticipated and immediate national security emergencies."  DOE Announcement.  As recently stated by the Secretary, DOE plans to complete the process by the first quarter of 2025.  Brian Dabbs, *Granholm says LNG pause will end within a year*, E&E News by POLITICO (Mar. 18, 2024), https://perma.cc/2L36-6W6X; *see also* Sweeney Decl. ¶ 27.

### B. The Update affects only a limited number of applications and has no retroactive effects.

The Update will temporarily defer DOE's public interest decisions on a small number of pending or future non-FTA export applications.[11]  DOE Fact Sheet at 1.  There are currently only four pending non-FTA applications that will be ready for final action upon the Update's.  Sweeney Decl. ¶ 42.  These four applications collectively concern 3.58 Bcf/d of potential exports.  *Id.*  The applications concern two projects in Louisiana (Commonwealth LNG, LLC and Venture Global Calcasieu Pass, LLC), one in Texas (Port Arthur LNG Phase II), and one off the coast of Tamaulipas, Mexico (NFE Altamira FLNG, S. de R.L. de C.V).  *Id.*  In one of the Plaintiffs' exhibits,

---

[11] The Update does not pause all applications for exports to non-FTA countries.  On April 5, 2024, DOE issued an order, in part, authorizing the export of previously-imported LNG to non-FTA countries pursuant to DOE's small-scale exports rule.  *See* Carib Energy (USA) LLC, DOE/FECM Docket No. 24-5-LNG, Order No. 5114, Order Granting Blanket Authorization to Export Liquefied Natural Gas Previously Imported from Foreign Sources and Liquefied Natural Gas Received from Domestic Sources to Free Trade Agreement Countries, and Authorizing Small-Scale Exports of Liquefied Natural Gas (Apr. 5, 2024), https://perma.cc/C9GP-JFZB.

Commonwealth LNG, LLC states that it remains fully committed to developing an export terminal in Louisiana: "While Commonwealth LNG is disappointed in the DOE delay, we remain fully committed to developing our LNG export facility in Cameron, Louisiana and delivering LNG to our nation's allies to help meet global climate initiatives."  Pls. Br., ECF No. 13-42, Ex. 40 at 2

There are also three other pending non-FTA applications for which DOE is or will be leading the environmental review under NEPA.  Sweeney Decl. ¶ 43.  DOE has determined that it cannot complete the NEPA process in those three proceedings until the updated analyses are available to ensure that its NEPA analysis is supported by the most up-to-date environmental studies.  *Id.*  These three applications concern a potential total export volume of 2.03 Bcf/d. *Id.*  One of the proposed projects (which involves U.S.-sourced LNG) is located in Mexico, where the applicant is requesting an increase in previously-approved export volume (Mexico Pacific Limited LLC).  *Id.*  The other two proposed projects are in Louisiana (Lake Charles Exports, LLC and Magnolia LNG, LLC).  *Id.*

The Update does not affect any other applications for imports or exports of natural gas that DOE processes under Section 3.  Such applications include but are not limited to, applications involving (a) exports of LNG to FTA countries; (b) imports of LNG (from FTA or non-FTA countries); (c) exports of LNG previously imported from foreign sources; (d) small-scale exports of natural gas (Small-Scale Natural Gas Imports, 83 Fed. Reg. 35,106 (July 25, 2018)); and (e) export commencement extensions from current authorization holders, pursuant to the April 2023 Policy Statement on Export Commencement Deadlines in Natural Gas Export Authorizations.  Sweeney Decl. ¶ 33; *see also* DOE Fact Sheet at 1, n.1.

The Update also has no retroactive effect and will not affect any existing non-FTA export authorizations, which total over 48 Bcf/d.  Sweeney Decl. ¶¶ 23, 25; DOE Fact Sheet at 1.  Of the currently authorized 48 Bcf/d of export capacity, 14 Bcf/d of export capacity is currently

operational; 12 Bcf/d of export capacity is under construction; and 22 Bcf/d of export capacity is awaiting construction.  Wade Decl. ¶ 50.  LNG exports for 2024 currently outpace 2023 exports, previously the highest year of export volume on record.  Wade Decl. ¶¶ 50, 56.

## STANDARDS OF REVIEW

### I.    Motion to dismiss for lack of jurisdiction under Rule 12(b)(1).

"Federal courts are courts of limited jurisdiction," *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998), and can only adjudicate claims when subject matter jurisdiction is "conferred by the Constitution and federal statute."  *Crochet v. Seadrill Americas Inc.*, No. 6:22-CV-01076, 2022 WL 16752304, at *1 (W.D. La. Sept. 19, 2022).  Federal Rule of Civil Procedure 12(b)(1) is "a large umbrella, overspreading a wide variety of different types of challenges to subject-matter jurisdiction including" standing.  *Stewart v. Cooley*, 648 F. Supp. 3d 772, 776 (W.D. La. 2022); *see Pub. Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001).  A complaint cannot "rest merely on unsupported conclusions or interpretations of law."  *Stewart*, 648 F. Supp. 3d at 776. "Subjective characterizations or conclusory descriptions of a general scenario which could be dominated by unpleaded facts will not defeat a motion to dismiss."  *Id.* (citations omitted).  The burden of establishing subject matter jurisdiction "is on the party asserting jurisdiction."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

Rule 12(b)(1) allows defendants to factually attack the complaint's allegations regarding jurisdiction with "evidentiary materials outside of the pleadings."  *Eagle TX I SPE, L.L.C. v. Sharif & Munir Enterprises, Inc.*, 602 F. App'x 576, 578 (5th Cir. 2015).  When a defendant makes a factual attack "no presumptive truthfulness attaches to plaintiff's allegations."  *Williamson v. Tucker*, 645 F.2d 404, 412-13 (5th Cir. 1981).

## II.    Motion to dismiss for failure to state a claim under Rule 12(b)(6).

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate when a plaintiff "fail[s] to state a claim upon which relief can be granted." *In re Belden Invs. LLC*, No. 2:20-CV-01486, 2021 WL 2315841, at *1 (W.D. La. June 7, 2021). Such motions are reviewed with the court "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010). However, "the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[L]egal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) (quoting *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278 (5th Cir. 1993)). "[T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery ... or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (cleaned up). Only claims that are both legally cognizable and plausible survive Rule 12(b)(6). *See Walker v. Motorola Mobility LLC*, 670 F. Supp. 3d 387, 393 (W.D. La. 2023) (citing *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)).

"When reviewing such a motion, the court should focus on the complaint and its attachments." *Walker*, 670 F. Supp. 3d at 393 (citing *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012)). The Court can "also consider documents referenced in and central to a party's claims," *id.* and "may also consider matters of which [they] may take judicial notice." *Hall v. Hodgkins*, 305 Fed. App'x 224, 227 (5th Cir. 2008) (cleaned up).

### III.    Motion for preliminary injunction.

"The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997).  Indeed, a preliminary injunction "may only be awarded upon a clear showing" that: :(1) Plaintiffs are likely to prevail on the merits, (2) Plaintiffs will suffer irreparable harm, (3) the equities tip in their favor; and (4) an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008).  The Fifth Circuit has "cautioned repeatedly" that a preliminary injunction "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four [*Winter*] requirements."  *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003) (citation omitted); *see supra* at 3 (listing *Winter* factors).  None of the *Winter* factors "have a fixed quantitative value; rather, a sliding scale is utilized to account for the intensity of each in a given calculus." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023) (cleaned up).

Courts should only issue a preliminary injunction to "preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). The purpose of a preliminary injunction "is not to give a plaintiff the ultimate relief he seeks, but to preserve a court's power to render a meaningful decision after a trial on the merits." *Peters v. Davis*, No. 6:17CV595, 2018 WL 11463602, at *2 (E.D. Tex. Mar. 28, 2018) (citation omitted).  Mandatory preliminary injunctive relief, "which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

## ARGUMENT

I.    **The Court should dismiss Plaintiffs' complaint**.

### A.  The Natural Gas Act vests exclusive jurisdiction in the courts of appeals.

This Court lacks subject-matter jurisdiction over Plaintiffs' complaint because Section 19 of the Natural Gas Act creates an exclusive path for judicial review of DOE's action or inaction related to the export of LNG.  Any challenge relating to LNG exports must be brought in the first instance in the appropriate court of appeal.  15 U.S.C. § 717r.[12]  By filing their claims in district court, Plaintiffs seek to sidestep the Natural Gas Act's "highly reticulated procedure for obtaining[] and challenging" a decision on a natural gas export application.  *Am. Energy Corp. v. Rockies Exp. Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010).  Plaintiffs cannot avoid the court of appeals' exclusive jurisdiction by challenging DOE's purported unreasonable delay in issuing a final order in an export proceeding; by challenging a purported "final agency action" under the APA; by raising constitutional claims; or by seeking declaratory judgment.

Although Congress granted the federal district courts general subject-matter jurisdiction over all civil cases arising under federal law, 28 U.S.C. § 1331, Congress "[sometimes] leapfrogs district courts by channeling claims through administrative review and directly to federal appellate courts." *Bank of La. v. FDIC.*, 919 F.3d 916, 922 (5th Cir. 2019).  When Congress "provides for a 'special statutory review proceeding' in one specific court"—as it did in Section 19 of the Natural Gas Act— "challenges to the administrative action must take place in the designated forum."  *Preminger v. Principi*, 422 F.3d 815, 821 (9th Cir. 2005); *Ligon v. LaHood*, 614 F.3d 150, 154 (5th Cir. 2010) ("Specific grants of jurisdiction to the courts of appeals override general grants of jurisdiction to the

---

[12] The Natural Gas Act anticipates that States may be parties to LNG export proceedings and gives them a path to judicial review if they are aggrieved by an order of the Commission by allowing them to: (1) become a party to the proceeding; and (2) file an application for rehearing of the order to which the party is aggrieved. 15 U.S.C. § 717r.  None of the Plaintiffs have taken these steps.

district courts."). "[I]f there is any ambiguity as to whether jurisdiction lies with a district court or with a court of appeals," courts "must resolve that ambiguity in favor of review by a court of appeals." *Nat'l Parks & Conservation Ass'n v. F.A.A.*, 998 F.2d 1523, 1529 (10th Cir. 1993) (cleaned up).

If Plaintiffs' allegations were true—that DOE made a final decision to ban new LNG exports—that clearly would be an "order" subject to Natural Gas Act, Section 19. So, if Plaintiffs are taken at their word, it is beyond dispute that review lies exclusively in the court of appeals. But the Natural Gas Act's exclusive-review provision extends not only to direct challenges to final orders, but also encompasses claims that are "inescapably intertwined" with review over DOE's LNG export orders, as binding precedent explains. *Ligon*, 614 F.3d at 155. After all, "[e]xclusive means exclusive, and the [Natural Gas Act] nowhere permits an aggrieved party otherwise to pursue collateral review . . . in state court or federal district court." *Am. Energy Corp.*, 622 F.3d at 605; *see also Ligon*, 614 F.3d at 155 ("a plaintiff may not circumvent the exclusive jurisdiction of the court of appeals by collaterally attacking an administrative order in a federal district court"). The Supreme Court has interpreted the Federal Power Act's materially identical exclusive-review provision to "necessarily preclude de novo litigation between the parties of all issues inhering in the controversy, and all other modes of judicial review." *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958). As such, challenges brought in the district court outside the jurisdictional framework that Congress established[13] are "impermissible collateral attacks." *Id.* at 341; *see also Adorers of the Blood of Christ v. FERC*, 897 F.3d 187, 197 (3d Cir. 2018).

---

[13] Congress vested district courts with limited jurisdiction over certain matters in the Natural Gas Act, not relevant here, such as eminent domain proceedings, 15 U.S.C. § 717f(h), and enforcement of DOE's orders. *Id.* § 717u. That Congress expressly granted district courts jurisdiction over other matters confirms that it intended to preclude district-court jurisdiction over issues related to DOE orders authorizing LNG exports.

Plaintiffs may not ignore the Natural Gas Act's exclusive jurisdictional scheme by collaterally attacking DOE's administrative process. *See City of Tacoma*, 357 U.S. at 335-36. Plaintiffs seek to end what they mischaracterize as an export ban and seek an order permanently enjoining DOE from "attempting to halt the consideration of LNG export applications." Compl. ¶ 248. If Plaintiffs were to obtain such relief, those authorizations would indisputably be subject to the exclusive jurisdiction under the Natural Gas Act in an appropriate court of appeals. *See* 15 U.S.C. § 717r. Plaintiffs cannot displace the court of appeals' jurisdiction by preemptively challenging the steps naturally preceding DOE's LNG exportation decision(s) in district court.[14] Because Plaintiffs' claims are "inescapably intertwined" with the review of final orders under the Natural Gas Act, *Ligon*, 614 F.3d at 155, they must be brought in a court of appeals in the first instance.

Although Plaintiffs characterize their complaint as a challenge to a "final agency action," Memo. in Support of Motion for a Stay Under 5 U.S.C. § 705 or a Prel. Inj. (" Pls. Br.") (ECF No. 13-1), at 17, in actuality, Plaintiffs challenge what they perceive as DOE's inaction on pending LNG export applications. But Plaintiffs may not challenge alleged inaction under the Natural Gas Act in district court. *See Am. Petroleum Inst. v. U.S. Dep't of Interior*, No. 2:21-CV-02506, 2022 WL 16704444 (W.D. La. Oct. 5, 2022), *report and recommendation adopted sub nom. Am. Petroleum Inst. v. U S Dept of Int.*, No. 2:21-CV-02506, 2022 WL 16701179 (W.D. La. Nov. 3, 2022) (recommending dismissal of claim as to Interior's delay approving the offshore oil and gas leasing program). When Congress assigns exclusive jurisdiction to review agency actions to a court of appeals, that exclusive jurisdiction extends to alleged agency inaction. *See JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 599-601 (5th Cir. 2016); *see also Telecommc'ns Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 78 (D.C. Cir. 1984) ("*TRAC*") (holding that an exclusive-review provision encompassed challenges to an

---

[14] *See, e.g., Bywater Neighborhood Ass'n v. Tricarico*, 879 F.2d 165, 168-9 (5th Cir. 1989); *Urban v. FERC*, No. 5:17CV1005, 2017 WL 6461823 (N.D. Ohio Dec. 19, 2017); *Lovelace v. United States*, No. 15-cv-30131-MAP, 2016 WL 10826764 (D. Mass. Feb. 18, 2016).

agency's unreasonable delay in issuing a decision).  Limiting the review of such agency inaction to the courts of appeals is necessary to protect those courts' "future jurisdiction."  *TRAC*, 750 F.2d at 76; *In re Howard*, 570 F.3d 752, 756 (6th Cir. 2009).  Otherwise, "the statutory obligation of a Court of Appeals to review on the merits" specific agency actions could "be defeated" in two ways: first, "by an agency that fails to resolve disputes" or declines to act to avoid the court of appeals, *TRAC*, 750 F.2d at 76; and second, by plaintiffs who "file preemptive suits in the district court and thereby avoid the court of appeals."  *Howard*, 570 F.3d at 756 (cleaned up).  The Fifth Circuit has joined other circuits in agreeing that claims involving agency inaction are subject to their exclusive jurisdiction.  *See JTB Tools*, 831 F.3d at 600, 601 n.4 (collecting cases).

There is nothing unique about Plaintiffs' claims that would permit them to bypass the Natural Gas Act's broad exclusive-review provision.  Plaintiffs primarily assert claims under the APA.  The APA provides that, in the first instance, "[t]he form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute."  5 U.S.C. § 703.  As the Fifth Circuit has recognized, Section 703 resolves any doubt about Congress's intent in promulgating exclusive-review provisions; so, the APA is "not a proper vehicle for circumventing the special statutory review process."  *Bywater Neighborhood Ass'n*, 879 F.2d at 168.  Plaintiffs' request for declaratory relief likewise does not help them.  *See id.* at 169 ("where Congress has created a specific mode of judicial review of administrative orders, declaratory relief under 28 U.S.C. § 2201 is not available to those who have not pursued that remedy").  Nor may Plaintiffs bypass the exclusive-review provision simply because they raise a constitutional claim.  *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 14 (2012) (reasoning that the statutory "objective of creating an integrated scheme of review would be seriously undermined" if a party could challenge an agency action "first in a district court, and then again in one of the courts of appeals, simply by alleging that the statutory authorization for such action is unconstitutional.").

While the plain text of the Natural Gas Act necessarily precludes district courts from exercising their general federal question jurisdiction to interfere with the export authorization process, jurisdiction is clearly precluded under the two-step framework in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). First, Congress's intent to vest exclusive jurisdiction to review DOE orders (and the steps preceding those orders) in the courts of appeals is "fairly discernible" from the Natural Gas Act's text. Like the exclusive jurisdiction provision in *Thunder Basin*, the Natural Gas Act provides for "exclusive" jurisdiction in the court of appeals to "affirm, modify, or set aside such order in whole or in part." 15 U.S.C. § 717r(b).

Second, Plaintiffs' claims "are of the type Congress intended to be reviewed" exclusively by a court of appeals. *Thunder Basin*, 510 U.S. at 212. All three *Thunder Basin* factors support this conclusion. *See, e.g.*, *Adorers of the Blood of Christ*, 897 F.3d at 195–97; *Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 629–33 (4th Cir. 2018). As to the first factor, the Natural Gas Act does not "foreclose all meaningful judicial review" of Plaintiffs' claims. *Elgin*, 567 U.S. at 15 (cleaned up). To the contrary, the statute expressly provides for judicial review in the court of appeals. *See* 15 U.S.C. § 717r(b). In *Thunder Basin*, the Supreme Court explained that the "statutory and constitutional claims . . . can be meaningfully addressed in the Court of Appeals," and that the case accordingly did "not present the 'serious constitutional question' that would arise if an agency statute were construed to preclude all judicial review of a constitutional claim." 510 U.S. at 215 n.20 (cleaned up). As to the second factor, Plaintiffs' claims are not wholly collateral because their claims are directly tied to pending LNG export proceedings. The final factor—agency expertise—also supports exclusive jurisdiction in the courts of appeal. Plaintiffs challenge DOE's process for evaluating LNG export applications—in particular, whether exports would be inconsistent with the "public interest." As such, it is both necessary and appropriate for DOE to address the threshold issues accompanying Plaintiffs' statutory and constitutional claims. That threshold determination is essential to

24

meaningful judicial review by the Fifth Circuit (or another circuit where venue is appropriate) on review of the final agency orders. *See Elgin*, 567 U.S. at 19.

Because jurisdiction does not lie in this court, Plaintiffs' complaint should be dismissed, and the preliminary injunction motion should be denied as moot.

### B. Plaintiffs fail to establish standing for any of their claims.

To demonstrate standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016). Plaintiff has the burden of establishing all three elements, for every claim. *Id.*; *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 821 (5th Cir. 2022). When the case is at the pleading stage, as here, the plaintiff must "clearly . . . allege facts demonstrating" each element. *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)). Where, as here, a plaintiff's "asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else," standing is not precluded, but it is ordinarily "substantially more difficult" to establish. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Plaintiffs—none of which are directly affected by DOE's temporary deferral on making final decisions on *other parties'* export applications—have failed to meet their difficult burden of establishing any of the three required elements of standing.

### 1. Plaintiffs fail to allege any non-speculative injury.

To establish injury in fact, a plaintiff must show it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560 (1992)). If a plaintiff's alleged injuries are forward-looking, the plaintiff must show "a material risk of future harm" that is "sufficiently imminent and substantial." *Perez*, 45 F.4th at 827 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021)). The injury must be "*certainly* impending," and allegations of "*possible*

future injury" fail to establish standing.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up); *see also Louisiana v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023)*; Barber v. Bryant*, 860 F.3d 345, 357 (5th Cir. 2017); *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003); *Prestage Farms, Inc. v. Bd. of Sup'rs of Noxubee Cnty., Miss.*, 205 F.3d 265, 268 (5th Cir. 2000).  Plaintiffs fail to allege a "certainly impending" injury, but instead rely solely on allegations of "possible, future injury."

First, all of Plaintiffs' alleged injuries derive from benefits they assume they will receive if: (1) DOE authorizes the export applications of third parties, and (2) those third-party facilities materialize.[15]  At the outset, even under the preferential standard of the Natural Gas Act, export authorizations are not assured and depend on DOE's public interest determination.  Contrary to Plaintiffs' allegations, it is not assured that, but for the Update and pause, pending applications would be authorized.  Moreover, Plaintiffs exercise no control over whether facilities are constructed even if the applicants have authorizations in hand.  Those decisions are completely within the control of third parties—*i.e.*, the applicants—who are not parties to this litigation.

Plaintiffs have also failed to identify a single pending or future applicant that has announced it will abandon a planned investment in Plaintiffs' states because of the Update and attendant pause, and in fact, none of the seven applicants have withdrawn their export authorization applications.  Sweeney Decl. ¶¶ 42–43 (noting there are seven non-FTA export applications currently pending that are affected by the Update).  Having identified no actual injury, Plaintiffs conjure a list of illusory, future harms—including loss of jobs, royalties, and taxes.  *E.g.*, Compl. ¶¶ 112–155.  These supposed harms stem from a single assumption: but for the time required between now and early 2025 to complete the Update, LNG companies will invest money in Plaintiffs' states, which in turn

---

[15] Of the seven pending applications that are affected by the Update and pause, those applications only relate to four proposed sites in Louisiana and one in Texas (the other two are in Mexico).  Sweeney Decl. ¶¶ 42–43. Louisiana's and Texas's allegations of harm stemming from DOE deferring final authorizations for those five facilities are wholly speculative.  The remaining fourteen Plaintiffs' standing allegations are even more remote.

will generate jobs, royalty payments, and tax revenue.[16]  But even in a world where the Update and pause on authorizations did not exist, there is nothing but speculation that a LNG company will invest money in any project even after receiving export authorization.  *See Clapper*, 568 U.S. at 413 ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment").  History shows that businesses can (and often do) decide to forego investment even with export authorizations in hand.  *See* Wade Decl. ¶¶ 65–67(noting the number of companies that have withdrawn their export applications, the number of authorizations DOE has vacated, and the number of companies that have DOE authorization and have yet to invest in infrastructure).

Despite claiming that LNG businesses may not invest in their states because of DOE's temporary Update and pause on final authorizations, *e.g.*, Compl. ¶ 114, Plaintiffs concede the conjectural nature of their injury by alleging that "*if*" the shifting timeline causes some of the pending LNG projects to be canceled, or "*if*" the Update delays increases to export capacity, there will be an undefined loss of future revenue to Plaintiffs.  Pls. Br. at 20 (emphasis added); *see also* Compl. ¶ 152 ("The LNG Export Ban *could* prevent the potential future development of LNG export markets for West Virginia") (emphasis added).  But these hypothetical, future injuries are not

---

[16] For example, Plaintiffs allege that Texas will suffer a future tax production loss of $259.8 million between fiscal years 2027 and 2031.  Pls. Br. 20.  At the threshold, a "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact."  *El Paso Cnty., Texas v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020).  However, even if a loss of general tax revenue could establish an injury in fact, Plaintiffs' declarant leans on a series of unreliable assumptions—(1) that six applications will result in realized projects and exports; (2) that the Update will automatically result in a two-year LNG export delay for six of the pending applications; and (3) that the six pending applications will export 90 percent of capacity two years following the project completion date proposed in their respective applications or on the project website.  *See* Pls. Br., ECF No. 13-46, Ex. 44 ¶ 6.  DOE has long noted the "continuing uncertainty that all or even most of the proposed LNG export projects will ever be realized because of the time, difficulty, and expense of commercializing, financing, and constructing LNG export terminals, as well as the uncertainties and competition inherent in the global market for LNG."  88 Fed. Reg. at 25,276.  In light of these uncertainties, Texas's alleged loss of $259.8 million in tax revenue between 2027 and 2031 is based on wholly unreliable assumptions and is far from certain to occur as a result of the Update.  The same applies to all of the states that claim a future loss of tax revenue.

concrete or imminent; instead, a "string of contingencies [] must occur before a justiciable claim would arise." *Prestage Farms, Inc.*, 205 F.3d at 268.

The closest Plaintiffs come to alleging actual injuries are their claims—based on an article from "World Oil" —that one LNG export company (Sempra) has "deferred its investment" on a planned facility in Cameron, LA, and another company (Commonwealth LNG) has "delayed construction of an export terminal." Compl.¶ 118. However, these claims are insufficient to confer standing. Sempra's export request for the planned facility in Cameron, LA has already been authorized and it has no pending requests for further export authorizations from that facility. Wade Decl., n. 64. Therefore, Sempra's export capacity in Louisiana is unaffected by the Update. As for Commonwealth LNG, it has reiterated its commitment to building its planned export facility after the Update and attendant pause were announced. Ex. 40 to  Pls. Br., ECF No. 13-42, Ex. 40 at 2 (Commonwealth LNG stated it "remain[s] fully committed to developing our LNG export facility in Cameron, Louisiana and delivering LNG to our nation's allies to help meet global climate initiatives.").

Without alleging concrete facts that the Update is currently causing harm or showing that the Update is likely to cause harm (based on historical precedent), Plaintiffs are left with bald "[a]llegations of possible future injury," which "simply aren't enough." *Bognet v. Sec'y of the Commonwealth of Pennsylvania*, 980 F.3d 336, 348 (3d Cir. 2020). The injury in fact requirement "weeds out the 'some day' cases—those where plaintiffs raise a harm that may happen 'some day' in the nebulous future," which appropriately reduces "the possibility of deciding a case in which no injury would have occurred at all.'" *Richard Roe W.M. v. Devereux Found.*, 650 F. Supp. 3d 319, 329 (E.D. Pa. 2023) (quoting *Lujan*, 504 U.S. at 564 n.2); *see also Deutsch v. Travis Cnty. Shoe Hosp., Inc.*, 721 F. App'x 336, 340 (5th Cir. 2018). Plaintiffs' alleged injuries are of the "maybe someday" variety.

To the extent Plaintiffs claim the short delay (associated with deferring final decisions on export applications until completion of the Update) is an Article III injury by itself, they are mistaken. Even assuming the Update will defer or delay investment by a few companies, it is entirely speculative to conclude that deferred or delayed investment will result in investment irreparably lost. Additionally, "mere delay or inconvenience from having to endure or await further proceedings generally does not aggrieve a party." *Gulfport Energy Corp. v. FERC*, 41 F.4th 667, 676 (5th Cir. 2022) (citing *Pennzoil Co. v. FERC*, 645 F.2d 394, 399 (5th Cir. 1981) and *Tenneco, Inc. v. FERC*, 688 F.2d 1018, 1022-23 (5th Cir. 1982)). Where an agency undertakes a lawful administrative process, as DOE has done here, a reasonable delay associated with completing the administrative process is not a cognizable injury. *Id.*

### 2. Plaintiffs fail to establish a causal connection between their speculative injuries and the Update.

Even if the Court were to find Plaintiffs have alleged an imminent, non-speculative injury, they have not shown how the Update is causally connected to that injury. There are numerous reasons why an LNG company may decide not to invest in Plaintiffs' states—including increased natural gas supply, decreased natural gas demand, loss of investors, or shifting investment priorities.

An alleged injury cannot "rely on a highly attenuated chain of possibilities." *Louisiana v. Biden*, 64 F.4th at 682 (quoting *Clapper*, 568 U.S. at 410). "[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Louisiana v. Dep't of Homeland Sec.*, No. CV 23-1839, 2024 WL 1328434, at *3 (E.D. La. Mar. 28, 2024) (quoting *Lujan*, 504 U.S. at 560). That causal connection is "substantially more difficult" to establish where the plaintiff is not the object of the government action or inaction but claims derivative harm. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Lujan*, 504 U.S. at 562)). Here, none of the Plaintiffs are applicants awaiting a decision on export

authorizations.  Because Plaintiffs' asserted injury "arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else" they must show "much more" to connect the government action to their purported injury, *Lujan*, 504 U.S. 555 at 562, something they have failed to do.

There is no "direct link" between Plaintiffs' alleged loss of future tax and other revenue and the Update and pause.  *El Paso Cnty., Texas v. Trump*, 982 F.3d 332, 340 (5th Cir. 2020).  Their allegations of future economic injury rest on a speculative chain of possibilities, not probabilities. They start with an incorrect premise by equating the Update to a "LNG Export Ban," Pls. Br. 27, even though one of Plaintiffs' declarants concedes the Update is not a ban on LNG exports, *see*  Pls. Br., ECF No. 13-46, Ex. 44 ¶ 5.  The Update results in no denials of any pending applications, does not affect any of the previously authorized LNG exports, does not alter DOE's well-established procedures for authorizing LNG exports, and does not change DOE's adherence to the presumption in favor of authorizing exports. Sweeney Decl. ¶¶ 23, 34–36, 41.  The Update only temporarily defers final decisions on pending export authorization applications to non-FTA countries due to the need to revisit the underlying studies that will inform DOE's public interest determination.  *Id.* ¶¶ 12–22. Plaintiffs take an analytical leap that a longer approval process for the purpose of updating outdated analyses will cause expansive economic harm.  But the Update has not chilled the LNG market, as 2024 LNG exports are outpacing those in 2023, which was already the highest year of export volume on record.  Wade Decl. ¶ 56.

Plaintiffs assume that if export authorizations are approved, those approvals necessarily result in investment.  The LNG program's history shows that assumption to be faulty.  DOE has approved a cumulative volume of over 48 Bcf/d of LNG exports to non-FTA countries; however, current U.S. export capacity is only a small fraction of that at just over 14 Bcf/d.  DOE Fact Sheet at 1.  Of the 34 Bcf/d of export capacity that is approved but not constructed, there is only 12

Bcf/d of export capacity currently under construction (and projected to come online by 2030). *Id.* That means that 22 Bcf/d of export capacity has been approved, but there is no indication if or when the LNG companies will proceed to investment.[17] *Id.* This "authorization overhang"—*i.e.*, a significant gap between approved LNG export applications and realized LNG projects and exports—shows that approval does not equal investment and that factors other than the Update are affecting investment decisions. Wade Decl. ¶¶ 58–69. Those "other" factors are outside the control of Plaintiffs and Defendants.

Plaintiffs argue that *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), supports their position on standing. *See* Pls. Br. 20. But *Wyoming* is distinguishable. In that case, Wyoming challenged an Oklahoma law that required Oklahoma utilities to burn at least 10 percent of their coal from coal mined in Oklahoma. *See* 502 U.S. at 440. Before Oklahoma enacted the law, it purchased almost all its coal from Wyoming. *Id.* at 445. Because Wyoming collected severance taxes based on that coal production, Wyoming alleged the Oklahoma law caused injury for standing purposes. *Id.* at 442, 445. The Court found Wyoming had standing to sue because Wyoming could show it directly lost tax revenue because of the new law. *Id.* at 445. Specifically, the court concluded Wyoming had provided unrebutted evidence that after the Oklahoma law took effect, it had a direct effect on Wyoming's coffers in the form of lost severance tax that it would have otherwise collected. *Id.* By contrast, here, Plaintiffs have not shown a direct link between the Update and a concrete loss in tax or other revenues—they have established neither that approved authorizations will result in constructed projects, nor that deferred investment or delayed construction will result in the permanent loss of a project. *El Paso Cnty.*, 982 F.3d at 341. Plaintiffs instead rely on false

---

[17] Of 22 approved large-scale export projects, ten of those projects are currently not constructed nor operating. Wade Decl. ¶ 65.

assumptions, indirect causal connections, and conclusory future allegations of harm that do not establish a cognizable injury in fact.

The facts here parallel those in *Louisiana v. Biden*, where the Fifth Circuit found that the plaintiff States failed to demonstrate standing because the States' alleged injuries were based on government actions that were "not certain to spawn the alleged harms," 64 F.4th at 682, and the States could not point to any specific project that was rejected to support its alleged financial harms. *Id.* at 682-683. The Court concluded that the States failed to demonstrate standing because their alleged harms, like those alleged here, are "several steps removed from—and are not guaranteed by—the challenged" federal action. *Id.* at 684. Here, it is just as likely or more likely that a decision whether to invest in an LNG export facility would be based on business contingencies—not DOE's Update. Where a future injury can be caused by any number of different contingencies, not just the harm identified by a plaintiff, there is an insufficient causal connection to supporting Article III standing. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 28, 42–43, 45–46 (1976).

*Louisiana v. Biden* is also instructive because it reiterates that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing." 64 F.4th at 683 (citation omitted). To the extent Plaintiffs attempt to rely on a procedural injury to establish standing, *see* Pls. Br. 20–21, an alleged violation of a procedural right does not excuse Plaintiffs from alleging a concrete harm that was caused by the violation of said right. *Id.* For all the reasons noted above, Plaintiffs have not identified a concrete harm; and they certainly have not linked an actual injury to the alleged violation of a procedural right.

### 3. A favorable decision will not redress Plaintiffs' alleged injuries.

The third prong of the standing inquiry requires a plaintiff to show that its requested relief will likely remedy the claimed injury. *El Paso Cnty.*, 982 F.3d at 337, 341 (citations omitted).

32

Plaintiffs ask the Court to "stay the [alleged] LNG Export Ban" or "enjoin Defendants from enforcing" it.  Pls. Br. 33.  But as discussed above, there is no ban to stay.  Plaintiffs' requested relief—"enjoining Defendants from halting or attempting to halt the consideration of LNG Export applications," Compl. 60—will not result in, for example, Texas collecting $259.8 million in production tax revenue between 2027 and 2031.  Again, even if DOE approved the seven pending applications today, that would not ensure seven realized projects or exports at the levels Plaintiffs allege will occur, much less the collection of tax revenues from those as-yet unrealized projects.

Plaintiffs also vaguely allege that vacating the Update will, like flipping a light switch, immediately increase investment, development, and production to the benefit of many.  *Id.* at 30.  But these alleged benefits are uncertain to occur and are uncertain to occur on a particular timeline, even if all pending applications were to be immediately approved.  Neither party controls the investment decisions that lead to the construction LNG export facilities and neither party controls third-party groups who may challenge DOE's authorizations in court.  Plaintiffs therefore cannot establish that staying or vacating the temporary pause on authorizing pending export applications, to ensure DOE's public interest determinations will rest on current data, will lead to certain or immediate investments in their states.

### 4. **Plaintiffs are not entitled to special solicitude**.

Plaintiffs also fail in buttressing their tenuous standing allegations by claiming "special solicitude" as states whose quasi-sovereign interests are affected by federal policy.  Compl. ¶ 112.  No special solicitude is warranted because the Update does not affect any of the quasi-sovereign interests identified in *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), or *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015), as revised (Nov. 25, 2015), nor do Plaintiffs allege any such effects.  Pls. Br. 30-31.  Regardless, Plaintiffs must still establish all three elements of standing to qualify for special solicitude, which they fail to do.  *Louisiana v. Biden*, 64 F.4th at 683.

For all these reasons, the Complaint should be dismissed for Plaintiffs' failure to carry their burden of establishing standing.

### C. Plaintiffs do not challenge a final agency action under the APA.

Plaintiffs' challenges to the Update under Section 706(2) of the APA (Counts I–XI, XIV) also should be dismissed for lack of jurisdiction because Plaintiffs are not challenging final agency action. Section 704 of the APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. "If there is no 'final agency action,' as required by the controlling statute, a court lacks subject matter jurisdiction." *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999). To be a "final" agency action subject to judicial review, an agency action must meet two conditions: "First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 580–81 (5th Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

The Update does not meet the first condition because it does not approve or deny any export applications but is an intermediate and necessary analytical step in the export authorization review process. In initiating a short-term process to update outdated analyses used to inform its public interest determinations, DOE has undertaken action that is, by definition, interlocutory in nature. Courts have frequently recognized that deferrals or postponements of agency decisions are not "final" agency actions.[18] Plaintiffs therefore fundamentally mischaracterize the Update in

---

[18] *See, e.g., Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 68 (D.C. Cir. 2000); *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 746 F. App'x 131, 134-135 (3d Cir. 2018); *Mashni v. U.S. Army Corps of Eng'rs*, 535 F. Supp. 3d 475, 483 (D.S.C. 2021); *Ctr. for Envtl. Health v. Wheeler*, 429 F. Supp. 3d 702, 714 (N.D. Cal. 2019); *Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 851 (E.D. La. 1992).

arguing it "immediately and finally decides that export applications should not be considered until the (undisclosed) date at which the (not-public) review of the public-interest determination will be completed." Pls. Br. 17. The Update finally decides nothing but is rather part of DOE's consideration of non-FTA export applications and its efforts to ensure that it has accurate information on which to base its public interest determinations. As DOE has explained, the Update "is an integral part of DOE's process for the public interest determination required by [Natural Gas Act] section 3(a)"—"a temporary step that is necessary so that DOE can avoid reliance on stale data and stale analyses." Commonwealth Notice at 10, 14.

The Update also does not meet the second condition because it does not determine rights or obligations or trigger legal consequences.[19] Plaintiffs mischaracterize the effect of the Update in contending that "entities are no longer entitled to have their applications considered, and presumptively granted (absent an adverse finding), by the Department." Pls. Br 18. Both before and after the initiation of the Update, applicants remain entitled to have their applications reviewed, and DOE has done nothing to change the presumption that the public interest favors the grant of non-FTA export applications. *See*, *e.g.*, Commonwealth Notice at 14 ("There has been no change in the status of Commonwealth's non-FTA Application. It remains pending subject to DOE's ongoing review, which (as noted above) includes taking the steps that DOE determines are necessary to assess whether Commonwealth's proposed exports to non-FTA countries are in the public interest."). For the sake of transparency, DOE has merely announced where it stands in the decision-making process, and it will apply the presumption favoring LNG exports to pending applications once it has updated economic and environmental information on which to base its public interest determinations.

---

[19] *See Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 756 (5th Cir. 2011) (letters from Environmental Protection Agency under Clean Water Act not final agency action because they merely restate prohibition against discharging pollutants without a permit rather than changing any rights or obligations).

The case law cited by Plaintiffs is inapposite.  In *Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022), the President "ordered the Secretary of the Department of the Interior to 'pause' new oil and gas leases on public lands or in offshore waters pending the completion of a *comprehensive review of Federal oil and gas permitting and leasing practices*."  *Id.* at 276 (emphasis added).  The Court found the order to result in "a complete 'Stop' of the federal leasing process" over a period of nineteen months in which multiple scheduled lease sales had been cancelled or postponed.  *Id.* at 283-84.  Here, the Update is of a projected shorter duration and far narrower scope, involving updates to technical analysis needed to make the statutorily-required public interest determinations on individual applications, not an overhaul of the entire LNG export authorization program and practices.  Rather than a complete "stop" of the export authorization process, the Update is an intermediate step in DOE's review that will allow it to make expeditious public interest determinations on pending and future applications once complete.  Moreover, despite the pause on final determinations, DOE is taking preliminary steps to process newly filed applications, including noticing the application in the Federal Register.  *See* Sweeney Decl. ¶¶ 34–36.  Additionally, the Update does not affect any FERC or MARAD proceedings, and those agencies are free to proceed with siting authorizations. Sweeney Decl. ¶¶ 37–39.

*Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F. Supp. 2d 627, 636 (E.D. La. 2010), is also readily distinguishable.  There, the Secretary suspended "all pending, current or approved drilling operations of new deepwater wells in the Gulf of Mexico and in the Pacific for six months," *id.*, and the Court did not even address whether this expansive moratorium constituted final agency action. Here, the Update has no such large-scale effects, as all operations authorized under previously approved non-FTA LNG export permits may continue—including exports under (1) the current operating export capacity of just over 14 Bcf/d; (2) the approximately 12 Bcf/d of export capacity that is currently under construction after having reached a final investment decision; and (3) the

more than 22 Bcf/d that is authorized but not yet operating or under construction.  Commonwealth Notice at 3–4.  There has been no large-scale suspension of non-FTA export activities, unlike the mass suspension of *all* drilling operations in *Hornbeck*.

Plaintiffs likewise find no support for their position in *Ensco Offshore Co. v. Salazar*, 781 F Supp. 2d 332, 336–37 (E.D. La. 2011), quoted by Pls. Br. 18.  There, the Court ruled that "agency delay in issuing or denying a permit [for deepwater drilling], or the failure to act at all, is a final agency action."  *Ensco*, 781 F. Supp. 2d at 336–37.  But the plaintiff in that case sought to compel agency action unlawfully withheld or unreasonably delayed under APA Section 706(1).  By contrast, here, Plaintiffs state that they "challenge an affirmative agency action," Pl. Br. at 22 n.3, and they include no argument in their motion on their sole unreasonable delay claim pled in Count XIII of their complaint.  *Ensco* does not speak to challenges to final agency action under APA Section 706(2), such as those pressed by Plaintiffs here.

Finally, Plaintiffs erroneously rely upon language in *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020), stating: "[A]n interim agency resolution counts as final agency action despite the potential for a different permanent decision . . . ." (quoted by Pl. Br. at 17).  But there is no interim resolution here, merely a process to complete the analyses required for a public interest determination under the Natural Gas Act before acting on pending applications.  The status quo on pending applications remains unchanged, as review of those applications remains "ongoing and subject to final resolution."  Commonwealth Notice at 16.  The Update is an intermediate step in that review.

The Update reflects that DOE will not make any final decisions on pending non-FTA export applications until it has the information necessary to make public interest determinations on those applications, as directed by Congress.  DOE's public statement of intent to comply with this statutory directive merely affirms the agency's commitment to undertake the analysis the law

requires and should not be mistaken for final agency action.  It neither marks the consummation of the agency's decision-making process nor determines rights or obligations by granting or denying—even on an interlocutory basis—any pending applications.  For all these reasons, the Court lacks subject matter jurisdiction over Plaintiffs' APA claims challenging affirmative agency action by DOE; and therefore, the majority of those pled in the Complaint (Counts I–XI, XIV) should be dismissed for lack of final agency action.

### D.  Plaintiffs fail to state a claim for relief.

#### 1.  Counts I–IV, XII, and XIV–XVI should be dismissed for failure to state a claim for relief.

Even if the Court does not dismiss Plaintiffs' complaint for lack of subject matter jurisdiction, Count I–IV, XII, XIV–XVI should be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  Based upon the allegations of the Complaint, documents referenced therein, and matters of which the Court may take judicial notice, these claims fail as a matter of law, even accepting the facts pled in the Complaint as true.  For the sake of efficiency and to avoid unnecessary duplication, the United States incorporates by reference its discussion of the legal insufficiency of these claims in its opposition to Plaintiffs' motion for preliminary injunction in Section (II)(A)., below, rather than duplicating those arguments here.

#### 2.  Any APA claims against the President must be dismissed because the President is not subject to suit under the APA.

The Supreme Court has held that the President's actions are not subject to APA review. *Franklin v. Massachusetts*, 505 U.S. 788 (1992).  While a president's actions may be reviewable on other bases, such as constitutionality, they are not subject to the requirements of the APA.  *Id.* at 801; *see also Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) ("[T]he President has never been thought to have to comply with APA rulemaking procedures when issuing executive orders.").  Therefore,

the President should be dismissed as a defendant to each of Plaintiffs' APA claims—Counts I–XI, XIII, XIV.

## II.    Even if the Court allows Plaintiffs' claims to proceed, their motion for a preliminary injunction should be denied.

Even if the Court does not dismiss Plaintiffs' Complaint, it should still deny their motion for a preliminary injunction because they have not established that they are entitled to this "extraordinary remedy which requires the movant to unequivocally show the need for its issuance." *Rapides Par. Sch. Bd.*, 118 F.3d at 1050. The requested relief should be denied because Plaintiffs have not "clearly carried the burden of persuasion' on all four [*Winter*] requirements." *Lake Charles Diesel, Inc.*, 328 F.3d at 196 (internal quotes omitted).

### A.   Plaintiffs' claims are unlikely to succeed on the merits.

### 1.   The Court lacks jurisdiction over Plaintiffs' claims.

As noted above, this Court lacks jurisdiction over Plaintiffs' claims, and therefore, cannot grant Plaintiffs' motion for preliminary injunction. *See Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 296 (5th Cir. 1979) (noting that a district court's grant of a preliminary injunction must be reversed if the court lacked subject matter jurisdiction over the action). In the context of a preliminary injunction, Plaintiffs must make a "clear showing" that they "have standing to maintain the preliminary injunction." *Barber*, 860 F.3d at 352. Because Plaintiffs have not made a clear showing that they have standing and because they have not shown that this Court may exercise its general subject matter jurisdiction over the Natural Gas Act-related claims, Plaintiffs cannot demonstrate a likelihood of prevailing on the merits of their claims. Likewise, all of Plaintiffs' APA claims, with the exclusion of its unreasonable delay claim (Count XIII), are predicated on Plaintiffs' misguided assertion that the Update and necessary, temporary pause on final determinations are final agency actions. Because there is no final agency action here, there is no jurisdiction.

### 2. **Plaintiffs' claims lack merit**.

Even if the Court were to find that Plaintiffs have standing, the Natural Gas Act's exclusive jurisdictional provision does not apply, and DOE's Update and attendant pause are final agency action, Plaintiffs still cannot demonstrate a likelihood of success on the merits, because their APA, constitutional, and ultra vires claims suffer from a variety of legal and factual deficiencies that mandate their dismissal.

### a. **Counts I and II: DOE is acting within its statutory authority to defer final determinations during the pendency of the Update.**

Counts I and II are both predicated on Plaintiffs' inaccurate framing of the Update as a ban on LNG exports. Having constructed this narrative, Plaintiffs argue that the alleged "LNG Ban" is "not in accordance with law" or is "in excess of statutory . . . authority[] or limitations, or short of statutory right." Compl. ¶¶ 159, 162 (citing 5 U.S.C. § 706(2)(A), (C)). Counts I and II are unmeritorious, though, because what DOE is doing—updating its economic and environmental studies—is not only in accordance with the Natural Gas Act but is a necessary predicate to making the statutorily-mandated public interest determination. Any pause on authorizing additional exports is a necessary outgrowth of the Update. Because updating DOE's economic and environmental analyses takes time, DOE was faced with the choice of: (1) temporarily pausing final public interest determinations, pending its completion of the Update, or (2) making the public interest determination based on outdated information. The second option was no choice at all, because any reliance on outdated information could be challenged as arbitrary and capricious and inconsistent with DOE's obligations under the Act. *See, e.g., Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1020 (5th Cir. 2019); *Sierra Club v. EPA*, 671 F.3d 955, 968 (9th Cir. 2012).

Section 3(a) of the Natural Gas Act plainly and unambiguously directs DOE to determine whether a proposed non-FTA export "will not be consistent with the public interest." 15 U.S.C. § 717b(a); *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 654 (2020) (statutes must be interpreted "in

accord with the ordinary public meaning of its terms at the time of its enactment [because] only the words on the page constitute the law adopted by Congress and approved by the President."). The Natural Gas Act does not prescribe a process for deciding what is or is not in the public interest, and it does not require DOE to reach its determination within a particular timeframe. *Id.* Instead, Congress allows DOE to exercise considerable discretion—bounded by the presumption in favor of authorizing exports—in how and when to determine whether an export authorization request is in the public interest:

> It is for the Commission [now DOE] in the first instance to determine, after reasoned consideration and on the basis of substantial evidence, *whether and in what manner to exercise its flexible Section 3 power*, and this determination will in turn be subject to the normal review processes provided in the [Natural Gas] Act.

*Distrigas Corp. v. Fed. Power Comm'n*, 495 F.2d 1057, 1064 (D.C. Cir. 1974) (emphasis added); *id.* at 1066 (remanding for supplementation of the record "under Section 3's public interest standard").

Courts have affirmed that Congress vested DOE with "considerable discretion" in implementing Section 3 of the Natural Gas Act, *Cal. Gas Producers Ass'n v. Fed. Power Comm'n*, 383 F.2d 645, 648 (9th Cir. 1967), and have long recognized that, in exercising their discretion, "'administrative agencies should be free to . . . pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'" *China Telecom (Americas) Corp. v. FCC*, 57 F.4th 256, 265 (D.C. Cir. 2022) (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)). For example, in reviewing the Natural Gas Act's scope of judicial review, the Supreme Court stated an agency should normally be allowed to "exercise its administrative discretion in deciding how . . . it may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence . . . ." *Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) (internal quotation omitted and emphasis added), discussed with approval in *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 544 (1978). In conformance with this authority, DOE has

41

explained how it exercises its administrative discretion under Natural Gas Act, Section 3 in its 2014 Procedures for Liquefied Natural Gas Export Decisions. *See Procedures for Liquefied Natural Gas Export Decisions*, 79 Fed. Reg. at 48,135 (emphasis added) (citing 10 C.F.R. §§ 590.202, 590.203). In response to a comment addressing when a non-FTA application is ready for final decision, DOE acknowledged that the commenter was "correct that the Natural Gas Act creates a rebuttable presumption in favor of authorizing imports and exports," but emphasized that the "presumption does not remove DOE's power to . . . decide when it has a complete record on which to base its decision." *Id.* And, in exercising this power, DOE faithfully adheres to a well-established framework—approved by the D.C. Circuit, *see Sierra Club I*, 867 F.3d at 203—for making the statutorily required public interest determination, including DOE's consideration of factors such as domestic economic effects, foreign policy goals, and environmental impacts for which DOE has developed and updated various economic and environmental studies. *Id.; see also, supra,* Factual Background §§ III-IV.

Because DOE's public interest framework is well-established and the Update does nothing to alter it, Plaintiffs' argument must be that DOE violates the Natural Gas Act by updating the data it relies upon in making Section 3(a)'s public interest determination. But the Natural Gas Act necessarily confers the exact discretion Plaintiffs claim violates the statute—*i.e.*, the discretion to base the public interest decision for export applications to non-FTA countries upon reliable and up-to-date information. Plaintiffs cannot seriously suggest that the statute does not contemplate DOE exercising its discretion to decide what information is necessary to inform the prescribed public interest determination.

Rather than addressing the discretion the Natural Gas Act's plain meaning clearly affords to DOE to conduct its Update, Plaintiffs assert that DOE is banning LNG exports, which they then claim runs afoul of the major questions doctrine. *E.g.*, Compl. ¶¶ 164–166. But DOE has not

42

banned LNG exports—it has only announced that final determinations on pending LNG export applications will require the completion of the Update, unless compelled by reasons of national security.  And the major questions doctrine has no application here.[20]  The Update falls squarely within the statutory authority vested in the agency by the Natural Gas Act and is consistent with "longstanding practice . . . implementing the relevant statutory authorities."  *Biden v. Missouri*, 142 S. Ct. 647, 652 (2022).  For over a decade, DOE has relied on environmental and economic studies to make its Section 3(a) public interest determination and has periodically updated those studies.  *See* Sweeney Decl. ¶¶ 5–11.  As noted above, many courts have confirmed DOE's authority to make the public interest determination and have affirmed its framework for doing so.[21]  Because DOE is operating within its clearly recognized and long-exercised powers and continues to acknowledge Congress's direction that export applications should only be denied if they are not in the public interest, *see* Wade Decl. ¶ 5 (reaffirming DOE's practice to grant non-FTA LNG export applications unless DOE finds that the proposed exportation will not be consistent with the public interest), Plaintiffs' claims that DOE is operating outside the scope of its statutory authority clearly fail.  Congress has told DOE to make public interest determinations, and DOE is acting consistent with that mandate in updating its economic and environmental analyses; and therefore, Claims I and II necessarily fail as a matter of law.

---

[20] In *West Virginia v. EPA*, the Supreme Court recognized a small category of "extraordinary cases in which the history *and* the breadth of the authority that the agency has asserted, *and* the economic *and* political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." 142 S. Ct. 2587, 2608 (2022) (cleaned up; emphasis added).  The Court in *West Virginia* applied those four factors in considering EPA's novel interpretation of "vague language" of an "ancillary" statutory provision in the Clean Air Act that "had rarely been used" to grant what the Court described as "unheralded power" representing a "transformative expansion" of EPA's regulatory authority. *Id.* at 2610 (applying doctrine to rule requiring shift in electricity production from fossil-fuel sources to renewables to address greenhouse gases).  None of the factors at issue in *West Virginia* is implicated here.

[21] In fact, courts have occasionally remanded public interest determinations by DOE or FERC under the Natural Gas Act to more fully develop the technical analyses underlying those decisions. *See, e.g.*, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021).  This only confirms the necessity of up-to-date technical information to support DOE's application approvals.

      **b.  Count III: The Update is not a rule that would trigger the APA's notice-and-comment procedures.**

Plaintiffs argue that the Update is a substantive rule subject to the APA's notice and comment procedures.  *See* Pls. Br. 13-14; Compl. ¶¶ 170-184.  "The APA identifies only three types of agency proceedings: rulemaking, *see* 5 U.S.C. § 551(5), adjudication, *see id.* § 551(7), and licensing, *see id.* § 551(9)."  *Sierra Club v. Peterson*, 185 F.3d 349, 365 (5th Cir. 1999).  The APA requires *only* substantive rules to go through notice and comment procedures.  5 U.S.C. § 553.  Claim III fails because the Update is a component of the informal adjudication process that DOE uses to evaluate non-FTA export applications, not a rule.

A "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy …." 5 U.S.C. § 551(4).  An adjudication, by contrast, is the "agency process for the formulation of an order," 5 U.S.C. § 551(7), and an order is the "whole or part of a final disposition… other than rule making, but including licensing," 5 U.S.C. § 551(6), meaning that "any agency process that results in a final disposition, except for rulemaking, is necessarily adjudication."  *Peterson*, 185 F.3d at 365.  "Agencies typically enjoy very broad discretion [in deciding] whether to proceed by way of adjudication or rulemaking."  *City of Arlington v. FCC*, 668 F.3d 229, 240 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013) (citation and internal marks omitted).

The Fifth Circuit considers two aspects of an agency action to determine if an action is a rulemaking or adjudication: (1) the agency's characterization of its own action and (2) the ultimate product of the action. *City of Arlington v. FCC*, 668 F.3d at 240.  First, DOE characterizes its evaluation of non-FTA export applications as adjudications.[22] *See* July 2023 Order at 4.  Second, the ultimate product of the proceedings is an order granting or denying authorization to export LNG to

---

[22] DOE's use of adjudications instead of rulemakings is guided by the statute, which requires DOE to "issue such *order* upon application . . ." 19 USC 717b(a) (emphasis added).

non-FTA countries.  The Update itself is a mere component of these adjudications—it is a step in an adjudication, designed to collect up-to-date information so that DOE can proceed with making its statutorily required public interest determination.

Plaintiffs incorrectly rely on cases where courts found an agency to have violated notice and comment requirements when it changed the method it used to reach a final conclusion, then applied that method to industry entities.  *See W&T Offshore Inc. v. Bernhardt*, 946 F.3d 227 (5th Cir. 2019) (Department of the Interior demanded a natural gas producer remedy cumulative delivery shortfalls through a cash payment, where previously options for remedies were given, and calculated the amount using a different methodology than previously announced); *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616 (5th Cir. 1994) (DOI changed its method for calculating royalties payable to DOI for minerals from leased federal and offshore lands); *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) (DOI changed the requirements for lessees to qualify for an alternative method of calculating transportation deductions from royalties owed to DOI).  The "creation and uniform application of a new methodology" through the challenged agency action was a defining characteristic in the Court's conclusion in each case that the action was a substantive rule.  *W&T Offshore*, 946 F.3d at 239.

Unlike the actions challenged in the cases cited by Plaintiffs, the Update does not change the procedures DOE uses to process non-FTA export applications.  Quite the contrary, the Update is a continuation of the method DOE has used for over a decade to evaluate non-FTA export applications—consider studies on economic and upstream environmental impacts as well as life-cycle greenhouse gas analysis of export applications and periodically update those studies.  *See* Sweeney Decl. ¶¶ 5–11.  In fact, DOE's 2014 Procedures for Liquefied Natural Gas Export Decisions establish that "[a]n application is ready for final action when DOE has completed the pertinent NEPA review process and when DOE has sufficient information on which to base a public interest determination."  Procedures for Liquefied Natural Gas Export Decisions, 79 Fed.

Reg. 48132, 48135 (Aug. 15, 2014).  In accordance with DOE's longstanding process, DOE is

collecting information through the Update to ensure that it has sufficient information to make

public interest determinations on pending applications.  The adjudication process has not changed,

and the presumption in favor of authorizing LNG exports absent an affirmative finding that an

export would be inconsistent with the public interest is still the law.  Simply put, the Update is not a

substantive rule; DOE is merely updating technical analyses used to inform determinations on LNG

export applications.  And even if the Update is construed as a procedural rule, as opposed to an

adjudication, procedural rules are exempt from notice and comment under the APA.  *See* 5 U.S.C. §

553(b)(A). Because the Update is not a rulemaking, DOE was not required to conduct notice and

comment procedures, and therefore Plaintiffs cannot succeed on Count III.

> ### c. Counts IV, VI, VIII, and IX: The Update is consistent with DOE's longstanding procedures, including its July 2023 decision, and is not a change that requires consideration of reliance interests or alternatives within the existing policy.

Counts IV, VI, VIII, and IX all rest on two flawed premises.  First, contrary to Plaintiffs'

assertion, DOE's Update is not a final agency action, *see supra* (I)(C) (explaining why there is no final

agency action here).  Second, even if the Update is a final agency action, it does not depart from

DOE's past policies and practices, as Plaintiffs allege.

Plaintiffs cite to several cases for the uncontroversial propositions that: (1) "agencies are free

to change their existing policies as long as they provide a reasoned explanation for the change,"

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); (2) an agency changing its position must

display awareness that it is doing so and be cognizant of reliance interests that may have been

engendered by the prior policy, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); and (3)

the reasoned analysis supporting the change in position must also consider alternative actions

"within the ambit of the existing policy."  *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909

(2020) (cleaned up).  But these standards only apply to changes in an agency's position.  Here, the Update is not a change that triggers these requirements.

As discussed in the preceding section, the Update is a periodic component of DOE's longstanding process for evaluating non-FTA export applications.  Under this informal adjudicatory process, DOE reviews applications for LNG exports to non-FTA countries through informal, case-by-case adjudication, and its review of export applications focuses on: "the domestic need for the natural gas proposed to be exported, (ii) whether the proposed exports pose a threat to the security of domestic natural gas supplies, (iii) whether the arrangement is consistent with DOE's policy of promoting market competition, and (iv) any other factors bearing on the public interest as determined by DOE, such as international and environmental impacts."  *See, e.g. Freeport LNG Expansion, L.P., at al.,* DOE/FECM Order No. 4961, at 27-28.

DOE previously commissioned two economic studies, issued in 2012, to support the growing number of LNG export applications being received at that time.  *See* July 2023 Order at 31-32.  In the intervening years, DOE has updated its economic studies twice—in 2015 and 2018.  *Id.*  Similarly, DOE first issued underlying environmental studies to support its public interest determinations in 2014 and issued an update to its lifecycle analysis for greenhouse gas emissions in 2019.  *Id.* at 32-33.  The D.C. Circuit has affirmed DOE's process and its reliance on these studies.[23]  *See Sierra Club I,* 867 F.3d at 203-04.

---

[23] The Center for LNG, which filed an amicus brief in this case, cites to regulations defining the scope of DOE's NEPA analyses as a limit on the environmental analyses that DOE may consider in Section 3(a) public interest determinations, then further alleges that considering environmental impacts in public interest determinations is an unexplained departure from DOE's previous policy.  *See* Amicus Brief at 6-7.  These arguments are mistaken.  DOE's public interest determinations are not controlled by its NEPA implementing regulations, and DOE has long considered environmental analyses as part of its public interest determination, as discussed herein.  Defendants reserve the right to seek leave to further respond in a separate filing.to the arguments raised in this amicus brief—and a separate proposed amicus brief recently lodged/filed by the American Petroleum Institute.

The goal of the Update is to take the existing technical studies and ensure they reflect current conditions and developments to make sure that authorizing additional exports will not have unknown and harmful economic and environmental impacts. DOE can hardly be faulted for updating studies that have become stale, among other reasons, due to massive changes in the scale of the global LNG export market since the last studies were completed, and such an update cannot be characterized as a paradigm shift when DOE has repeatedly used the same approach. *See* 79 Fed. Reg at 32263 (final actions on LNG export applications can only occur "when DOE has sufficient information on which to base a public interest determination.").

To that end, Count IV fails because the Update is entirely consistent with the order that Plaintiffs style—DOE's "July 2023 Decision." *See* Pls. Br. 14-15; Compl. ¶¶ 185-189. The July 2023 Decision resolved a petition by environmental groups for a broad rulemaking *to re-define DOE's framework* for assessing non-FTA export applications. *See* July 2023 Order. DOE denied the petition, declining to promulgate rules to re-design its process for considering non-FTA export applications. July 2023 Order at 1. DOE specifically affirmed the propriety of its current framework in which it implements "its LNG export program through a combined approach of individual adjudications and export-focused regulatory actions, rather than a single rulemaking of broad applicability." *Id.* at 4. DOE explained that this approach allows it "to maintain important flexibility to consider developing facts and circumstances in the U.S. and global LNG export markets, as well as evolving considerations related to the environment, global energy security, and other matters bearing on the public interest." *Id.* at 4–5. This is exactly what DOE is now doing through the Update: collecting updated information to inform the record for its adjudicatory approach to considering applications. Far from an unexplained departure from the July 2023 Decision, the Update fully conforms to the approach affirmed in that Decision.

Counts VI (Compl. ¶¶ 199-208, Pls. Br. 15-16), VIII (Compl. ¶¶ 213-216), and IX (Compl. ¶¶ 190-198) likewise fail on the same grounds—the Update is part of a well-established process for obtaining information upon which the public interest determination turns. The Update therefore does not trigger a requirement that DOE give a reasoned explanation for a change in position,[24] weigh interests relying on a prior policy, or consider alternatives within the scope of a prior policy. Plaintiffs have not demonstrated a likelihood of success on Counts IV, VI, VIII, and IX.

    **d. Counts V, VII and X: DOE's Update is not arbitrary and capricious because the Update is reasoned, DOE did not fail to consider important aspects of the problem, and DOE was not required to and did not fail to conduct a cost/benefit analysis.**

Counts V (Compl. ¶¶ 190-198), VII (Compl. ¶¶ 209-212) and X (Compl. ¶¶ 212-223) fail because DOE considered all aspects of the problem and weighed the cost of a pause against the benefit of making informed and durable public interest determinations.

As shown in a recent order granting a non-FTA export authorization, DOE routinely provides its reasoning for why the agency needs to monitor and may need to update the information it relies upon in making its public interest determination:

> DOE will continue taking a measured approach in reviewing the other pending applications to export natural gas. Specifically, DOE will continue to assess the cumulative impacts of each succeeding request for export authorization on the public interest with due regard to the effect on domestic natural gas supply and demand fundamentals.

> The reasons in support of proceeding cautiously are several: (1) the 2018 LNG Export Study, like any study based on assumptions and economic projections, is inherently limited in its predictive accuracy; (2) applications to export significant quantities of domestically produced LNG are still a relatively new phenomen[on] with uncertain

---

[24] Even though DOE was not required to articulate its reasoning for engaging in a well-established administrative process, the Update is nonetheless well-reasoned. Though Plaintiffs assert in Count V that DOE has "provided no reasoning whatsoever" for its actions (Compl. ¶ 197), DOE has broadcast the reasons for updating the technical analyses it uses to inform its public interest determinations required by Section 3(a) of the Natural Gas Act. As noted throughout, the LNG export market has grown exponentially since DOE last updated the studies underpinning its public interest analysis. The Update is necessary to make sure DOE is making decisions based on current economic and environmental realities—not the situation as it existed in 2018 or 2019.

impacts; and (3) the market for natural gas has experienced rapid reversals in the past and is again changing rapidly due to economic, geopolitical, technological, regulatory, and climate change-related developments.  The market of the future very likely will not resemble the market of today.  In recognition of these factors, DOE intends to monitor developments that could tend to undermine the public interest in grants of successive applications for exports of domestically produced LNG and to attach terms and conditions to LNG export authorizations to protect the public interest.

*Sabine Pass Liquefaction, LLC*, DOE/FECM Order No. 4800, Docket No. 19-125-LNG, Order Granting Long-Term Authorization to Export Liquefied Natural Gas to Non-Free Trade Agreement Nations, at 67-68 (Mar. 16, 2022).  Long before the Update and temporary pause on authorizations were announced, DOE acknowledged that the public interest is not static, and the Natural Gas Act's public interest mandate implicitly requires periodic updates to the information underpinning that decision.  At present, DOE has concluded that it "does not have sufficient information on which to base [its public interest] determination." Commonwealth Notice at 14; Sweeney Decl. ¶¶ 5-18.  This conclusion reflects the massive changes in the size and complexity of the LNG export market since DOE last updated its underlying technical analyses.  DOE last updated the economic study underlying the public interest analysis in 2018 and last updated the environmental analyses in 2019.  *See* DOE Announcement.  Since that time, operating LNG export capacity has more than tripled.  *Id.*  Beyond this dramatic growth in U.S. LNG production and exports, changes in geopolitics and a better understanding of LNG markets, natural gas supplies, and emissions have further underscored the need for DOE to update its analyses so that decisions on non-FTA export applications can "be made based on the latest market information and analytical approaches."  *Id.*  All of these profound changes—which DOE considered and explained in a reasoned manner—compelled DOE's conclusion that the Update is necessary.

To the extent Plaintiffs allege that DOE did not consider myriad issues, such as impacts on national security, state revenues, employment opportunities, funding for schools and charities, and pollution allegedly caused by increased reliance on foreign energy sources, *See* Pls. Br. 17; Compl. ¶

211, Plaintiffs both miscomprehend the scope of the Update and seek to impose an impossible, circular burden on the agency.  First, Plaintiffs seem to confuse the Update with many of the issues DOE will consider when making a final decision on whether to authorize LNG exports.  Though the updated economic and environmental analysis, once complete, will most certainly inform DOE's ultimate decisions on pending non-FTA export applications, DOE will ultimately consider a wide range of other variables, including many of those identified by Plaintiffs, in making its final public interest determinations.  Second, Plaintiffs effectively seek to require DOE to make its public interest determinations before acquiring the information it needs to make such determinations.  Plaintiffs have the sequence backwards.  If DOE were required to determine the full range of effects of acquiring updated economic and environmental information before initiating the process to acquire that information, it would be caught in an endless loop that it could never complete.

To similar effect, in Count X, Plaintiffs mistakenly point to an alleged failure to consider the costs and benefits of the Update as evidence that DOE failed to consider an important aspect of the problem.  Compl. ¶ 223.  But, again, the limited purpose of the Update is to revise the stale economic and environmental studies DOE uses in its public interest analysis, and DOE is not legally required to justify that judgment with a cost-benefit analysis.  And in any event, DOE did weigh the costs and benefits of the Update, based on then available information.  DOE specifically found that the Update and the attendant pause presented no risk to the current and near-to-medium-term global supply of LNG, and that it would affect neither the 12 Bcf/d of export capacity under construction, nor the over 20 Bcf/d of already authorized exports not yet under construction.  DOE Announcement at 1.  DOE also considered the benefits of the Update in providing information that DOE will use to mitigate the risks of higher domestic energy prices and potential impacts to energy security and the environment.  *Id.* at 2.  And finally, where, as here, DOE's decision is compelled by statute and the Update is necessary for DOE to make that decision, the agency must satisfy its

statutory duty regardless of any costs that may result from a delay in final decisions.  *Cf. Painsolvers, Inc. v. State Farm Mut. Auto. Ins. Co.*, 685 F. Supp. 2d 1123, 1139–40 (D. Haw. 2010) ("[I]t is an extraordinary request to ask Defendant to take steps that would prevent it from fulfilling its statutory duties. . . .").

For all these reasons, Plaintiffs have failed to demonstrate a likelihood of success on Counts V, VII, and X.

### e. Count XI: The Update is not pretext; it is sound policy in conformance with statutory obligations.

Plaintiffs claim DOE's rationale for the Update—namely ensuring DOE relies on current data and metrics to grant or deny the export authorizations at issue—is pretext for "cav[ing] to a sustained political pressure campaign in an election year."  Compl. ¶¶ 224–227.  The sound policy basis for the Update shows otherwise.

DOE has explained, the Update is driven by the exponential growth in the LNG export market and the need to gather current economic and environmental data to inform the public interest determination, something that has not been done in five plus years.  DOE Announcement; DOE Fact Sheet; Sweeney Decl. ¶ 12.  Moreover, since announcing the Update, DOE has repeatedly reaffirmed the presumption in favor of authorizing LNG exports—further undercutting Plaintiffs' suggestion that the Update was politically motivated to appease environmental interests who oppose additional LNG exports.  DOE is pursuing the statutory objective that Congress gave it—to make sound public interest decisions based on reliable information.

Even if plaintiffs had provided evidence that the Update was motivated by the Administration's broader priorities, "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019).  Agency policymaking is not a "rarified technocratic process, unaffected by political considerations or the

presence of Presidential power," *id.* (quoting *Sierra Club v. Costle*, 657 F.2d 298, 408 (D.C. Cir. 1981)), nor should it be in a democratic system where administrative agencies must be responsive and accountable to policymakers.  In addition, in reviewing an agency decision, a court is limited to evaluating the agency's "contemporaneous explanation in light of the existing administrative record . . . [t]hat principle reflects the recognition that further judicial inquiry into executive motivation represents a substantial intrusion into the workings of another branch of Government and should normally be avoided."  *Id.*  Further, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons."  *Id.*

Here, DOE has stated sound reasons for undertaking the Update, including safeguarding the integrity of the process by which DOE grants or denies export authorizations in a transforming energy sector, *e.g.* using up-to-date analyses on "current authorized exports compared to domestic supply, energy security, [and] greenhouse gas emissions."  ECF No. 1 ¶ 97 (citing the DOE Announcement).  DOE's use of a sound methodology in reviewing the export authorization applications, in turn, advances public interests, including national energy affordability and independence.  *Id.*  Though Plaintiffs seek to freeze DOE's prior analyses in time and assume that they remain perpetually valid, DOE has acted entirely reasonably in concluding that it needs to complete the Update to assure it does not rely upon stale, inaccurate information in making its public interest determinations.  Given the reasonable basis for DOE's initiation of the Update, Plaintiffs are unlikely to succeed in their claim under Count XI that the Update is pretext for a solely political decision.

### f.    Count XII: The Congressional Review Act does not apply to the Update.

Plaintiffs claim, without support, that the Update violates the Congressional Review Act ("CRA"), 5 U.S.C. § 801 *et seq.*, which identifies certain procedures an agency must follow to notify Congress of promulgated rules.  ECF No. 1, ¶¶ 229–232.  The CRA provides that "[n]o

determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. This prohibition "denies courts the power to void rules on the basis of agency noncompliance with the Act." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 346 (D.C. Cir. 2018) (quoting *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009)). Even without the statutory bar precluding judicial review of a purported violation of the CRA, Plaintiffs' CRA claim would still fail. As explained in connection with Count III, the Update is not a rule at all, but is instead technical analyses to be used to support informal adjudication of non-FTA export applications and their public interest determination. Claim XII fails as a matter of law, and therefore Plaintiffs are unlikely to succeed on this count.

> **g. Count XIII: The Update does not unreasonably delay DOE's approval of pending or future export applications.**

In their sole challenge to alleged agency inaction under the APA, Plaintiffs claim under Count XIII that the "delay in processing applications" is unreasonable per 5 U.S.C. § 706(1). ECF No. 1, ¶¶ 234–236. Section 706(1) of the APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Although "[f]ailures to act are sometimes remediable under the APA," they are "not always" so. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004). Section 706(1) "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or to 'take action upon a matter, without directing how it shall act.'" *Id.* at 64. Section 706 vests federal courts with the discretion to decide whether agency delay is unreasonable "when an agency is required to act—either by organic statute or by the APA— within an expeditious, prompt, or reasonable time." *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999). Agency delay in "face of a clear statutory duty (*but in the absence of a statutory deadline*) must be 'egregious' before it can convert agency inaction into a final action reviewable under the APA or warrant mandamus." *Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 616 (7th Cir. 2003) (collecting cases) (emphasis added).

To evaluate whether a plaintiff has met the "difficult burden" of showing that the government's purported delay is unreasonable, the D.C. Circuit has developed six guiding factors, *see TRAC*, 750 F.2d at 80, which have been adopted by the Fifth Circuit. *See Ingalls Shipbldg., Inc. v. Asbestos*, 17 F.3d 130, 133 (5th Cir. 1994). Those factors are:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.

*Id.* (internal citations and quotations omitted). The first factor is the "most important." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008). In assessing whether an agency follows "a rule of reason," a court must "evaluate the length of the delay in light of 'the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency.'" *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 340 (D.C. Cir. 2023) (quoting *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003)).

Plaintiffs have directly contradicted the basis for Count XIII by stating "Plaintiffs challenge an affirmative agency action," Pls. Br. 22 n.3, and have otherwise failed to provide any argument either to substantiate the claim or to reconcile it with their theory that DOE has affirmatively banned LNG exports. However, even considering the merits of this claim, the Update is not unreasonable delay per the six *TRAC* factors. 750 F.2d at 80. First and foremost, under the first factor, any delay associated with authorizing exports because of the Update will be short-term because the process will be concluded by the first quarter of 2025. That does not violate a rule of reason. Given the complexity of the economic and environmental issues to be addressed by the Update—implicating massive changes in the volume of LNG exports from the United States since

DOE last updated its studies—DOE's timetable for completing the Update early next year is entirely reasonable and consistent with its pause in 2012-2013, when it updated an economic study. Indeed, the scope of the temporary deferral of final decisions is narrowly tailored to those non-FTA export applications subject to the forthcoming, updated analyses, as the Update will not affect already authorized exports and is subject to exception for unanticipated and immediate national security emergencies. ECF No. 1, ¶ 97 (citing DOE Announcement). Notably, Commonwealth LNG LLC applied to the State of Louisiana for a coastal use permit in 2019, which was the only step precluding the FERC from finalizing Commonwealth LNG's siting authorization; however, Louisiana has yet to process that permit request five years later. *See* Wade Decl. ¶¶63–64. DOE's update of the economic and environmental studies underpinning its public interest analysis is more far-reaching and complicated than Louisiana's assignment to issue a coastal use permit and will be completed in approximately 12 months.

Nor do the remaining factors support Plaintiffs' claim. Under the second and third factors, Congress has provided no timetable for completion of the Update beyond the bounds of reasonableness set forth in the APA, 5 U.S.C. § 555(b), and the Update poses no risks to human health and welfare. Far from it, the Update seeks to understand the effects of additional LNG exports on domestic energy prices and ensure that such exports are not contrary to the public interest. Under the fourth factor, enjoining the Update would compel DOE to act on pending applications without the information it deems necessary to make a valid public interest determination, which would conflict with its statutory duty to make informed public interest decisions. Under the fifth factor, Plaintiffs can show no prejudice, because their alleged injuries are entirely speculative and uncertain to occur, as explained in connection with Plaintiffs' lack of standing. Even if Plaintiffs had shown some limited economic prejudice, it would be outweighed by the benefits from DOE's use of up-to-date analyses, which protects American consumers and

businesses against unintended or unnecessary energy cost increases, among other things.  Finally, the sixth factor is largely neutral, given Plaintiffs' failure to show any impropriety by DOE in connection with the Update.

Plaintiffs refer to *Ensco Offshore Co.*, 781 F. Supp. 2d at 332, but the facts of *Ensco* are distinguishable.  ECF No. 1, ¶ 236.  In *Ensco,* plaintiffs sought an order for the United States to process five deepwater drilling permit applications that were pending for many months.  781 F. Supp. 2d at 334-35.  Plaintiffs' motion for injunctive relief came about one year after a catastrophic explosion and oil spill, after which the United States issued a "blanket moratorium" on all deepwater drilling in the Gulf of Mexico.  *Id.*  Before the oil spill, drilling permits were processed in about two weeks.  *Id.*  The court held the government unreasonably delayed the processing of plaintiffs' drilling permits and ordered the government to take no more than 30 days to process the permits.  *Id.* at 338-39.  The court reasoned "[a]s the first anniversary of the Deepwater Horizon disaster draws near, any reason that would have justified delays has, under a rule of reason, expired" and "[b]eginning to process permit applications will restore normalcy to the Gulf region and repair the public's faith in the administrative process."  *Id.* at 340.

Here, unlike in *Ensco,* DOE's temporary deferral of final decisions on a limited number of non-FTA export applications is not the result of a "blanket moratorium" or unreasonable delay in processing a permit.  *Id.* at 339.  Rather, the Update is short-term and narrowly tailored to a single category of pending export authorization applications to ensure DOE relies upon up-to-date and reliable information in making public interest determinations in the face of a rapidly expanding natural gas sector.  ECF No. 1, ¶ 97 (citing the January 26, 2024 announcement).  Previously authorized exports are unaffected.  Sweeney Decl. ¶ 33.  Further, unlike in *Ensco*, the deferral of determinations on pending non-FTA export applications has been in place for a few months, not more than a year, and non-FTA export applications are not processed according to the

extraordinarily short timeline for processing drilling permits.  Plaintiffs are unlikely to succeed on the merits of Count XIII.

### h. Count XIV: Because DOE acted within the statutory authority conferred on it by Congress, the Update does not violate the separation of powers or the Foreign Commerce Clause.

In Count XIV, Plaintiffs claim that "[a] ban on LNG exports is a regulation of foreign commerce," and that DOE thereby infringes on Congress's authority to regulate commerce with foreign nations in violation of U.S. Const. art. I, §§ 1, 8, cl. 3.  ECF No. 1, ¶ 238-241.  This claim fails as a matter of law for two reasons.  First, the claim is based on the false premise repeated throughout Plaintiffs' Complaint that the Update "bans" LNG exports.  Again, the Update does no such thing and instead merely temporarily delays a small number of final non-FTA export application decisions while DOE updates the five-year old economic and environmental analyses used to authorize such exports.  ECF No. 1, ¶ 99 (citing the January 26, 2024 "fact sheet" announcement).  Second, Plaintiffs' claim ignores that Congress in Section 3(a) has expressly directed DOE to determine whether non-FTA exports would be inconsistent with the public interest.  15 U.S.C. § 717b.  Because the Update is within statutory authority conferred on DOE by Congress, it does not violate separation of powers or the Foreign Commerce Clause.  Count XIV fails as a matter of law, and therefore Plaintiffs cannot demonstrate a likelihood of success on the merits.

### i. Counts XV and XVI: DOE, its officials, and the President acted within the scope of their authority.

In Plaintiffs' final two claims, Counts XV and XVI, Plaintiffs allege that the Update is beyond the authority of DOE, its officials, and the President.  ECF No. 1, ¶¶ 243–244, 246–247.  "Judicial review for *ultra vires* agency action rests on the longstanding principle that if an agency action is unauthorized by the statute under which the agency assumes to act, the agency has violated the law and the courts generally have jurisdiction to grant relief."  *Fed. Express Corp. v. U.S. Dep't of*

58

*Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (cleaned up).  "This nonstatutory form of judicial review survived the enactment of the APA."  *Id.*  However, *ultra vires* claims are confined to "extreme" agency error or "blatantly lawless" agency action; "garden-variety errors of law or fact are not enough."  *Id.* at 765 (citing *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493–94 (D.C. Cir. 1988)); *Oestereich v. Selective Serv. Sys. Loc. Board No. 11*, 393 U.S. 233, 238 (1968).  Further, an *ultra vires* claim must demonstrate a failure to perform an unmistakable statutory mandate or a purely ministerial act.  *See Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022) ("a challenged action must contravene a clear and specific statutory mandate to be susceptible to *ultra vires* review") (cleaned up); *Stem v. Gomez*, 813 F.3d 205, 214 (5th Cir. 2016) (an *ultra vires* claim must allege and prove that a state official acted without legal authority or failed to perform a purely ministerial act).

Here, Plaintiffs do not allege, much less establish, how DOE's Update—which includes a temporary deferral in final decisions of export authorization applications—constitutes "extreme" agency error or "blatantly lawless" agency action so as to trigger *ultra vires* review.  *Fed. Express Corp.*, 39 F.4th at 765.  Nor can they, as the Natural Gas Act mandates authorizing natural gas exports only if the export "will not be [in]consistent with the public interest."  *See* 15 U.S.C. § 717b(a); ECF No. 1, ¶ 97 (citing DOE Announcement).  Likewise, the President's statement on the Update is entirely consistent with DOE's goal to modernize its technical analyses, which is what is required for DOE to make an informed public interest determination.  There is no *ultra vires* action where an agency or executive official acts in accordance with a statutory mandate.

For all the foregoing reasons, Plaintiffs fail to satisfy the first *Winter* factor—a likelihood of success on the merits of any of their other claims—as they must to demonstrate entitlement to preliminary injunctive relief.

**B.  The Update will not cause Plaintiffs any irreparable harm.**

Plaintiffs also fail to satisfy the second *Winter* factor, which requires a showing that they will sustain irreparable harm if the Court denies injunctive relief.  Even if Plaintiffs establish an injury-in-fact for Article III standing, they cannot show irreparable harm for a preliminary injunction, which "is a higher burden than that of standing due to the drastic remedy that is a preliminary injunction." *Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478, 498–99 (W.D. La. 2022) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

"A showing of irreparable harm requires a demonstration of harm for which there is no adequate remedy at law."  *Louisiana*, 55 F.4th at 1033–34 (quotations omitted) (quoting *Daniels Health Scis., LLC. v. Vascular Health Scis., LLC,* 710 F.3d 579, 585 (5th Cir. 2013)); *see also Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies").  To show irreparable harm, Plaintiffs must demonstrate that they will suffer an injury that is "both certain and great; it must be actual and not theoretical."  *Wis. Gas Co.*, 758 F.2d at 674; *see also Louisiana*, 55 F.4th at 1034 (explaining that harm must be more than "speculative" to be considered irreparable).  Such harm "must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976) (quotations omitted).

Plaintiffs argue that the Update will cause irreparable harm in the form of future tax and royalty revenue losses related to the extraction, production, and transportation of natural gas.  ECF No. 13-1, at 19–10; *see also* ECF No. 1, ¶¶ 114-153.  As a preliminary matter, Plaintiffs cannot claim the Update will directly cause irreparable harm, because their asserted injuries arise from the government's allegedly unlawful regulation of someone else—namely, the seven applicants currently subject to the Update.  In these circumstances, they have a higher burden to show injury.  *Lujan*, 504

U.S. at 562.  Further, Plaintiffs do not claim specific tax revenue losses, but rather projections of potential tax revenue losses over a period of years—years that well post-date the Update and/or the conclusion of this litigation.  *See, e.g.* ECF No. 13-1at 20 ("Texas conservatively projects a loss of $259.8 million in production tax revenues over five years"); *Wis. Gas Co.*, 758 F.2d at 674 (irreparable harm is "certain" and "actual").  As discussed extensively above, supra (I)(B)(1) & (2), such possible losses are inherently speculative and predicated upon a series of unfounded assumptions that fail to demonstrate injury that is "actual and not theoretical."  *Wis. Gas Co.*, 758 F.2d at 674; *see also Louisiana*, 55 F.4th at 1034.

Plaintiffs also argue the Update will cause "reduced energy security," by "threaten[ing] Plaintiffs' ability to access reliable energy," but again, such harm is neither certain nor imminent so as to constitute irreparable harm.  ECF No. 13-1at 24; *Wis. Gas Co.*, 758 F.2d at 674.  Though public safety interests can constitute irreparable harm, Plaintiffs do not show how DOE's Update – which will consider whether removing significant amounts of LNG from the domestic marketplace by way of exports is inconsistent with the public interest – harms domestic energy security.  *Texas v. United States*, 555 F. Supp. 3d 351, 436 (S.D. Tex. 2021).  It is unclear from Plaintiffs' pleadings what support, if any, they have for their assertion that a temporary deferral on authorizing additional LNG exports will harm domestic energy supplies.  That assertion seems to defy traditional notions of supply and demand because, by definition, LNG that is exported is inaccessible to domestic markets.  If anything, the Update promotes energy security by ensuring that DOE understands the effects of future export approvals on domestic energy prices, our allies abroad, energy security, and other public interest considerations.  Sweeney Decl. ¶ 30.  Plaintiffs also outright ignore that the Update "is subject to exception for unanticipated and immediate national security emergencies."  ECF No. 1, ¶ 97 (citing the January 26, 2024 announcement).

Plaintiffs cite *Texas v. U.S. Envtl. Prot. Agency*, 829 F.3d 405 (5th Cir. 2016), where the Fifth

Circuit found the EPA had caused "institutional injury" through its adoption of a final rule that

disapproved state plans for controlling haze and imposing a federal plan contrary to the "cooperative

federalism" of the Clean Air Act.  *Id.* at 434 (cited by Pls. Br. 24).  But here, the Update is neither

agency rulemaking—as explained above—nor does the Natural Gas Act include provisions that

parallel "the system of cooperative federalism enshrined in the Clean Air Act."  829 F.3d at 433.

Likewise, Plaintiffs' claim that DOE irreparably harmed Plaintiffs by failing to conduct a notice and

comment process for the Update, Pls. Br. 23–24, fails for related reasons and because any procedural

harm can be remedied by a remand ordering DOE to allow notice-and-comment.  Again, the Update

is not rulemaking per 5 U.S.C. § 551(5) but is instead a component of the informal adjudication

process that DOE will use to make public interest determinations on pending non-FTA export

applications.

For all these reasons, Plaintiffs fail to establish that an injunction is necessary to avoid

irreparable harm under the second *Winter* factor.

### C. The equities lean sharply in favor of allowing DOE to complete its public interest Update as contemplated by the Natural Gas Act, and the Update is in the public's interest.

Finally, Plaintiffs also fail to satisfy the third and fourth *Winter* factors because the equities

and the public interest tip in DOE's favor.  When the government is a party, the analyses of the

public interest and balance of equities merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  When

addressing these factors, "courts 'must balance the competing claims of injury and must consider the

effect on each party of the granting or withholding of the requested relief.'"  *Winter*, 555 U.S. at 24

(quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

Here, Plaintiffs hypothesize that investment in their states and the associated tax and/or

royalty revenues they *may* receive will be *delayed* by approximately one year.  *See* Compl. ¶¶ 114–155;

Pls. Br. 27-30, 33. By contrast, the relief they appear to seek—forcing DOE to proceed with public interest determinations before the conclusion of the Update—would: (1) force DOE to make uninformed public interest determinations that would likely result in additional, prolonged litigation, which could create significantly longer delays for applicants than the Update itself; and (2) frustrate the Executive Branch's ability to function by allowing parties to challenge every step of the administrative process no matter how large or small, substantive or procedural, or final or tentative. Plaintiffs' desire to force DOE to ignore its statutory duty to make an informed public interest determination should not be countenanced, especially when the available evidence suggests that the current economic effects of LNG exports are much more complicated than the rosy economic picture painted by Plaintiffs, Compl. ¶¶ 40, 41, 68, 69. *See* Sweeney Decl. ¶¶ 54–61.

It is incontrovertible that "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Section 3(a) of the Natural Gas Act is "guided … by a standard of a consumer-based 'public interest.'" *W. Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 865 (D.C. Cir. 1982). As the D.C. Circuit noted, DOE must "keep at least one eye upon the consumers likely to be affected by a proposed action." *Id.* While that "does not mean that the consumers' interests must always prevail[,] [] they must be recognized." *Id.* Plaintiffs' request for a preliminary injunction effectively asks this Court to force DOE to take its eye off the ball.

Necessarily, the Natural Gas Act's statutorily mandated public interest determination requires DOE to study and consider how potential export authorizations will affect the economy. Since DOE last updated its LNG-focused economic analysis in 2018, U.S. LNG export capacity has more than tripled. *See* DOE, *Unpacking the misconceptions surrounding the DOE's LNG update* (Feb. 8, 2024), https://perma.cc/NSV3-TKNK (emphasis added). There is some indication that this

exponential growth in LNG exports may increase domestic energy prices, which in turn could harm other American businesses and households.  For example, the Energy Information Administration (EIA)'s 2023 long-term outlook found that "higher LNG exports create a tighter domestic natural gas market (all else held equal), increasing domestic natural gas prices."  *See* U.S. Energy Info. Admin., Annual Energy Outlook 2023: Issues in Focus: Effects of Liquefied Natural Gas Exports on the U.S. Natural Gas Market (May 23, 2023), https://perma.cc/Y5LJ-C8VW.  DOE has also received comments from business and political leaders raising similar concerns that exponential increases in LNG exports may have negative impacts on domestic energy prices.  *See supra* at 15-16; *see also* Sweeney Decl. ¶ 17.  DOE's decision to study the potential impacts of increasing LNG exports on other American businesses and consumers is in the public's interest; and Plaintiffs' suggestion that DOE grant export applications without up-to-date information encourages uninformed and irresponsible government decision-making—which is not in the public's interest.

If the Court were to find, however, that a rushed processing of export applications is more important than a measured analysis of the impacts of those applications on the Nation as a whole, Plaintiffs' requested relief—"vacating" or "staying" the so-called "ban"—will nevertheless not expedite LNG exports.  To the contrary, any applications granted based on outdated economic and environmental analyses would be susceptible to challenge in an appropriate court of appeals. Indeed, when DOE's authorizations have been challenged, those challenges have withstood scrutiny by the D.C. Circuit Court of Appeals in large part due to the strength of DOE's administrative record.  *See, e.g., Sierra Club I*, 867 F.3d at 189 (rejecting Sierra Club's Natural Gas Act and NEPA challenges to the Freeport LNG export authorization based on a review of DOE's Addendum, economic studies, and lifecycle greenhouse gas analysis); *Sierra Club v. U.S. Dep't of Energy*, 703 F. App'x  1, 2 (D.C. Cir. 2017) (rejecting similar challenges to the authorization of LNG exports from three facilities).  It is foreseeable that another court of appeals could remand any granted

applications as arbitrary and capricious, finding that DOE relied on stale technical analyses.  Simply put, it is in the applicants' interest that DOE finish updating its technical analyses so that any future applications that may be granted can withstand a § 717(r) challenge.

For all these reasons, Plaintiffs have failed to satisfy any of the *Winter* factors and are not entitled to preliminary injunctive relief.  To the extent the Court nonetheless grants Plaintiffs any relief under their motion, that relief should be narrowly tailored.[25]

## CONCLUSION

For all the foregoing reasons, Plaintiffs' Complaint should be dismissed for lack of jurisdiction and failure to state a claim.  If the Court were to deny our motion to dismiss, it should nonetheless deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted this 6th day of May, 2024.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

/s/ J. Scott Thomas

J. SCOTT THOMAS (VA Bar 86439)

---

[25] Plaintiffs are not entitled to a universal or nationwide injunction under traditional equitable principles.  *See Labrador v. Poe*, 144 S. Ct. 921(2024) (Gorsuch, J., concurring) (slip op., at 4-5; 12-13); *see also id.* at 10 n.4 (Kavanaugh, J., concurring).  Plaintiffs' request for universal relief "goes well beyond simply maintaining the status quo" and is therefore "particularly disfavored." *Martinez*, 544 F.2d at 1243.  After all, both before and after the DOE Announcement, the agency still needed to gather and evaluate information necessary to support final public interest determinations on pending non-FTA export applications.  Plaintiffs' broad and vague request to have this Court "stay" or "enjoin [DOE] from enforcing the LNG Export Ban," Pls. Br. at 25, would also inevitably impair the interests of parties who are not before the Court and whose interests in the Update are no less weighty than Plaintiffs' interests and would certainly interfere with ongoing Natural Gas Act proceedings that would affect non-party applicants.  Finally, Plaintiffs are not entitled to circumvent traditional equitable principles by requesting relief under 5 U.S.C. § 705, which permits a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" only "to the extent necessary to prevent irreparable injury."  5 U.S.C. § 705.  Accordingly, while Defendants believe the motion should be denied in its entirety, the Court should at a minimum ensure that any relief is narrowly tailored to prevent injury to individual States that have demonstrated specific, irreparable harm.

KATHARINE LAUBACH (CO Bar 42693)
MAGGIE WOODWARD
Trial Attorneys
Natural Resources Section
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-3553 (Thomas)
Telephone: (202) 305-8568 (Laubach)
Telephone: (202) 305-4224 (Woodward)
jeffrey.thomas2@usdoj.gov
katharine.laubach@usdoj.gov
maggie.woodward@usdoj.gov

JEFFREY N. CANDRIAN (CO Bar 43839)
Trial Attorneys
Natural Resources Section
999 18th St., South Terrace, Suite 370
Denver, Colorado 80202
Ph: 303-844-1382 (Candrian)
Email: Jeffrey.candrian@usdoj.gov

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2024, I electronically filed **Defendants' combined motion to dismiss and opposition to Plaintiffs' motion for stay or preliminary injunction** with the Clerk of Court using the ECF system, which will automatically send email notification to the attorneys of record.

*/s/ J. Scott Thomas*
JEFFREY SCOTT THOMAS